Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California  92014
(858) 342-8360
Fax: 858-755-6348
ellendowd@sbcglobal.net

**Attorney for Plaintiff, MARY STRUBLE, As Conservator for CS**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MARY STRUBLE, As Conservator for CS,

                    Plaintiff,

v.

FALLBROOK UNION HIGH SCHOOL
DISTRICT, a Local Educational Agency
                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:   **07 CV 2328 LAB CAB**

COMPLAINT/APPEAL OF OFFICE OF
ADMINISTRATIVE HEARINGS, SPECIAL
EDUCATION DIVISION FOR PARTIAL
REVERSAL OF DECISION AND
ATTORNEY FEES AND COSTS

[20 U.S.C. § 1400, ET SEQ

        Plaintiff, MARY STRUBLE, ("Plaintiff") as Conservator for CS ("Student"), alleges

against Defendant, FALLBROOK UNION HIGH SCHOOL DISTRICT, a local educational

agency ("The District") as follows:

                    JURISDICTION AND VENUE

        1.        This court has original jurisdiction of this action under 28 U.S.C.

§ 1331 because it arises under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400,

et seq., section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Civil Rights Act, 42

U.S.C. § 1983.  This is an action to appeal and reverse the decision of the State of California,

Office of Administrative Hearings, Special Education Division in OAH Case Number

N2007090067 entered on November 20, 2007.

        2.        Jurisdiction is conferred by 28 U.S.C. § 1343.

3.    Venue is proper in the Southern District of California, under 28 U.S.C. § 1391 (b) because Plaintiff and the District are located in this judicial district and the claim arose in this judicial district.

4.    Exhaustion of administrative remedies has been satisfied, as Plaintiff has pursued and exhausted all administrative remedies through the state due process administrative hearing, and have received a final administrative decision with the right to appeal the decision within 90 days pursuant to California Education Code § 56505(i). Based upon the errors of law, as detailed below, Plaintiff also requested Modification of Decision, which the administrative office denied.

THE PARTIES

5.    Student is an 18 year-old conserved young man who last attended 12th grade at Fallbrook High School, within the Fallbrook Union High School District. Student qualifies for special education under the eligibility category of Autism (AUT).

6.    Plaintiff and Student reside within the jurisdictional boundaries of Fallbrook Union High School District.

7.    The District's offers of a free, appropriate public education (FAPE) in the 2005-2006 and 2006-2007 school years were the subject of an Administrative Due Process Complaint filed by the Student against Defendant on September 4, 2007, California Office of Administrative Hearings (OAH), Case No. N2007090067. An Administrative Due Process hearing was held in the underlying matter on October 16-19, 2007. A Decision was rendered partially in favor of Student, and erroneously, partially in favor of the District on November 20, 2007. A true copy of the Decision appealed from is attached hereto as Exhibit "1" ("the Decision").

8.    Defendant, Fallbrook Union High School District is, at all times relevant to this complaint, a school district duly organized and existing under the laws of the State of California as a local educational agency ("LEA"). At all times relevant to this complaint, the District had responsibility for the provision of education to Plaintiff and to discharge all duties imposed upon on the District by law.

## THE ISSUES PRESENTED AT HEARING

9.      The issues to be determined at Hearing and set forth in the Decision are:

(1)  Did the District fail to offer and provide a free appropriate public education (FAPE) to Student during the 2005-2006 school year when student was in eleventh in one or more of the following ways:

     a.      Failure to provide parents with options for Student's graduation.

     b.      Failure to write handwriting goals.

     c.      Failure to provide occupational therapy services for handwriting.

     d.      Failure to take appropriate action when student failed to make progress to meet goals.

     e.      Failure to provide a behavior support plan, and/or failure to write adequate behavior goals.

(2)  Did the District fail to offer and provide a FAPE to Student during the 2006-2007 school year when Student was in the twelfth grade in one or more of the following ways:

     a.      Failure to write handwriting goals.

     b.      Failure to provide social skills training.

     c.      Failure to provide occupational therapy services for handwriting.

     d.      Failure to timely provide communication logs.

     e.      Failure to timely provide a behavior support plan.

     f.      Staff insensitivity to words and actions that trigger anxiety in Student.

     g.      Staff insensitivity to parental concerns.

     h.      Failure to provide any educational program (such as home hospital or itinerant teacher) after May 3, 2007.

     i.      Failure to provide parents or Student with options for graduation, and/or predetermination of placement.

     j.      Failure to provide a safe learning environment.

10.      The gravaman of the Due Process Complaint filed by Student with OAH was that the District violated procedural provisions of IDEA, when it failed to inform Plaintiff and

Student of options for graduation, including attainment of a high school diploma, and only offered a pre-determined, "take-it-or-leave-it" placement at Fallbrook High School Transition Program, at which Student could not earn a high school diploma.

11. The remedy being sought for Student was for the District to provide compensatory education to Student by the District funding a non-public placement where Student could attain a high school diploma.

12. In accordance with the reauthorization of Individuals With Disabilities Education Act (IDEA) 20 U.S.C. § 1400 et seq. (2005), only the party filing the Due Process Complaint can present issues and request relief. Therefore, at the Administrative Due Process Hearing, the District did not raise independent issues.

## ERRORS OF FINDINGS OF FACT AND LAW IN THE DECISION

13. As stated in Student's Motion For Modification of Decision, attached hereto as Exhibit "2," the issues provided that any one or more could be found in Student's favor, which could be sufficient to find a denial of FAPE by the District, and which could give rise to the remedy of compensatory education. The Decision correctly states that under case law, a two-prong approach is used to determine whether there was a denial of FAPE, with the first prong determining whether there were procedural violations were significant enough to constitute a denial of FAPE, and if not, then the second prong is used to determine whether the District substantively violated Student's rights and denied FAPE.

14. In the Decision, Exhibit "1" hereto, Conclusions of Law 4-12 determine that Student was denied a FAPE due to the District's procedural violations of not communicating graduation options to Student and Plaintiff, and by having a predetermined placement which significantly impeded Student's parents' opportunity to participate in the Decision making process.

15. Since the first prong for procedural violations constituting a denial of FAPE was met, and, as stated in the issues, Paragraph 9, above, only one of more finding(s) of violations by the District is necessary for Student to prevail, the Decision should not have decided all of the various substantive violations, because Student already proved a procedural denial of FAPE.

Student is prejudiced by the Decision's unnecessary dicta about all if the remaining issues, because, if counted issue by issue (which, in itself is not the standard, it is quality of violation, not quantity), it appears that the District prevailed on more issues, which is bound to create additional litigation, particularly over the provision of attorney fees.

16.    The Student prevailed on the ultimate issue in the case, and also prevailed, in part, on the remedy, as the Decision states that Student should be able to work toward his high school diploma.

17.    As stated in Student's Supplement To Motion For Modification of Decision, attached hereto as Exhibit "3," the Decision violates the law in the fashioning of Student's remedy. First, the Decision incorrectly states that "student didn't meet his burden of proof that a non-public school should be ordered to provide compensatory education to Student." (Conclusion of Law 31). The Decision states that neither the Fallbrook High School Transition Program, nor continuation at Fallbrook High School is appropriate, but makes no determination of what program, i.e., non-public school, non-public agency should be awarded for the District's outrageous behavior in not advising Student and Plaintiff that Student was not on a diploma track until June 7, 2007—during that last 2 weeks of Student's senior year.

18.    The most flagrant violation of law in the Decision, is the Order for Plaintiff, Student and the District, within 30 days to participate in an IEP Meeting to determine the appropriate compensatory education for Student. The ALJ's reasoning is that if the parties cannot agree at this IEP Team meeting, one or both can file another Due Process Complaint with OAH, and re-litigate and re-exhaust remedies, or, either party can appeal the instant Decision. What is the point of exhausting administrative remedies, if, the ALJs are not trained and knowledgeable in special education law to write a correct Decision in the first place,[1] and, the ALJ delegates authority for fashioning a remedy to the very educational agency that has denied

---

[1] This has been a long-standing complaint about the futility of the special education administrative process due to abject lack of training, knowledge and oversight of the OAH ALJs, who have been presiding over these cases since July 1, 2005, and have undermined rights of Students throughout the State, and have engendered many more federal court Complaints and Appeal; to wit: the following cases have been filed in this Court complaining about the lack of expertise of the OAH ALJ's: 06CV2357 BEN (RBB), 06CV2451 BTM (RBB), 07CV0675 BTM (RBB), 06CV2473 WQH (RBB), 06CV2378 JAH (BLM).

Student a FAPE?  This is unlawful, as was stated in Student's Supplement to Motion For Modification of Decision, Exhibit 3, which attached is a very recent 6th Circuit case, *Board of Education of Fayette County, Kentucky v. L.M.,* decided March 2, 2007.  It upholds the mandate that "IDEA due process hearings "may not be conducted by an employee of the State educational agency or the local agency involved in the education or care of the child." (citing, *Reid ex rel. Reid v. District of Columbia,* 401 F. 3d 516, 526 (D.C. Cir. 2005, citing 20 U.S. C. § 1415(f) (3)).  If an IEP Team, which, by statute, must include a representative of the local educational agency, "the IEP Team would in effect exercise the officer's powers." *Reid,* 401 F. 3d at 526.

19.     On December 6, 2007 OAH issued an Order Denying Student's Motion For Modification of Decision, attached hereto as Exhibit "4".  Rather than participate in an IEP meeting with the District, and become subject to another administrative Due Process Hearing, having already exhausted administrative remedies, Plaintiff and Student seek relief from this Court.

20.     The Decision misstates and misapplies law.  Procedural violations were committed by the District, which denied Plaintiff a FAPE.  Therefore, the equitable remedy, by operation of law  is an award of compensatory education at a non-public school or non-public agency, with all related services and special education transportation.

<u>FIRST CLAIM FOR RELIEF</u>

For Partial Reversal of Due Process Decision

21.     Plaintiff incorporates by reference each and every allegation of Paragraphs 1 through 20 of the complaint as though fully set forth herein.

22.     In rendering the Decision, the ALJ failed to properly apply the two-prong approach, and incorrectly made Factual Findings beyond what is required. All Factual Findings in the Decision after Factual Finding 56, should be omitted from the Decision as moot,

23.     In rendering the Decision the ALJ failed to properly apply the law to the facts in this case. The Decision's statements that the District prevailed on any issue should be reversed. Additionally, the Decision delegates the remedy to an IEP Team, which is unlawful and should

be reversed. Compensatory education at a non-public school, or non-public agency where Student can attain his high school diploma should be awarded by operation of law.

<u>SECOND CLAIM FOR RELIEF</u>

For Attorney Fees and Costs

24.     Plaintiff incorporates by reference each and every allegation of paragraphs 1 through 23 of the complaint as though fully set forth herein.

25.     Upon partial reversal, as a prevailing party, Plaintiff is entitled to the payment by the District for attorney fees and costs pursuant to 20 U.S.C. § 1415.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against the District, as follows:

1.     For partial reversal of the Office of Administrative Hearings Decision entered on November 20, 2007, as set forth above;

2.     For reasonable attorney fees and costs incurred in bringing the underlying administrative hearing and in bringing this matter, and;

3.   For such other and further relief as the Court may deem just and proper.

Dated: December 13, 2007

Ellen Dowd, Attorney for Plaintiff,
Mary Struble, as Conservator for CS

**EXHIBIT 1**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

Petitioner,

v.

FALLBROOK UNION HIGH SCHOOL
DISTRICT,

Respondent.

OAH CASE NO. N2007090067

## DECISION

Administrative Law Judge (ALJ) Susan Ruff of the Office of Administrative Hearings, Special Education Division, State of California (OAH), heard this matter on October 16, 17, 18, and 19, 2007, in Fallbrook, California.

Ellen Dowd, Esq., represented Petitioner (Student) at the hearing. Student's mother was present throughout the hearing. Student was not present.

Sharon Watt, Esq., of Filarsky & Watt, represented Respondent Fallbrook Union High School District (District) at the hearing. Sallie Hunt, Director of Special Education, was present at the hearing on behalf of the District.

Student's due process complaint was filed on September 4, 2007. On September 7, 2007, the parties agreed to waive the 30-day resolution session period and proceed to hearing. At the close of the hearing on October 19, 2007, the parties requested time to file written closing argument. The matter was taken under submission on November 6, 2007, upon receipt of the parties' written closing argument. The parties stipulated that the deadline for preparation of the Decision in this matter would be extended until two weeks after the receipt by OAH of the written closing argument (November 20, 2007).[1]

---

[1] Because of the waiver of the resolution session period, the 45-day time limit for hearing and decision began to run the day after September 6, 2007. (Ed. Code, § 56501.5, subd. (d).) The parties stipulated to an

In the District's written closing argument, the District attached an exhibit and requested that the ALJ take official notice of that exhibit. Student filed an objection to that request. If the District wished to have its "exhibit" considered as evidence, the District should have produced the exhibit to Student's counsel prior to the hearing in accordance with the requirements of Education Code section 56505, subdivision (e)(7), and sought to introduce the document into evidence during the hearing. The District made no attempt to introduce the document into evidence or to keep the record open to permit the District to obtain the document. The District does not give a sufficient reason for attempting to introduce an "exhibit" after the close of evidence when Student has no chance to respond. The District's request is denied . (Ed. Code, § 56505, subd. (e)(8).)[2]

## ISSUES[3]

1.    Did the District fail to offer and provide a free appropriate public education (FAPE) to Student during the 2005-2006 school year when Student was in the eleventh grade in one or more of the following ways:

      a.    Failure to provide parents with options for Student's graduation.

      b.    Failure to write any handwriting goals.

      c.    Failure to provide occupational therapy services for handwriting.

      d.    Failure to take appropriate action when Student failed to make progress to meet goals.

      e.    Failure to provide a behavior support plan, and/or failure to write adequate behavioral goals.

2.    Did the District fail to offer and provide a FAPE to Student during the 2006-2007 school year when Student was in the twelfth grade in one or more of the following ways:

---

extension of the deadline to give the ALJ sufficient time to review the evidence and written closing argument of the parties.

    [2]  To help provide clarity in the record, the District's closing brief was marked as Exhibit 94. Student's closing brief was marked as Exhibit X, and Student's Errata Pages were marked as Exhibit Y.

    [3]  This list of issues is modified from the list in Student's due process complaint filed on September 4, 2007. During the hearing, Student requested and received permission to withdraw some of the issues in the due process complaint. In addition, a few of the issues listed above have been revised for clarification purposes. In its closing brief, the District states that "the Hearing Officer ruled that Petitioner would not be allowed to proceed" on certain issues. That characterization is not accurate. Instead, it was Student who requested and received permission to withdraw certain issues from this matter. The limiting of certain issues was also done at Student's request.

a.    Failure to write any handwriting goals.

b.    Failure to provide social skills training.

c.    Failure to provide occupational therapy services for handwriting.

d.    Failure to timely provide communication logs.

e.    Failure to timely provide a behavior support plan.

f.    Staff insensitivity to words and actions that trigger anxiety in Student.

g.    Staff insensitivity to parental concerns.

h.    Failure to provide any educational program (such as home hospital or itinerant teacher) after May 3, 2007.

i.    Failure to provide parents or Student with options for graduation, and/or predetermination of placement.

j.    Failure to provide a safe learning environment.

## FACTUAL FINDINGS

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide Student's Parents with Options for Student's Graduation? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student's Parents with Options for Student's Graduation and/or Predetermining Student's Placement?[4]*

1.    Student is an 18-year-old man who lives within the Fallbrook Union High School District. Student's parents have educational rights for Student. During the 2005-2006 and 2006-2007 school years at issue in this case, Student attended Fallbrook High School and was eligible for special education under the category of autism.

2.    Student contends that the District failed to provide Student and his parents with sufficient information regarding Student's graduation options, thereby denying Student a FAPE. Student also contends that the District made a predetermination of placement at the June 2007 IEP meeting. The law provides that parents have a right to participate in the development of the individualized education program (IEP) for their child. Part of their participation includes the right to be informed of the availability of FAPE and all available alternative educational programs, both public and nonpublic. On or before a Student's

---

[4] Because the same factual findings are necessary to decide both of these issues, they will be addressed under the same heading of this Decision.

3

sixteenth birthday, the Student's IEP must include information regarding Student's options for postsecondary goals and transition after high school.

3.    Student is considered to be in the "high-functioning" range of the autism spectrum. His cognitive ability is in the average range, but his disability impedes his academic and social progress. He has significant problems with communications, social interaction, auditory memory, perseverating on issues, and anxiety. His educational areas of need during the 2005-2006 and 2006-2007 school years included reading comprehension, math, social skills, problem solving and vocational skills. During those two school years Student was placed in a special day class (SDC) for most of his academic subjects because of significant academic delays.

4.    California law provides two different "tracks" by which a special education student can complete high school. If the student is capable of meeting the requirements to obtain a high school diploma, the student is said to be on a "diploma" track. If a special education student does not have the capability of meeting the requirements for a high school diploma, the child may be placed on a track which leads to a certificate of completion. For example, a certificate of completion might be awarded when a student's limited cognitive abilities make it impossible for the student to pass an algebra class necessary to earn a diploma or to pass the California High School Exit Exam (CAHSEE). The requirements for attaining a diploma from Fallbrook High School include passing an algebra class and passing the CAHSEE.

5.    A student who obtains a certificate of completion from the District can still participate in the graduation ceremony at the high school. In addition, community colleges such as Palomar Community College permit students without high school diplomas to enroll in some of the college classes.

6.    In some cases a special education student who completes high school and obtains a certificate of completion from the District may be permitted to return for another year of high school as a "super senior" or "second year senior."

7.    The District offers a "transition program" for special education adults after high school. The program is designed to teach adults the basic skills necessary for adult life and working in the community.

8.    There are also nonpublic schools which provide education to special needs adults after they have completed high school.

9.    Prior to reaching high school age, Student attended school in the Fallbrook Union Elementary School District. During Student's middle school years, Student began attending the Country School, a nonpublic school. During the 2003-2004 school year, Student's first year in the District, Student continued to attend the Country School at the District's expense. During the summer of 2004, Student was gradually transitioned to Fallbrook High School, which Student attended for Student's remaining three years of high

4

school. On May 3, 2007, about a month before the end of Student's senior year of high school, Student's parents pulled Student from the high school based upon the recommendation of Student's private psychiatrist.

10.    One of the main factual disputes in this case involves whether the District staff provided Student's parents with sufficient information about Student's options for graduation. Student's mother testified that at no time did the District staff inform Student's parents during any IEP meetings prior to June 2007 that Student would not achieve a high school diploma when he graduated from Fallbrook High School. According to Student's high school report cards, he received mostly As and Bs, and Student's mother believed he was doing well in his classes. She stated that she first learned Student would not graduate with a diploma late in the 2006-2007 school year, when counsel she had retained explained that to her. She said that the District staff never explained what the checked boxes regarding certificate of completion in the IEPs meant. Student wants to earn a diploma. Had Student's mother realized he was not on a diploma track, she would have taken steps to understand why or change it.

11.    The District witnesses dispute the testimony of Student's mother. The District contends that Student's mother was aware that Student was working toward a certificate of completion, not a diploma, at all times while he was at Fallbrook High School. Sallie Hunt, the District's Director of Special Education, testified that the issue of a certificate of completion was discussed at every single IEP meeting in which goals and objectives were discussed since the time Student transferred from the Country School, except possibly one IEP meeting called by Student's parents to discuss problems with Student's one-to-one aide. It was always understood that he was working toward a certificate of completion. Hunt described one conversation she had with the parents in the winter of the 2006-2007 school year, in which she stated that the only thing Student could not do without a diploma was join the military and that was not an option for him.

12.    Other District witnesses supported Hunt's testimony. Margaret Martineau, the school psychologist who assisted with Student's social skills group during the 2005-2006 school year, testified that there was always discussion at the IEP meetings about certificates of completion, and they decided from the beginning that Student would be on a non-diploma track. Carla Crane, Student's case manager and special education teacher during his senior year, testified that she believed that Student's mother understood that Student would be getting a certificate of completion. Crane could not recall a specific conversation about the topic, but she stated that Student's mother made comments such as "I understand he is on a certificate program."

13.    In order to determine what information was or was not given to Student's parents by the District staff and the significance of that information, it is necessary to review

5

the IEP meeting reports, beginning with the May 21, 2003 meeting that occurred prior to the time Student began school in the District.[5]

14.    Although Student was still in middle school and not yet within the jurisdiction of the District at the time of the May 21, 2003 IEP meeting, Sallie Hunt, the District's Director of Special Education, attended the meeting. Student's mother and father also attended the meeting. The notes of the meeting indicate that Student would be taking the "CAPA" (California Alternative Performance Assessment) rather than the standard state achievement testing given to all students. The CAPA is designed as an alternative test for students who are not performing at grade level. Under the preprinted language in the IEP stating "Differential Performance Standards for Graduation Required," the handwritten notation states: "to be determined." There is no mention in the IEP notes of any discussion regarding high school graduation or a high school diploma.

15.    A follow-up IEP meeting was held in June 2003. Ms. Hunt also attended that meeting. There is no reference to high school graduation or certificates of completion in the IEP. In April 2003, Student's parents sent a written request asking that Student be exempted from statewide testing during Student's eighth grade year.

16.    Student attended the Country School during his first year of high school. An IEP meeting was held on January 13, 2004, to review Student's progress and his placement at the Country School. On April 28, 2004, the District sent CAPA materials to the Country School for testing. The evidence did not establish whether Student took this test at the Country School. Student's mother testified that no one explained to her that Student would need to take the state's standardized achievement tests in ninth grade in order to obtain a diploma. School psychologist Margaret Martineau also could not remember an IEP discussion about whether exempting Student from taking high school standardized testing would prevent him from getting a diploma.

17.    On May 11, 2004, Student's annual IEP meeting was held. Student's mother was in attendance. The "special factors" page of the IEP under the "transition" section contains a handwritten notation stating: "preparing for certificate of achievement." Miguel Espinoza, one of Student's special education instructors at Fallbrook High School the following year, attended the meeting. He could not recall whether there was a conversation at the meeting concerning a certificate of completion and admitted that the phrase "preparing for a certificate of achievement" could have been written before the meeting. The IEP stated that Student would take the CAPA. The remaining IEP meeting notes do not reflect any discussion about a certificate of completion or diploma.

18.    Student began attending Fallbrook High School during the 2004-2005 school year. He took most of his academic classes in the school's "Bridge" program, an SDC

_____

[5] These school years are prior to the statute of limitations period, but they are relevant to the current issue. If events at these earlier IEP meetings had given the parents the information they needed, there might have been no need for the District to give the parents the same information at a later date.

designed for pupils who, because of their disabilities, were unable to gain educational benefit from general education classes.  Although the Bridge program is an SDC, it is possible for a pupil to start in the Bridge program and ultimately attain a high school diploma, depending on the pupil's individual abilities.

19.    On November 3, 2004, an IEP meeting was held to review the three-year (triennial) assessment done of Student.  Ms. Martineau had administered cognitive testing as part of the triennial assessment.  She reported to the IEP team that Student scored in the average range of intelligence on an untimed, nonverbal intelligence test.  The handwritten notes of the meeting reflect Martineau's report.

20.    During the hearing, Ms. Martineau testified that she believed her test results were a fair measure of Student's true cognitive ability.  She explained that Student's parents were very concerned about Student's anxiety and did not want him "melting down."  Martineau had thought that Student might be able to make it on a diploma track, but the IEP team determined that it was better to make Student comfortable in the District's Bridge program with a modified curriculum.  There are no specific handwritten notes in the IEP to reflect the team's decision to keep Student off a diploma-bound track.  The IEP reflects that Student was reading at a fifth grade level and his math was at approximately a third grade level.

21.    Mr. Espinoza recalled that the team exempted Student from statewide assessments because they felt Student could not handle the anxiety or frustration of taking the tests, but Espinoza could not recall whether there was a discussion at the meeting about whether Student's failure to take tests would impede Student's ability to graduate with a diploma.

22.    The IEP reflects the team's decision to exempt Student from state testing.  Under the California State Assessment heading, the notes contain the number "40."  This was the District's numerical code indicating the parents had requested that Student not be involved in statewide testing.  Another handwritten note beside it explained the reason as "parents' request."  The IEP also noted that the "promotion standards" would be according to the IEP, not the District standards.  The IEP meeting notes conclude that "An Individual Transition Plan will be written in May."

23.    The State or District Wide Assessment sheet in the IEP contains pre-printed language in tiny print stating: "The IEP team, including parent(s) or guardian(s), anticipates that the student will not be a candidate for a regular high school diploma but rather will be a candidate for a certificate of educational achievement/completion."  That box has been checked on the document.  There is large, handwritten language farther up on the page stating: "Significant academic delays in all areas preclude success on any/all CA standardized assessments."

24.    Aside from the checked box on the assessment page, there is no mention in the IEP meeting notes of a discussion regarding a diploma or certificate of completion.  Ms.

7

Hunt, who took the notes at the meeting, explained that she does not record everything in her handwritten notes if there is already information on a topic elsewhere in the IEP.

25.     Student's transcript shows that Student got As in all his classes during his tenth grade year and mostly As during his eleventh grade year. Mr. Espinoza explained that Student's classes were special education classes which taught core curriculum, but at a modified level. An individual could tell they were special education classes by looking at the course number on Student's transcript. Espinoza testified that he had a discussion with the parents that the classes were special education. At some point during the 2005-2006 school year, Ms. Martineau spoke with Student about his long term goals, and he said he wanted to go to college. She thought it was a good goal for him – students in the District's Bridge program do attend college.

26.     On May 31, 2005, another IEP meeting was held. Student was having difficulty with the one-to-one aide assigned to him, and the team recommended that he work with classroom aides instead of having a one-to-one aide assigned to him. The notes reported that Student had made excellent progress in reading and was performing at a sixth grade level. The team determined that Student would be placed in a regular education classroom for life sciences and physical education the following school year.

27.     On October 19, 2005, an IEP team meeting was held. The meeting was called by Student's mother to discuss the situation with Student's aide support. Student's mother and father both attended the meeting. The meeting notes reported that Student had been moved from the general education science class to an SDC class. Student had been stressed and overwhelmed by the volume of work in the general education science class, and the work was too academically challenging for him, even when modified. The notes state that "Mr. Espinoza presented a draft of some Individual Transition Plan activities." The notes do not elaborate on what was discussed about those activities, and the IEP does not contain a copy of the draft.

28.     Student's next annual IEP review was held on November 30, 2005. Both of Student's parents attended the meeting. The IEP contained the same State or District Wide Assessment sheet as the November 2004 IEP had. Once again there was a box checked next to the tiny, pre-printed language on the form stating: "The IEP team, including parent(s) or guardian(s), anticipates that the student will not be a candidate for a regular high school diploma but rather will be a candidate for a certificate of educational achievement/completion." Mr. Espinoza explained that he wrote some of the handwritten notes on that page prior to others and identified some of the IEP notes as being written during the meeting. He said the box next to the statement regarding the certificate of completion was checked during the meeting.

29.     The evidence does not support Mr. Espinoza's statement in that regard. Mr. Espinoza testified from a photocopy of the exhibit. However, when the original exhibit was subsequently entered into evidence, it was clear that the comments written during the meeting were in blue ink while the ones written before the meeting were in black ink. The

mark in the box next to the certificate of completion language was in black ink, so the box was obviously checked prior to the start of the meeting.

30.    The individualized transition plan (ITP) page of the IEP was also written in black ink, indicating that the form had been filled out prior to the meeting. The only blue ink on the page was in the page numbering at the top and the ink used to cross out the word "draft" which had been written on the page. The ITP had the box for "letter/certificate" checked instead of the box for "diploma." Under the heading of "unsubsidized part-time employment" the ITP listed the word: "Paleontology." No one at the meeting discussed with Student whether it was realistic for him to try to become a paleontologist. Under the heading "Part-time college" and the heading "regular wage scales" it stated "TBA." According to Mr. Espinoza, this meant "to be arranged." The ITP mentioned participation in the Community Based Instructional Program (CBI), but made no mention of attending the District's transition program after high school. The CBI program permitted a student to practice job skills in the community. The students worked at different job sites, learned about how to act at a job site, learned to fill out time sheets, and similar skills.

31.    As with the November 2004 IEP, the California State Assessment section of the November 2005 IEP listed the word "40" based on the "parents' request." That was also written in black ink, indicating that it was filled out before the meeting. Someone had written in blue ink on the IEP that Student would attempt the reading portion of the "CAT-6" (the state standardized testing). The meeting notes (written in blue ink) mention that Student was making excellent progress in reading and would be moved to a resource English class from the Bridge program. The resource program was designed for Students who had a higher level of achievement than the Bridge Program, but were still not ready to be placed in a general education reading class. The blue-ink notes make no mention of an IEP discussion about a certificate of completion or diploma. Espinoza testified that it was not necessary to include that in the notes, because it was already listed in other places in the IEP.

32.    Student's next annual IEP was held on November 27, 2006, during Student's senior year. Both of Student's parents attended the meeting. The IEP notes indicate that "Parents are concerned that [Student] is not ready to 'graduate' and/or move on to Transition program." The word "graduate" was placed in quotations in the IEP, but the District witnesses did not explain why. School psychologist Sandra Magaro testified that Student's parents did not ask questions about whether Student would get a certificate or diploma at that IEP meeting. They just talked about the graduation coming up.

33.    The promotion criteria box in the IEP is checked for "District," not "IEP" as it had been the previous year. The graduation plan has a box checked beside a pre-printed statement: "To participate in high school curriculum leading to a Certificate of Completion." This pre-printed information is in larger type than the tiny statements regarding certificates of completion in the prior IEPs. Above that pre-printed statement is another pre-printed statement about attaining a high school diploma, which does not have the box checked.

9

34.    The meeting notes state that "[Student's] parents want him to be a second year senior next year. Mrs. Hunt suggested that he have a four period day with work activities in the afternoon." There is a page attached called "Transition Services" which recited that Student had not passed the California High School Exit Exam (CAHSEE) or an algebra class. It also showed that Student had completed 210 out of 230 credits needed for graduation. Hunt testified the purpose of having Student come back to high school the following year as a "super-senior," was not to enable Student to get a diploma. Instead, the District considered it because Student's mother, at that time, thought Student was "blossoming" in high school.

35.    Around December 2006 and January 2007, Student's parents began to investigate options for Student for the following year. In approximately January 2007, the District suggested that Student go to Palomar Community College and attempt the placement test. Student's parents were concerned that he was not ready to go to Palomar College. Ms. Hunt testified that there were also discussions about having Student attend the District's transition program the following year, and the parents went to visit that program in December 2006. On December 5, 2006, Student's mother sent an email stating, in part: "At this point we are looking at [Student] taking ROP to be a Vets Assistant – of course this may change before he graduates, but for now it appears do-able."

36.    Student continued to receive excellent grades during his time at Fallbrook High School. For example, Student received a B- in his computer class during his junior year and a B- in his first semester of his foods and nutrition class in his senior year. These were both general education classes, not SDC or resource classes. Webber Comella, the computer class teacher, testified that Student's grade was probably inflated, but gave no indication that he informed Student's parents of the inflated grade or reported that to Student's IEP team. On the few occasions when Student's grades in a class dropped significantly, Student's parents were concerned and sent emails to District staff to find out what had happened. For example, in March 2007, when Student's parents learned from a progress report that Student was getting a D+ in his foods and nutrition class, Student's mother sent an email to Student's case manager to find out what they could do to help bring his grade up.

37.    On February 12, 2007, Student signed a document entitled "Student's Statement Regarding School Attendance" which stated that "[Student] will participate in an Adult Transition Program" the following year. The document makes no mention of a diploma or certificate of completion.

38.    As discussed in Factual Findings 75 – 131 below, Student's behavioral problems began to escalate in the middle of his senior year. On March 21, 2007, the IEP team held a meeting to discuss Student's behavior support plan. There is no indication that the IEP team discussed the certificate of completion or diploma at that meeting.

39.    On May 3, 2007, Student's parents withdrew Student from Fallbrook High School based on the advice of Student's private psychiatrist. Student has not attended

Fallbrook High School or any other school program since that time and has been living at home with his parents.

40.    On May 10, 2007, another IEP meeting was held to review Student's triennial assessment. Although Student's three-year review was not due until November 2007, Student's parents wanted an update of how he was doing and the District wanted to help determine Student's placement for the following year. Therefore the District conducted the triennial assessment a few months early. The cover sheet of the IEP listed Student's "exit date" as June 14, 2007, and the "exit reason" as "72 Grad HS other than diploma." The IEP summarized Student's academic skills as follows: Reading: "Can read a 10th grade level literature text; has only literal level of comprehension;" Written Expression: "Can write a paragraph or a letter. Can use a wordprocessor and spell check;" Mathematics: "Can solve basic arithmetic problems without a calculator."

41.    The IEP had the box checked for certificate of completion under graduation plan. Student's mother testified there was no discussion at that meeting about the certificate of completion and she never noticed the box regarding the certificate of completion being checked. No one told her that Student would have to pass the CAHSEE to graduate. Ms. Hunt thought there must have been some discussion about a diploma at that meeting, because Student' mother wrote a follow-up email with a proposed goal involving algebra.

42.    Student's final IEP meeting during the 2006-2007 school year was held on June 7, 2007. It was held a week before the end of the 2006-2007 school year (which ended June 14, 2007). The IEP had a box checked stating that Student would earn a certificate of completion and another box stating that: "Beginning no later than grade 9" Student's parents must be informed that as of the 2005-2006 school year Student must pass the CAHSEE to obtain a diploma. Student's mother raised the issue of Student achieving a high school diploma during that meeting.

43.    For the first time in all the IEPs, the written meeting notes for the June 2007 IEP meeting describe a discussion regarding a high school diploma. The notes state: "[Student's mother] said [Student] would like to earn a high school diploma. Mrs. Hunt said the Algebra I and Geometry requirements will be stumbling block. Additionally, he will need to attempt and probably need to pass the Exit Exam. It is unlikely that Student could do that." During the lunch break of the meeting, Ms Hunt retrieved pages from the CAHSEE to demonstrate the difficulty level of the mathematics on the test. However, there was no discussion at the meeting regarding whether the "stumbling blocks" might be overcome, or whether, with appropriate education and supports, Student might be able to achieve a high school diploma. Student's mother believes that Hunt had "given up" on Student at that point. There was no further discussion of the subject at the meeting.

44.    The IEP team discussed two possible placements for Student during the meeting: either Student could return for another year at Fallbrook High School as a "super-senior" or Student could attend the District's transition program which is also located on the Fallbrook High School Campus. Student's mother did not want Student to return to

11

Fallbrook High School in either program and asked about a different school. The IEP meeting notes do not indicate that any discussion of other possibilities took place. No witness at the hearing indicated that other possibilities were discussed.

45.     On June 12, 2007, Ms. Hunt sent a follow-up letter to the parents with the District's final FAPE offer. The letter stated, in part: "I realize that the [parents] are still contemplating [Student's] academic potential. Nonetheless, the district is offering a placement at the Fallbrook Union High School District Transition Program."

46.     There are two relevant evidentiary considerations here: 1) what graduation options were discussed with the parents in the IEPs leading up to the District's final placement offer; and 2) what was discussed at the June 2007 IEP meeting where the placement offer was made?

47.     There is evidence to support both Student's and the District's positions regarding what was discussed at the pre-June 2007 IEP meetings concerning a certificate of completion/diploma. The strongest evidence in favor of the Student's position is the testimony of Student's mother. Student's mother was a credible witness. She was calm, direct and articulate in her answers. She is correct that anyone reviewing Student's transcript would see nothing to indicate he was not working toward a diploma – instead they would see what appeared to be a very good student who got mostly As and Bs. At all times the parents' actions were consistent with those of people who thought their son was working toward a diploma. For example, on the occasions in which Student's grades dropped, his parents immediately contacted the District to find out why. When Student's parents learned from their counsel that Student was not on a diploma track, they immediately addressed the issue at the IEP team meeting and requested IEP goals (such as an algebra goal) to help him on that path.

48.     In addition, the IEP documents themselves support Student's position. At no point do the handwritten notes written during the meetings reflect a discussion regarding a diploma track or certification of completion track until the June 2007 IEP meeting. Although boxes were checked on the IEP forms to show Student was working toward a certificate of completion, in at least one instance (the November 2005 IEP) it is clear that those were checked before the meeting, so they do not mean a discussion took place during the meeting.

49.     On the other hand, there is also evidence to support the District's position. The District witness testified that Student's parents understood Student was working toward a certificate of completion, not a diploma, although many of them could not recall specific discussions on the subject. Ms. Hunt testified that the subject of a certificate of completion was discussed at almost every meeting. However, the written IEP evidence does not support her statement. For example, the fact that the November 2005 IEP had all the information regarding testing and the tiny box regarding a certificate of completion marked prior to the meeting implies that there was no discussion.

12

50.     The strongest evidence for the District was the testimony of Margaret Martineau.  In November 2004, when her testing revealed that Student had average intelligence, Martineau said there was a discussion about whether Student could earn a diploma and the team decided to opt for a path that would decrease Student's anxiety. However, it does not appear that this District understanding regarding the non-diploma path was adequately communicated to the parents.  The District undoubtedly told the parents that the Bridge program and modified curriculum would be less stressful for their son.  But did they plainly tell the parents that their choices would prevent their son from working toward a diploma?  If so, one would assume that something would be written in the meeting notes. After all, the IEP team was making a momentous decision that placed a student who potentially had the intellectual capability of attaining a diploma on a track that would not lead to a diploma.  Although handwritten notes are not required in an IEP, logic would indicate that *some* notation of that decision and the parents' understanding of the consequences of their choice would have been written in the meeting notes.  The fact that such a notation is absent strongly indicates that no such discussion took place or that it was so watered down by the District staff that the parents never really understood the consequences of the choices they were making.

51.     The checked boxes on the IEPs are also evidence in favor of the District's position, but as stated above, in at least one case, it is certain the box was checked and information written prior to the meeting.  The only time a hand-written notation appears (instead of just a checked box) in all the IEPs before June 2007, was in the May 2004 IEP, which occurred just prior to Student transferring from the Country School to Fallbrook High. There is a handwritten statement on the "special factors" page that says "preparing for certificate of achievement."  That same page discusses Student's anxiety and need for modified instruction.  That is some evidence that a discussion took place.  However, the statement does not say "instead of a diploma" or mention diploma at all.  Once again, there is no mention in the notes that the parents understood that their choices regarding Student's anxiety would prevent him from achieving a diploma.  Student's mother testified unequivocally that she never understood he was not working toward a diploma.

52.     The November 2006 IEP contains an ambiguous handwritten statement about the parents' concern that Student was not ready to "graduate" and move on to the transition program.  It was unclear why the word "graduate" was in quotation marks, but it does not prove there was a discussion about certificates of completion or diplomas.  The parents could easily have believed that the transition program was just another place student could go after receiving his diploma, just as Palomar College was.

53.     Although there is evidence for both positions, Student's evidence is sufficient to "tip the balance" in Student's favor.  No doubt the District employees were sincere in their belief that the parents understood, but the evidence does not support a finding that the District adequately informed the parents.  Student met his burden of proving that the District committed a procedural violation of IDEA by failing to provide Student's parents with options for graduation.

13

54.    Likewise, Student has met his burden of proof on the issue of failure to discuss options/predetermined placement at the June 2007 IEP meeting. As discussed above, once the diploma issue was raised by Student's parents at the June 2007 IEP meeting, the discussion focused around why Student was not currently capable of attaining a diploma. There was no discussion of whether Student might be able to attain a diploma within two or three years, and if so, what would be the most appropriate program to help him attain that goal. There was no discussion of whether the District's transition program could help him work toward a diploma or whether there were other possible placements that could help him if the District's programs could not.

55.    It appears that, by June 2007, the District had given up on Student. In a December 13, 2006 email sent to Student's television technology teacher, Hunt talked about Student lacking the "intellectual capacity" to really learn in the class. When Student's mother mentioned the possibility of a diploma in the June meeting, Hunt brought in pages of the CAHSEE to prove how impossible that was. During her testimony, Hunt made it clear that the offer to have the Student return to Fallbrook High School as a "super senior" had nothing to do with Student earning a diploma.

56.    The evidence at the hearing showed that Student had made significant academic gains while in high school. His reading had improved from a fifth grade level to a tenth grade level. His math skills had also improved. Given the District's own assessment which found Student's cognitive ability to be in the average range, the progress Student made in high school, Student's desire to work toward a diploma, and his parents' concern about the issue, there should, at the very least, have been some discussion at the IEP meeting about whether there were supports or programs that might be appropriate for Student to help Student achieve a diploma. Instead, the District presented only two possible programs, neither of which would help Student work toward a diploma. The failure to have that discussion constituted a procedural violation of IDEA.[6]

*Did the District Deny Student a FAPE During the 2005-2006 and 2006-2007 School Years by Failing to Include a Handwriting Goal in Student's IEP and/or Failing to Provide Occupational Therapy Services for Handwriting?[7]*

57.    Student contends that handwriting, particularly cursive writing, was an area of unique need for Student, and that the IEP should have contained goals and occupational therapy (OT) services to help Student make progress in that area. An IEP is required to contain goals and objectives to address a student's areas of unique need. In addition, a district is supposed to provide designated instruction and services (DIS services), including OT services, if those services are necessary for a student to benefit from special education.

---

[6] Whether these procedural violations led to a substantive denial of FAPE will be discussed in the Legal Conclusions, *infra*.

[7] These four issues have been grouped together in this section of the Decision, because they are based upon the same factual findings.

14



58.    A review of Student's IEPs shows that handwriting was recognized as an area of need for Student almost as soon as Student began attending Fallbrook High School. The November 3, 2004 IEP noted that Student's fine motor skill "displays weakness – especially with writing." Student's father told the IEP team that he would like to see Student's handwriting improve in "legibility, size and speed" and requested that a handwriting goal be included in the IEP. The IEP team added "smaller, legible handwriting" as part of a goal involving Student reading a passage and writing about that passage.

59.    That IEP goal continued in effect until Student's next annual IEP on November 30, 2005. The November 30, 2005 IEP notes state that Student's "fine motor skills are improving but [he] still lacks in strength. [Student] prefers to print rather than use cursive." That IEP contained no goal related to handwriting.

60.    The November 27, 2006 IEP contained virtually the same statement as the IEP from the previous year: "Fine motor skills are improving. [Student] prefers to print rather than use cursive." Once again, there was no handwriting goal contained in the IEP.

61.    On December 5, 2006, Student's mother sent an email to Carla Crane, Student's case manager, asking for a handwriting goal to be included in Student's IEP related to Student signing his name in cursive. Crane responded with an email stating that handwriting was a "classroom goal," but that a goal could be added to his IEP for that.

62.    At the March 21, 2007 IEP meeting the team added a goal that Student would be able to "sign his name in cursive without a model." The "baseline" for the goal stated that he could sign his name in cursive with a model. Crane presented this goal to the IEP team. Crane had noticed earlier in the year that Student was unable to sign his name, and the parents requested the goal, so the District decided to add it. Crane said she had worked on that skill with Student prior to March 2007, even though there was no IEP goal. The District's evidence included a sheet in which Student had practiced signing his name in cursive. Although the sheet was undated, Crane testified that it was created in January 2007.

63.    The May 10, 2007 IEP noted that Student "prefers to print but has been working on...writing his name in cursive without a model."

64.    Student and the District submitted various documents in evidence which contained Student's "signature." In very few of these did Student's "signature" appear in cursive writing. For example: On May 5, 2005, Student printed his name instead of signing it. He did the same thing on March 22, 2006. On June 6, 2006, Student properly signed his name in cursive on a document. However, after that, Student printed his name instead of signing it in documents dated November 27, 2006, February 12, 2007, May 3, 2007, and May 9, 2007.

65.    Student's teachers also differed in their opinions about whether Student could write his name in cursive. Mr. Espinoza thought that Student could accurately write his name in cursive. Lynette Shires, Student's foods and nutrition teacher during his senior year,

15

testified that Student never used cursive writing in her class. Kristine Heckman, who worked with Student in the CBI program, testified that Student was unable to sign his name when she worked with him. Ms. Martineau testified that Student is able to communicate in writing and does not need a writing goal. Sandra Magaro, the school psychologist who tested Student during the 2007 triennial assessment, believed that he did not need a handwriting goal because he can use a computer.

66.     Mary Reisman, Student's SDC teacher for the 2005-2006 school year, testified that teaching a pupil his or her cursive signature is a main priority of the SDC class, but she did not believe Student needed a handwriting goal because his handwriting was legible.

67.     Student's failure to write his name in cursive was not caused by a fine motor deficit. Sandra Magaro administered the Beery Developmental Visual Motor Integration Test to Student as part of the 2007 triennial assessment and determined that Student's fine motor skills are in the average range. Student's expert Cynthia Norall agreed that Student's writing issues were not due to fine motor problems. The documentary evidence showed that at various times Student was physically capable of signing his name in cursive, although it is not clear whether he was able to sign it without copying from a model.

68.     The evidence supports a finding that Student's 2005-2006 and 2006-2007 IEPs should have contained a handwriting goal regarding Student's use of cursive to sign his name. There is no dispute that using cursive writing to sign his name was an important area for Student to learn. The District's own SDC teacher discussed the importance of a cursive signature. It is also clear that a cursive signature was an area of need for Student. Student's use of a cursive signature was rare and did not appear to be generalized by him to environments outside of class. If he had an actual IEP goal instead of just informal classroom goals, his progress could have been monitored, and the IEP team could have determined whether he used the skill outside of the classroom. His failure to use cursive despite having the motor ability to do so should have been of concern to the IEP team and prompted a discussion during the IEP meetings.

69.     However, the evidence does not support a finding that Student required OT services relating to handwriting. All the testing done of Student indicated that his fine motor abilities were in the average range. He had the capability of signing his name and did sign his name on more than one occasion. Student presented no testimony from an OT expert to counter the District's triennial assessment findings. Student failed to meet his burden to prove that the District failed to provide Student with necessary OT services in the area of handwriting.

*Did the District Deny Student a Free Appropriate Public Education During the 2005-2006 School Year Due to Student's Failure to Make Sufficient Progress to Meet His IEP Goals?*[8]

---

[8] Since the failure of a Student to meet one or more of his or her IEP goals is not, in and of itself, a violation of IDEA, it is presumed that Student contends that the District failed to take appropriate action when the

16

70.     In Student's written closing argument, Student clarified that this contention involves Student's problem solving goal that was in his 2005-2006 IEP.  Student does not contend that Student failed to make progress on his other goals, and the evidence shows that Student did make progress on other goals.

71.     Student's November 30, 2005 IEP contained a problem solving goal that stated: "By November 2006, [Student] will have learned two strategies for problem solving and will have used such strategy 4 or 5 times, when facing a difficult situation, as measured by case manager/psychologist records."

72.     School psychologist Martineau drafted the goal.  It was based on a "four-step" method of problem solving that she had developed and used in the social skills group she ran. She added a fifth step when she worked with Student because of Student's unique behavioral needs.  The speech-language therapist who supervised Student in the CBI program also worked with Student on this goal.  Student made substantial progress on the goal during the 2005-2006 school year, although he did not fully achieve the goal.  When Martineau retired at the end of the 2005-2006 school year, she reported his progress to Sandra Magaro, the school psychologist who took her place.  They discussed the matter and determined that it would be best to keep the goal in the next IEP unchanged because he had not yet achieved it.

73.     The same goal appeared in the November 2006 IEP.  Magaro carried the goal over into the next IEP unchanged because Student was new to her and she was not sure just how far he had come in terms of meeting the goal.  When she worked with him, she saw progress on the goal, but he had still not met the goal so they continued to work on it.

74.     The evidence supports a finding that Student did make progress on this goal during the 2005-2006 school year.  The testimony of Martineau and Magaro is undisputed that progress had been made.  Student's good behavior and good grades between November 2005 and November 2006 also reflect the progress he made.  There was no violation of FAPE.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide a Behavior Support Plan (BSP), and/or Failure to Write Adequate Behavioral Goals? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a BSP and/or Failing to Provide a Safe Learning Environment?[9]*

75.     When a Student's behavior impedes his learning or that of others, a school district is required to consider the use of positive behavioral interventions and supports, and other strategies to address that behavior.  When a child exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the child's

---

goals were not met.  However, because the evidence does not support a finding that Student failed to make sufficient progress, there is no need to reword this goal to clarify what Student intended.

[9]  These issues are grouped together because they involve the same factual findings.

IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. Serious behavior problems include behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective.

76.     There is no dispute that Student's behaviors impede his learning. Every IEP that Student had during his time at Fallbrook High School noted that his behaviors impeded his learning. The November 30, 2005 IEP called for the following interventions to address Student's behavior: "Counseling, problem solving techniques, 're-grouping' time." In addition, the IEP contained a problem-solving goal related to behavior, as discussed in Factual Findings 70 – 74 above.

77.     Student had some behavioral incidents during the 2005-2006 school year. Prior to the November 2005 IEP meeting, Student's parents were concerned about the insensitive treatment of Student by his one-to-one aide, and a special IEP meeting was held on October 19, 2005. The aide was removed from working with Student. Student was also moved from his general education life sciences class to an SDC class because the stress of the regular class was overwhelming to him and caused him to have emotional "melt-downs."

78.     There was also an incident around October 2005, in which some boys were bullying Student. The substitute teacher in the class did not assist Student when Student spoke with the teacher about it. Student reported to his parents that when he spoke with Mr. Espinoza about it, Espinoza did not do anything about it either.

79.     The next incident in the 2005-2006 school year occurred five months later in March 2006, when Student was in a general education computer class. Student caught some other boys in class looking at a pornographic website and reported it to the teacher. Webber Comella, the teacher in that class, explained that Student was almost "euphoric" when he reported the improper conduct and thereafter continued to dwell on the episode, even after Comella told Student that he would deal with it. At one point, Student complained to his parents that there were "gang-bangers" in the class so he was afraid to attend the class, that Students were making fun of him, and that students were eating, drinking and jumping all around in class.

80.     Mr. Comella denied that students in his class were eating, drinking and jumping all around. He also denied that there were any "gang-bangers" in his class and denied that Student was afraid to come to his class. He explained that, when Student continued to dwell on the incident with the pornography website, Comella told Student that he could not keep going after the boys verbally or he would get in trouble. However, Comella denied that Student got in trouble with the other boys.

81.     There were no other significant behavioral incidents during Student's 2005-2006 school year.

18

82.     The parties dispute how accurate Student's representations were regarding the events that happened to him. Student's mother believed her son's reports of the events that happened at school and relied upon his version of events when she contacted the school about his behavioral issues. Student's mother was a very credible witness, but her information about events was only as accurate as the source from which it came. The evidence supports a finding that Student was not always accurate in his description of events and would sometimes exaggerate events or believe that events were directed at him when they were not. For example, at one point he complained that a sign-language interpreter and a deaf student were signing about him. However, when the teacher questioned Student, it turned out that he did not even understand sign language.

83.     Cynthia Norall testified as an expert witness on behalf of Student. Dr. Norall is an autism specialist who is the director of Comprehensive Autism Services and Education, Inc., an agency that provides services to county regional centers for autistic children. Dr. Norall is a licensed educational psychologist and has provided training for school districts. She has been employed by school districts in autism-related positions in the past.

84.     Dr. Norall explained that Student's disability causes him to dwell on events. He has a heightened sense of justice and can be very sensitive if he believes he has been wronged. He can relive an incident over and over in his mind, almost as if a video was playing. Because of his autism, he misreads social cues.

85.     The evidence does not support a finding that there were "gang-bangers" in Student's computer class. Instead, it appears that Student's perseveration on the "pornography event" caused him to exaggerate events and develop fears that were unfounded.

86.     The evidence also does not support a finding that Student needed a BSP during the 2005-2006 school year. The incidents in the early part of the school year were dealt with by removing Student's one-to-one aide and changing him to a less stressful science class. The later incident in March 2006 seems to be an isolated event. Although Student did perseverate about it, it did not keep him from completing the class or getting a B- in the class. Student's other grades for that school year also indicate he had a good year and Ms. Martineau's testimony confirmed that he made progress in his social skills and problem solving. The evidence also does not support a finding that the District failed to provide Student with sufficient behavioral goals during that year. As stated in Factual Findings 70 – 74, Student had a problem solving goal in his IEP. That problem solving goal was directly related to the heart of Student's behavioral problems – his perseveration about the actions of others.

87.     Student's behavior problems escalated during his senior year. In September 2006, Student reported an incident in which a girl told Student to stick out his tongue. When he complied, she pressed her two fingers on the side of his throat and asked him if it hurt. Ms. Crane sent an email to Student's mother stating that the teacher would watch the girl and her interactions with Student. There was no report of further incidents involving this girl.

19

88.     On September 22, 2006, there were email exchanges between the District and Student's parents about Student being unusually aggressive in class. However, Student's actions were due to medication issues and were resolved.

89.     On November 27, 2006, Student's annual IEP was held. The IEP team found that Student's behavior impeded learning. Under the statement "If yes, specify positive behavior interventions, strategies, and supports" the box was checked under "behavior goals." The IEP contained a goal on problem solving and a goal on initiating friendships.

90.     Between September and December, there were minor incidents between Student and other pupils, which were dealt with through an informal "mediation" process on campus.

91.     On December 7, 2006, Student was upset by the bullying of another boy in class. He went to the office of Ms. Magaro, the school psychologist who led his social skills group, and telephoned his mother. Magaro was about to start the group when he arrived. She asked him if she could start the group and then come back to talk to him. He agreed. She got someone else to facilitate the social skills group, but when she came back to speak to Student, he was gone.

92.     Student's parents came to the campus and learned that the campus police were looking for their son. Student's parents discovered Student sitting in a fetal position beside the chain link fence where his parents typically pick him up after school. He was very upset and later told them he did not want to go back to school.

93.     On January 18, 2007, a behavior support plan (BSP) was prepared for Student. It addressed Student's conduct in perseverating about other children's problems and perceived injustice.

94.     When the second semester of Student's senior year began, Student was bullied by other boys in his English class. On February 23, 2007, the boys squirted water on Student's back with water bottles. Student was very upset by this incident. On February 26, Student's parents took him to their private psychiatrist because Student suffered an emotional melt-down as a result of these experiences.

95.     Student began avoiding his English class. On some occasions he went to the office. On March 1, 2007, he left class and went to the "dungeon." The dungeon was a room next to the cafeteria which was used for meetings. It was somewhat hidden from the general student population of the school and Student felt safe there. Ms. Crane reported to the parents that Student was asking for passes to get out of some of his other classes as well.

96.     On March 1, 2007, Student's parents sent an email to Ms. Hunt which stated, in part, that the BSP was not working and requested that the school prepare a behavior intervention plan (BIP).

97.     Hunt sent an email in response to the parents on the same day stating, in part: "A Behavior Intervention Plan is only written when the student's behavior is dangerous to himself or others. I don't think [Student's] issues are truly dangerous but they are certainly problematic." She said she would talk with Student's case manager and the school psychologist about meeting to review the BSP.

98.     On approximately March 6, the District assigned a one-to-one aide to work with Student in his English class.

99.     On March 8, 2007, Student skipped his fifth period English class and went to the dungeon again. On March 9, 2007, Student was bothering another child in his fourth period class. Crane chastised Student for it and kept him after class during fourth period. She reported that he was unusually argumentative recently.

100.    Student suffered an emotional "melt-down" at home that night. When his parents asked him about it, he said that a substitute teacher in the fifth period English class had allowed the boys who bullied Student to play very loud music. Student has sensory issues as a result of his disability and was troubled by the loud music. However, when he asked to leave the class, he was told he could not.

101.    On March 16, 2007, Ms. Crane sent an email to Student's parents explaining that Student had been quiet all week and had started attending fifth period again. Student told his parents that he did not bother talking to Ms. Crane any more because it would not do any good and that no one listened to him.

102.    On March 21, 2007, the District completed a Functional Analysis Assessment (FAA) report and prepared a BIP. The FAA/BIP was reviewed at an IEP meeting held the same day. Student's mother attended the meeting and took the plan home to discuss it with Student's father. She signed her approval for the plan on March 23, 2007.

103.    During the week of March 29, 2007, Student's behavior improved. Student's parents explained to Ms. Crane that they had promised him a reward if he behaved well that week.

104.    During the following week (the week before spring break), Student's behaviors escalated dramatically. On April 3, 2007, Student had an incident in a class in which he struck another student. When confronted by the teacher, he first lied and said he had not done so. When the teacher explained that both she and the aide had seen it happen, he said the student was "bugging" him. However, the other student had been sitting quietly at his chair. While the teacher went to check the other boy, Student went to the table and sat down. He then slammed his hands on the table and flipped it over. The teacher had the aide remove the other pupils from class and called for the school psychologist. She was able to calm Student down. He said he did not know why he hit the other boy. It was just a reaction.

105.    On April 4, 2007, Student's foods and nutrition teacher chastised Student in class. Student told his mother that the teacher said, "This is the last time I'm going to help you with this! Next time you are on your own!" Student reported that the teacher had said that modifying the work for Student was very labor intensive and that she was doing more work than Student was.

106.    Lynette Shires, the teacher in the general education foods and nutrition class, testified that Student's version of what happened was not completely accurate. She explained that she had given the pupils an assignment to write about vitamins and minerals and what effect they have on the body. She modified Student's assignment and made a special packet for him. He lost it twice, so she photocopied it a third time for Student's mother. Student was procrastinating and not working on the project in class. Shires told him that she wanted him to start working on it before she would help him. He became upset that she wanted him to do something that he did not want to do. Student was getting a D in the class because he was not completing assignments.

107.    On that same day, Student reported to his one-to-one aide that another child in his English class had thrown a paper and hit him in the head. The teacher and the aide did not see it happen or see any paper on the floor. When the aide was walking Student to his next class, Student began arguing with the aide about what she was supposed to do as part of his IEP. The aide felt offended that Student was telling her what to do. She did not know what was in his IEP. The District does not usually tell aides what is in an IEP, but instead instructs them regarding how to work with pupils as needed.

108.    On April 5, 2007, there was an assembly about driving safety for all the high school students in which there was an accident simulation. Student's parents felt this would be too upsetting for Student and asked that he be excused from it. Apparently there was miscommunication between District staff and Student went to the assembly anyway. It is not clear whether he was sent there by the teacher or went on his own when the other students went. Student was very upset by what he saw during the assembly.

109.    The same day, another student threw a "stink bomb" into Student's drama class. The parties dispute the facts of that incident. The campus security guard who gave Student's parents a ride to Ms. Crane's office reported that one of the other students in class threw the "stink bomb" at Student, hitting him in the hand. Ms. Crane reported that Student had hit the other boy. Student subsequently told his mother that a particular boy had run into the class, thrown the stink bomb at Student and hit him in the hand, then run off. When Student confronted the other boy after the other pupils had left class, the boy had called him names (including "retard" and "psycho") and accused him of making up the story. In response, Student hit the boy on the head.

110.    Florene Villane, the drama teacher, testified that a student from outside the room threw the "stink bomb" and it landed near a trash can. It did not hit Student. Student was concerned about the teacher and ran to pick it up. After he picked it up, he grew upset because he could not get the smell off his hands. She told him he could wash his hands, and

22

he went to the resource teacher's room. Villane said the boy that Student blamed for the incident did not throw the "stink bomb." The other boy could not have thrown it, because he was inside the class when the "stink-bomb" was thrown into the class from outside.

111.   The evidence supports Villane's version of the events. The "stink bomb" was thrown from outside class, so the boy blamed by Student could not have thrown it. It appears that the security guard who spoke with the parents had heard rumors and not the correct story. Student's version of the events is contradictory – if the other boy had run into the class, thrown the stink bomb, and then run off, how could the boy have still been in the room after class for Student to confront?

112.   Crane sent an email to the drama teacher in which she stated that Student "has started to become physical and we really need to address this. He has had a problem everyday this week."

113.   On Sunday, April 8, 2007, during spring break, Student parents sent an email to Hunt explaining that Student was seeing a private mental health professional, in part, because of their concerns about the incidents at school. They asked that the District immediately assign an autism consultant to assess the situation with Student.

114.   On April 16 and 17, 2007, after spring break, Student told his parents that he did not want to go back to Fallbrook High School and he did not feel safe there.

115.   On April 18, 2007, Hunt responded to the parents' April 8 email. She asked to meet with the parents and the mental health professional. She said the District did not have an autism consultant immediately available, but she would discuss seeking additional support and staff for Student after the meeting with the mental health professional.

116.   On April 19, 2007, Student's private psychiatrist Dr. Ong wrote a letter to Ms. Hunt which stated, in part:

> [Student's] current symptoms of anxiety, depression and anger outburst have been reportedly intensified by his current level of school placement. I have collaborated with Mr Mark Luciano (Educational Consultant) today and he feels the same way after a brief classroom observation while [Student] is in class. It is my opinion that current school placement for [Student] is not adequate in maximizing his educational & behavioral needs.

117.   On April 25, 2007, during Magaro's triennial assessment of Student, Student reported that he was very sad, did not want any further testing, and put his head down on the desk.

118.   On May 3, 2007, Student's parents pulled Student from school and did not let him return to Fallbrook High School.

23

119.  . On May 9, 2007, Dr. Ong wrote another letter to Ms. Hunt, stating:

I saw [Student] last May 3, 2007 with our crisis therapist, Nancy Zieve, LCSW. Mother had picked up [Student] after school in an agitated state. His current school placement is not adequate in meeting [Student's] mental & emotional needs, subsequently, he is not learning to his potential. It is my recommendation that [Student] will be taken off his current school while placement in a new school is being assess (sic). Please feel free to collaborate with me with your concerns.

120.  Another IEP was held on May 10, 2007, to discuss the results of the triennial assessment. During the meeting, Ms. Hunt recommended that Student start seeing the school psychologist individually to help him deal with his anxiety so he could return to school. The IEP notes reflect that Student's mother "said she won't force him to do that."

121.  On May 14, 2007, Ms. Hunt sent a letter to Student's parents with a request for authorization to speak with Ong. Neither Student's parents nor Student consented to this request. Student's mother testified that, based on advice of counsel, she did not believe she could consent because it would violate Student's privacy.

122.  On June 7, 2007, the District provided an assessment plan to Student's parents, requesting their authorization to conduct a social/emotional behavior assessment of Student. Student's parents did not consent to that assessment. Student's parents requested an independent educational assessment of Student.[10]

123.  Student subsequently retained Cynthia Norall to conduct an independent assessment of Student. Dr. Norall reported that Student became distressed when she began asking him about how he got along in high school. He became more upset during the writing and mathematics portions of her assessment. Ultimately he "shut-down" and curled up in a fetal position in the waiting room. In her opinion, his reaction was because of the stress and anxiety that resulted from his time at Fallbrook High School. She believed that, because of his disability, he relived the incidents that occurred there over and over in his mind. She believes he should never go back there.

124.  Ms. Martineau, who worked with Student in the social skills group during his junior year, opined that Student's shut-down in Norall's office was probably because he was overwhelmed by the amount of testing Norall gave to Student. Martineau said that Student tended to shut-down when he was tired and felt overwhelmed by his school work. She would never have tested him as long on a single day as Norall did. Martineau's testimony, supported by her many months of working with Student, makes sense. It was the mathematics portion of the assessment which caused Student the most trauma, but there was

---

[10]  Student withdrew his request for reimbursement for Dr. Norall's independent assessment. The validity of the District's triennial assessment and the propriety of the District's June 7 request for a further assessment are not at issue in the instant case. There is a separate, District-filed case involving assessment issues.

no evidence that he suffered from bullying or teasing in his math class. Instead, it was the English class where most of the bullying took place.

125.    The evidence does not support a finding that the District failed to provide Student with a safe learning environment. Although some boys in Student's English class bullied Student and squirted him with water, the District responded by assigning a one-to-one aide to be with Student during that class. Aside from the bullying, there was no evidence of any physical danger to Student. The evidence did not establish that the "stink-bomb" was thrown at Student or even that it hit Student. Instead, aside from the water incident, the physical altercations involving Student during his second semester senior year involved Student hitting other boys, not the reverse. Student's feeling of being unsafe appears to be the result of his own perseverating over various events rather than the events themselves.

126.    Dr. Ong's letters do not change this. Although his second letter stated that the school was not meeting Student's mental and emotional needs, his letter does not elaborate on the basis for his opinion. Dr. Ong did not testify at the hearing and the District was not given leave to contact him. Although he recommended that Student not attend Fallbrook High any longer, he did not state that Student was unsafe there. Dr. Norall's opinion that Student was reliving events at school was important, but not enough to prove Student was unsafe. The evidence established that he exaggerated events in his mind when he perseverated on them, so what he was reliving may have been different from what actually happened.

127.    The evidence also does not support a finding that the District failed to timely provide a BSP or BIP. The incidents prior to December 2006 were minor difficulties with other students that were handled effectively with mediation. There was one serious incident in December, but most of Student's serious behavioral issues began during his final semester of his senior year.

128.    The District reacted to the second semester problems appropriately, first by preparing a BSP in January 2007. When the behaviors continued to escalate, the District conducted an FAA and prepared a BIP. Most of Student's severe behaviors occurred *after* the preparation of the BIP on March 21, 2007, not before, and occurred during the week before spring break. After Dr. Ong wrote his first letter in April 2007, Student continued to attend the high school until May 3, 2007. The evidence did not establish what triggered Student's "melt-down" on May 3 that caused his parents to withdraw him from school.

129.    The District followed the proper progression of moving from IEP supports, to a BSP to a formal FAA and BIP. Although Ms. Hunt told the parents on March 1, 2007, that no BIP was necessary, an FAA was conducted and a BIP was prepared and signed only three weeks later. Ms. Hunt's statement is not enough to prove that the District acted improperly.

130.    Student also contends that the behavioral goal in the IEP, which dealt with problem solving, was inadequate. However, it appears that it dealt with the heart of

25

Student's behavioral issues – his inability to deal with a problem with another student or in class.

131.    Student has failed to meet his burden of proving that the District denied him a FAPE by failing to provide a BSP or adequate behavioral goals during Student's 2005-2006 school year or by failing to timely provide a BSP/BIP or failing to provide a safe learning environment during the 2006-2007 school year.

*Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student with Social Skills Training?*

132.    School Psychologist Sandra Magaro provided Student with a social skills group once a week during the 2006-2007 school year. Student also had the option of coming to her office when he needed a sensory break. In Student's written closing argument, Student does not dispute that the social skills group meetings took place. Instead Student contends that Student should have had one-to-one social skills training or have been placed in a nonpublic school. The evidence does not support Student's position. Student's own expert Dr. Norall recommended that Student participate in her social skills group called a "friends club." There is also no evidence that Student's social skills training had to be provided by a nonpublic school. Magaro was well qualified to handle the social skills training. Although Dr. Norall recommended "social coaching" for Student with a behavioral aide, she did not testify that the social skills group provided by Magaro during Student's senior year was inadequate. Norall also believed that mediation was important for Student. The District witnesses testified that the school staff used mediation as a strategy for Student during Student's 2006-2007 school year.

133.    Student has the burden to show that the District failed to provide social skills training during the 2006-2007 school year. Student failed to meet that burden.

*Did the District deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a Communication Log Between the District and Student's parents?*

134.    There is no specific requirement in IDEA that a school district provide a daily or weekly log of communications between the school staff and a child's parents. However, if the IEP calls for a log to be provided, then it must be provided.

135.    Student's parents have requested and received communication logs from the schools that Student attended before he came to the District. Student's May 11, 2004 IEP and November 3, 2004 IEP called for Student's parents to receive weekly progress reports. The November 30, 2005 IEP, on the other hand, called for only a progress summary report once a semester. The November 27, 2006 IEP does the same.

136.    The evidence in the file shows that in January 2007, Ms. Crane, Student's case manager, started sending weekly reports to the parents. However, even earlier in the year, there was a continual communication by email between Student's parents and Ms. Crane.

There was no lack of communication between Student's parents and the District staff at any time during the 2006-2007 school year.

137.    Student failed to meet his burden of proving that the District denied him a FAPE by failing to timely produce communication logs.

*Did the District Deny Student a FAPE During the 2006-2007 School Year Because of Staff Insensitivity to Words and Actions that Trigger Anxiety in Student or Because of Staff Insensitivity Toward Student's Parents?[11]*

138.    Student contends that the attitude of District staff was insensitive toward words and actions that escalated Student's anxiety. While "insensitivity" is not a specific basis for a denial of FAPE, it is possible that sufficient insensitivity by school district staff might constitute a failure by the staff to comply with a student's IEP. The law requires a District to comply with the terms of an IEP in order to provide a student with a FAPE. Likewise, although the law does not specifically prohibit district staff from being insensitive toward parents, if that insensitivity rises to the level that it deprives the parents of the ability to participate in the IEP process, it could constitute a procedural violation of IDEA.[12]

139.    Student cites to several incidents in which the District staff demonstrated insensitivity to Student. On December 13, 2006, Ms. Hunt sent an email to Student's television technology teacher in which she stated that Student did not have the intellectual capacity for his class and the best Student might be in the television field is a "gofer."

140.    On January 10, 2007, Ms. Hunt complained to District staff that they needed a formal communication plan so that Student's parents "don't come running over here every time he sneezes." Hunt also demonstrated insensitivity by asking if Student was a bigot when Student had complained about other students bullying him in one of his classes.[13]

141.    As stated in Factual Findings 105-106 above, there was an occasion in which Student's foods and nutrition teacher grew impatient with Student because he was procrastinating on a project and spoke sternly to him.

142.    In addition, Student's parents filed a complaint in December 2006 because of rude treatment that Student's mother and Student had received from a traffic guard near the campus parking lot.

---

[11] These two issues are grouped together because the same factual findings support both.

[12] Student's counsel did not state the legal basis for these allegations in Student's written closing argument or cite to any cases relating to "insensitivity."

[13] Ms. Hunt's testimony also demonstrated her insensitivity to the parent's concerns. At one point during direct examination, Hunt went beyond the scope of one question asked by her counsel in order to comment that Student's parents complained about a teacher scolding Student for his flatulence in class. Hunt's testimony appeared to be designed to belittle Student's parents.

143.    Although there is no dispute that these comments were made or that they demonstrated a level of insensitivity toward Student and his parents, they are not sufficient to amount to a denial of FAPE, either procedurally or substantively.

144.    Ms. Hunt was not one of Student's instructors. She was an administrator at the school. Any insensitivity she displayed would not have affected Student or triggered anxiety on his part. Likewise, the parking attendant was not a trained educator who worked with Student on his IEP goals. The one incident with Student's foods teacher, even if it occurred in precisely the way Student described, was not alone enough to constitute a failure to comply with Student's IEP. There were many other staff members to whom Student could go for support.

145.    All of Student's teachers and counselors who testified at the hearing demonstrated genuine concern for Student's well being and a desire to help him with his education. While Hunt may have complained about Student's parents in her emails, her staff did their best to address the concerns of Student and his parents in a timely and courteous manner. The record is full of instances in which the staff responded quickly to emails sent by Student's parents and met with Student's parents to address Student's educational and behavioral issues.

146.    Student did not meet his burden of proving that the staff insensitivity toward him denied him a FAPE.

147.    Likewise, the evidence does not support a finding that staff insensitivity toward Student's parents constituted a procedural violation of FAPE. There is no indication that Hunt's comments regarding Student being a "gofer" or the parents rushing in "every time he sneezes" were sent to the parents or intended to be read by them. While these comments and Hunt's testimony do indicate a bit of a callous attitude toward Student's parents, that attitude did not prevent Student's parents from participating in Student's IEP process. These were not frightened parents who were cowed into accepting whatever a callous District forced upon them. Instead, these were concerned, dedicated parents who tried their best to work with the District, but were unafraid to challenge the District when necessary for their son's education. There was no denial of FAPE.

*Did the District Deny Student a FAPE by Failing to Provide Student with an Educational Program (such as home hospital or an itinerant teacher) after May 3, 2007?*

148.    Student contends that the District denied Student a FAPE by failing to provide Student with any education between May 3, 2007, when Student's parents pulled Student from high school, until the end of the school year on June 14, 2007. A school district is required to provide a continuum of program options, including home hospital or itinerant teachers, if necessary to meet a student's unique needs.

149.    Student's parents pulled Student from Fallbrook High School on May 3, 2007, based on Dr. Ong's recommendation. At the May 10, 2007 IEP meeting, Student's parents

28

requested that Student's assignments be sent home., Ms. Hunt told them that not all of the general education assignments could be done at home but that assignments could be modified to some degree. The District recommended that the school psychologist Ms. Magaro see Student on an individual basis to help deal with his anxiety so he could return to school. Student's parents refused.

150.    The District did not explore any other options for providing Student with an education at that meeting. The District did not call an emergency IEP or take steps to get Student back into school after that date.

151.    On May 14, 2007, the District sent a release to Student's parents and Student so the District could speak with Dr. Ong. As stated above in Factual Finding 121, Student's parents refused to sign it.

152.    On June 7, 2007, the final IEP meeting of Student's 2006-2007 school year was held. The District offered Student a placement for the 2007-2008 school year, but did not address the remaining school time in the 2006-2007 school year.

153.    Student did not attend Fallbrook High School from May 3, 2007, to the end of the 2006-2007 school year, and did not complete his final semester classes.

154.    The evidence does not support a finding that the District failed to provide Student with an educational program between May 3, 2007, and the end of the 2006-2007 school year on July 14, 2007. Student's parents pulled Student from Fallbrook High School based on the recommendation of Student's psychiatrist, but they refused to allow the District to speak with that psychiatrist to find out the basis for his opinion. The District requested authorization from both Student's parents and Student to speak with Dr. Ong. There was no evidence at hearing that the parents asked their son whether he would consent to have the District speak with Dr. Ong. In addition, Student's parents did not permit the school psychologist Ms. Magaro to speak with Student about returning to school. Dr. Ong's letter did not state that continued attendance at Fallbrook High School would be mentally or emotionally damaging or dangerous for Student. It merely said he was not "learning to his potential" there. That alone was not sufficient to warrant a home placement.

155.    Without input from Dr. Ong or Ms. Magaro, the District could only rely on its recent triennial assessment to determine an appropriate placement for Student for the remainder of the school year. That assessment did not find any basis for home hospital or itinerant teacher services. Based on that information, the District offered Student an educational program at Fallbrook High School between May 3, 2007, and the end of the school year. That offer was consistent with the legal requirement that the District provide FAPE in the least restrictive environment. There was no violation by the District.

29

*Factual Findings Related to Proposed Remedies*

156.    Student requests compensatory education in a nonpublic school (NPS) as a remedy for the District's denial of FAPE.  Student presented evidence related to the Fusion Learning Center and the services it provides.  However, the evidence established that the Fusion Learning Center is not a certified NPS with the State of California.  Student's expert Dr. Norall mentioned other possible schools, but Student provided no specific information regarding the programs at those schools or whether they would accept Student in their classes.  Dr. Norall believes that Student has the capability of attaining a diploma if an appropriate school program is provided.  Student wants to attain a diploma, but does not wish to go back to the Fallbrook High School campus.  Student's parents also wish to have Student work toward a diploma.

## CONCLUSIONS OF LAW

*Burden of Proof*

1.    The Student, as the party who filed the due process request, has the burden of proof in this proceeding.  (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

*The Requirements for a Free Appropriate Public Education*

2.    Under the federal Individuals with Disabilities Education Act (IDEA) and corresponding state law, students with disabilities have the right to a FAPE.  (20 U.S.C. § 1400 et seq.; Ed. Code, § 56000 et seq.)  FAPE means special education and related services that are available to the student at no cost to the parents, that meet the state educational standards, and that conform to the student's IEP.  (20 U.S.C. § 1401(a)(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).)

3.    In *Board of Education of the Hendrick Hudson Central School District v. Rowley* (1982) 458 U.S. 176 [102 S.Ct. 3034] (*Rowley*), the Supreme Court discussed what is required for an offer of FAPE.  The court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs.  (*Id.* at p. 201.)  *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers.  (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is "sufficient to confer some educational benefit" upon the child.  (*Id.* at pp. 200, 203-204.)  In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program.  (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314.)

30

4.    The congressional mandate to provide a FAPE to a child includes both a procedural and a substantive component. In *Rowley, supra*, 458 U.S. 176, the United States Supreme Court utilized a two-prong test to determine if a school district had complied with the IDEA. First, the district is required to comply with statutory procedures. Second, a court will examine the child's IEP to determine if it was reasonably calculated to enable the student to receive educational benefit. (*Id.* at pp. 205 – 207.)

5.    However, not every procedural violation of IDEA results in a substantive denial of FAPE. (*W.G. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484.) According to Education Code section 56505, subdivision (f)(2), a procedural violation may constitute a substantive denial of FAPE only if it:

(A)    Impeded the child's right to a free appropriate public education;

(B)    Significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(C)    Caused a deprivation of educational benefits.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide Student's Parents with Options for Student's Graduation? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student's Parents with Options for Student's Graduation and/or Predetermining Student's Placement?*

6.    Parents are an important part of the IEP process. Parents have the right to participate in the development of the IEP for their child and "to be informed of the availability under state and federal law of free appropriate public education and of all available alternative programs, both public and nonpublic." (Ed. Code, § 56506, subd. (d).)

7.    A district must have a continuum of program options available to special education students to meet their needs. (Ed. Code, § 56360.) The continuum of program options includes, "instruction in the home, in hospitals, and in other institutions to the extent required by federal law or regulation." (Ed. Code, § 56361, subd. (i).) "Services provided by nonpublic, nonsectarian schools, as defined pursuant to Section 56034, and nonpublic, nonsectarian agencies, as defined pursuant to 56035, shall be available." (Ed. Code, § 56365, subd. (a).)

8.    Beginning no later than the effective date of the IEP in effect when the pupil reaches the age of sixteen, the meeting must include consideration of postsecondary goals and transition services for the pupil. (Ed. Code, § 56341.5, subd. (e).)

9.    The IDEA contemplates that decisions will be made by the IEP team during the IEP meeting. It is improper for the district to prepare an IEP without parental input, with

31

a preexisting, predetermined program and a "take it or leave it" position. (*W.G., supra*, 960 F.2d, at p. 1484.)

10.     As set forth in Factual Findings 1- 56, the evidence supports a finding that the District failed to provide Student's parents with options for Student's graduation. While the District personnel understood that Student was being placed on a track that would not lead to a diploma, they did not effectively and appropriately communicate that to Student's parents.

11.     The failure of the District to adequately keep the parents informed constituted a procedural violation of IDEA. As set forth in Legal Conclusion 5, in order to determine if that procedural violation also constituted a substantive violation of FAPE, it is necessary to look at the factors set forth in Education Code section 56505, subdivision (f)(2). In the instant case, the second factor is the key. The failure to properly inform the parents about the options for Student's graduation significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to Student. Student's parents were making critical decisions regarding Student's classroom placement and testing. Without full knowledge that the choices they were making would affect their son's ability to attain a diploma, they could not make informed decisions. Their decisions could easily have been different if they knew the correct information.

12.     Likewise, the District's predetermination of placement at the June 2007 IEP meeting significantly impaired the parents' opportunity to participate in the decisionmaking process. The school presented two placement options, neither of which was intended to assist Student with possibly attaining a diploma. When the parents attempted to participate in the process, they were closed out without a discussion of other reasonable alternatives. Even though the District proposed two placements instead of the one placement proposed in the *W.G.* case, the District was still predetermining what the placement would be and then refusing to consider other options. The District's actions denied Student a FAPE.

*Did the District Deny Student a FAPE During the 2005-2006 and 2006-2007 School Years by Failing to Include a Handwriting Goal in Student's IEP and/or Failing to Provide Occupational Therapy Services for Handwriting?*

13.     An IEP must include a statement of measurable annual goals, including academic and functional goals designed to meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general education curriculum and meet each of the pupil's other educational needs that result from the disability. (Ed. Code § 56345, subd. (a)(2).) An IEP must also include related services (called "designated instruction and services" in California) which are necessary to assist an individual with special needs to benefit from special education. (20 U.S.C. § 1401(26); Ed. Code, § 56363, subd. (a).) These services may include occupational therapy. (Ed. Code, § 56363, subd. (b)(6).)

14.     As set forth in Factual Findings 57 - 69, the Student had needs in the area of handwriting with respect to the ability to sign his name in cursive. Student's IEP did not

address those needs until March 2007. Although Student worked on signing his name in class, he did not have the systematic oversight of an IEP, and, as a result, was very erratic on the use of a cursive signature. Student met his burden of proving that the failure to include a handwriting goal in the IEP denied Student a FAPE. However, Student did not meet his burden with respect to the need for OT services. All the individuals who assessed Student agreed that his writing problems were not caused by a fine motor deficiency. Student did not call an OT expert to state that Student required such services in order to consistently sign his name in cursive.

*Did the District Deny Student a Free Appropriate Public Education During the 2005-2006 School Year Due to Student's Failure to Make Sufficient Progress to Meet His IEP Goals?*

15.    The law requires an IEP team to meet at least annually "to determine whether the annual goals for the pupil are being achieved, and revise the individualized education program, as appropriate, to address among other matters the following: (1) Any lack of expected progress toward the annual goals and in the general curriculum, where appropriate...." (Ed. Code, § 56341.1, subd. (d).) An IEP meeting must be called when the "pupil demonstrates a lack of anticipated progress." (Ed. Code, § 56343, subd. (b).)

16.    As set forth in Factual Findings 70 - 74, Student did not meet his burden of proving that Student failed to meet his goals during the 2005-2006 school year. Instead, the evidence showed that Student made substantial progress on the problem solving goal in question. The inclusion of the goal in the following IEP was not improper.

*Did the District Deny Student a FAPE During the 2005-2006 School Year by Failing to Provide a BSP, and/or Failure to Write Adequate Behavioral Goals? Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a BSP and/or Failing to Provide a Safe Learning Environment?*

17.    When a child's behavior "impedes the child's learning or that of others," a school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." (20 U.S.C. § 1414(d)(3)(B)(i).) When a child "exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives" of the child's IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) Serious behavior problems are defined as "behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective." (Cal. Code Regs., tit. 5, § 3001, subd. (aa).) Before a BIP is developed, the district must conduct a functional analysis assessment (FAA). (Cal. Code Regs., tit. 5, § 3052, subd. (a)(3).) An FAA is a detailed assessment of a child's behavior, which includes, among other things, systematic observation of the occurrence of the targeted behaviors, systematic observation of immediate antecedent events associated with the behavior and the consequences of the behavior. (Cal. Code Regs., tit. 5, § 3052, subd. (b)(1).)

33

18.     As set forth in Factual Findings 75 - 131, Student did not meet his burden of showing that the District failed to respond appropriately to Student's behavioral issues. The few behavioral incidents that Student had during the 2005-2006 school year were easily handled by the IEP supports in place. There was no need for a BSP or any behavior goals besides the problem solving goal in the IEP. When that situation changed during the middle of the 2006-2007 school year, the District responded appropriately, first with a BSP and then a BIP.

19.     Student also failed to meet his burden to show that the District failed to provide him with a safe learning environment. On each occasion that Student was subjected to bullying by peers or insensitive treatment by aides, the District took action to correct the circumstance. Because the District had no opportunity to speak with Student's psychiatrist and because the parents would not let Student talk to the psychologist after May 3, 2007, the District was hampered in its efforts to provide any changes necessary to deal with Student's continued "melt-downs." There was no denial of FAPE in this regard.

*Did the District Deny Student a FAPE During the 2006-2007 School Year by Failing to Provide Student with Social Skills Training?*

20.     As set forth in Factual Findings 132 – 133, the evidence did not establish that the District failed to provide Student with social skills training. There was no denial of FAPE.

*Did the District deny Student a FAPE During the 2006-2007 School Year by Failing to Timely Provide a Communication Log Between the District and Student's parents?*

21.     As set forth in Factual Findings 134 – 137, the evidence did not establish that the District was required to provide a communication log to the parents during the 2006-2007 school year. There was no requirement in the IEP for such a log and Student has cited to no legal authority that a District must produce a communication log to all parents of special education pupils. The District began providing weekly updates in January 2007, but even before that, there was constant email communication between Student's parents and the District. There was no procedural violation and no denial of FAPE.

*Did the District Deny Student a FAPE During the 2006-2007 School Year Because of Staff Insensitivity to Words and Actions that Trigger Anxiety in Student or Because of Staff Insensitivity Toward Student's Parents?*

22.     Student cites to no legal authority stating that staff insensitivity may constitute a denial of FAPE. However, it is possible that, if the District's insensitivity prevents meaningful participation by the parents in the IEP process, it might constitute a procedural violation. In addition, if District staff is insensitive to a special education student's needs to the extent that the District is no longer following Student's IEP, it might constitute a denial of FAPE. As set forth in Factual Findings 138 – 147, Student did not meet his burden of showing that any insensitivity by District staff toward Student or his parents was severe

34

enough to prevent the parents from participating in the process or constitute a failure to follow Student's IEP. There was no denial of FAPE.

*Did the District Deny Student a FAPE by Failing to Provide Student with an Educational Program (such as home hospital or an itinerant teacher) after May 3, 2007?*

23. As stated above in Legal Conclusion 7, a district must have a continuum of program options available for special education students. Special education and related services may be provided in the home or hospital if the IEP team recommends such instruction or services. (Cal. Code Regs., tit. 5, § 3051.4, subd. (a).) "For those individuals with exceptional needs with a medical condition such as those related to surgery, accidents, short-term illness or medical treatment for a chronic illness, the individualized education program team shall review, and revise, if appropriate, the individualized education program whenever there is a significant change in the pupil's current medical condition." (Cal. Code Regs., tit. 5, § 3051.4, subd. (c).) When recommending placement for home instruction, the IEP team must have a "medical report from the attending physician and surgeon or the report of the psychologist, as appropriate, stating the diagnosed condition and certifying that the severity of the condition prevents the pupil from attending a less restrictive placement." (Cal. Code Regs., tit. 5, § 3051.4, subd. (d).)

24. As set forth in Factual Findings 148 – 155, the District provided Student with an educational program in the Fallbrook High School between May 3, 2007, and the end of the school year. According to the triennial assessments conducted by the District shortly before the May 2007 IEP meeting, that was the appropriate program for Student. Based on a letter from Student's psychiatrist, Student's parents pulled Student from the high school on May 3. However, neither Student nor his parents gave the District permission to speak with the psychiatrist, and Student's parents declined an offer to have the District's psychologist speak with Student. The psychiatrist's letter dealt with Student's learning potential, not any physical or mental harm that would result from his placement in the high school. Without anything more, it would not have been appropriate for the District to place Student in a home environment. There was no denial of FAPE.

*What is the Appropriate Remedy for the Denial of FAPE?*

25. As stated above in Legal Conclusions 1 – 24, the District failed to provide Student with a FAPE during the 2005-2006 and 2006-2007 school years because the District failed to inform Student's parents regarding Student's graduation options, predetermined Student's placement during the June 2007 IEP meeting, and failed to provide Student with a handwriting goal related to signing his name in cursive writing until March 21, 2007. Student seeks compensatory education "at a certified NPS, with all services, and with special education transportation" to remedy the denial of FAPE.

26. Compensatory education is an equitable remedy designed to "ensure that the student is appropriately educated within the meaning of the IDEA." (*Parents of Student W v. Puyallup School District, No. 3* (9th Cir. 1994) 31 F.3d 1489, 1497.) There is no obligation

to provide a day-for-day compensation for time missed. The remedy of compensatory education depends on a "fact-specific analysis" of the individual circumstances of the case. (*Ibid.*) The court is given broad discretion in fashioning a remedy, as long as the relief is appropriate in light of the purpose of special education law. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996].)

27.     Looking at the facts in the instant case, it is questionable whether Student needs compensatory education at all. As set forth in Factual Finding 56, Student made significant educational progress while in high school. He went from a fifth grade reading level to a tenth grade reading level in three years. His math skills also improved greatly. Although placement is not at issue in this case, the evidence introduced at the hearing indicated that Fallbrook High School was the appropriate placement for Student in the least restrictive environment for the three years Student attended there. It is partly because of Student's significant progress that attaining a high school diploma is a possibility for him at this time.

28.     On the other hand, even though Student made educational progress in his high school years, he was not progressing toward a diploma because of the choices the IEP team made. If his parents had understood the consequences of their choices, they might have made other choices. For example, they might have encouraged standardized testing of their son rather than agreeing to exempt him from testing every year. They might have asked for more goals in mathematics, such as the goals they sought in June 2007, once they realized that he needed algebra to graduate.

29.     The evidence has established that Student lost educational opportunity due to the District's failure to properly inform his parents about his non-diploma track. Some measure of compensatory education is appropriate.

30.     The more difficult question is what type and/or amount of compensatory education would make up for the educational opportunities which Student lost. The District's transition program is not designed to give Student the opportunity to work toward a diploma. Based on Ms. Hunt's testimony that allowing Student to return to high school as a "super senior" was not intended to allow Student to earn a diploma, it does not appear that another year at Fallbrook High School is the appropriate compensatory remedy.

31.     However, Student presented very little evidence on the subject of the appropriate compensatory remedy. The Fusion Learning Center is not a state certified NPS, and Student did not present specific evidence about other NPS programs. Under these circumstances, Student did not meet his burden of proving that an NPS placement should be ordered to provide compensatory education to Student.

32.     The appropriate remedy under these circumstances is to require the District to hold a new IEP meeting to allow the IEP team to discuss appropriate placement and services to permit Student to work toward a high school diploma.

36

33.    A new IEP meeting will also remedy the denial of FAPE based on predetermination of placement. Because the District predetermined the proposed placement at the June 2007 IEP meeting, the District failed to consider other possible options for Student's education. The appropriate remedy is to order the District to hold another IEP meeting to consider a placement which will permit Student, with appropriate supports and services, to work toward a diploma. The IEP meeting should be held at a time when Student's expert Dr. Norall and/or any other experts Student wishes to invite to the meeting may be present. The IEP team should specifically address the issue of placement, services and supports necessary to help Student work toward a diploma. Possible NPS placements should be considered by the IEP team. If the IEP team is unable to agree upon an appropriate placement, nothing in this Decision would stop either party from seeking further relief through a future due process proceeding.

34.    The IEP team should also make certain that a handwriting goal for Student's cursive signature is included in Student's next IEP. That will be sufficient to remedy the failure to include a handwriting goal in the past IEPs.


## ORDER

1.    The District is ordered to schedule a new IEP meeting within 30 days of the date of receipt of this Decision. The meeting will be scheduled at a time convenient to Student, Student's parents, Student's counsel, and any experts Student chooses to bring to the meeting.

2.    At that meeting, the IEP team will discuss and consider placements, goals and services that are designed to help Student work toward a high school diploma, including NPS placements.

3.    Nothing in this Decision is intended to prevent either party from filing a further due process proceeding regarding any proposal made at that IEP meeting.


## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. In accordance with that section the following finding is made: Student prevailed on Issues 1 (a) and (b), and 2 (i). The District prevailed on the remaining issues.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within 90 days of receipt of this Decision in accordance with California Education Code section 56505, subdivision (k).

Dated: November 20, 2007

SUSAN RUFF
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

38

Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California 92014
(858) 342-8360

**Attorney for Petitioner, Christopher Struble**

## BEFORE THE STATE OF CALIFORNIA

## OFFICE OF ADMINISTRATIVE HEARINGS

## SPECIAL EDUCATION DIVISION

| | |
|---|---|
| In The Matter Of | ) Case No.: N2007090067 |
| | ) |
| CHRISTOPHER STRUBLE | ) PETITIONER, CHRISTOPHER |
| | ) STRUBLE'S MOTION FOR |
| Petitioner, | ) MODIFICATION OF DECISION |
| | ) |
| v. | ) |
| | ) Hearing Dates: October 16-19, 2007 |
| FALLBROOK UNION HIGH SCHOOL | ) ALJ: Hon. Susan Ruff |
| DISTRICT, | ) |
| | ) |
| Respondent. | ) |
| | ) |
| _____ | )__ |

# I.

# INTRODUCTION

Christopher Struble ("Student") is an 18-year-old special education student who filed for Due Process against Fallbrook Union High School District ("The District"), in order to resolve disputes concerning whether the District violated procedural and substantive provisions of IDEA, in order to obtain a remedy of compensatory education.

Student did not file for and undergo a Due Process Hearing for the purpose of taking another step backward in order to go to an IEP Team Meeting, where the District's options are wide open. Moreover, the District refused to participate in either a Resolution Session or a Mediation in this case. That is why Student needed a definitive Decision. The Decision contradicts itself, and must be modified.

# II.

# ARGUMENT

**A.     When Procedural Violations of IDEA Are a Denial of FAPE, Under Rowley, The ALJ Need Not Make Any Determination As To The Substantive Violations.**

While there was significant discussion at Hearing of precisely what Student's Issues were, Student's counsel stated on the record that Student needed to prevail on only one or more significant issues in order to prevail. Student also presented evidence at Hearing that parents had requested a different school at the 6/7/07 IEP (Ex. G p. 210). The advice of Dr. Ong and Dr. Cynthia Norall was for a non-public placement where Student could obtain his High School Diploma. In the Decision, Findings of Fact Paragraphs 51-56 establish that Student has not been given the opportunity to attain a diploma, and parents were not adequately informed of graduation options.

Conclusions of Law 4-12 substantiate that Student was denied a FAPE because the District's procedural violations of not communicating graduation options[1], and having a

---

[1] While Student characterized this failure as a substantive failure, it can also be viewed as a procedural failure in view of the mandate that "Requirements for graduation and specified alternative modes for completing the prescribed course of study shall be made available to pupils, parents and the public." Cal. Ed. Code § 51225.3, History. Amended by Stats 2000 ch 1058 (AB 2907), s 40, eff. 9/30/00.).

1 "predetermined placement" "significantly impeded the parents' opportunity to participate in the

2 decision making process regarding the provision of a FAPE.

3        The Decision correctly states in Conclusion of Law No. 4 that, "The congressional

4 mandate to provide a FAPE to a child includes both a procedural and a substantive component.

5 In *Rowley, supra* 458 U.S. 176, the United States Supreme Court utilized a two-prong test to

6 determine if a school district had complied with the IDEA.  **First, the district is to comply with**

7 **statutory procedures..."** (emphasis added).

8        Now that there has been a finding that the District failed to comply with the procedures of

9 IDEA, *Rowley* and its progeny hold that [t]he first part of the inquiry addresses procedural

10 violations.  If the administrative law judge finds that violations of IDEA procedural requirements

11 have been committed by the school district, a second step is required to determine whether that

12 procedural violation is one which has resulted in such substantial harm that the violation itself

13 constitutes a denial of FAPE. *Deal v. Hamilton Cty, Bd. of Educ.,* 392 F. 3d 840, 854 (6th Cir.

14 2005).  Examples of such violations include the pre-determination of an IEP, the failure of the

15 district to convene a properly constituted IEP Team, and the failure of the district to allow the

16 parents to participate meaningfully in the IEP discussions and determinations.  In each of those

17 situations, our Circuit Courts have found that the procedural violations constituted a denial of

18 FAPE to the student.

19        If the procedural violation is not one that results in substantial harm, the third step is

20 taken.  With the third step, the trier of fact must determine whether any actions of the District

21 resulted in a denial of substantive FAPE for the child.  Because the District has failed to meet the

22 procedural requirements of the IDEA, it is unnecessary for the ALJ to address issues concerning

23 whether the District substantively met the requirements of FAPE. (OAH Decision N

24 2006100142, 3/21/07).

25

26

27

28

Therefore, there was no need to rule on the various implementation issues, as these were raised only for the purpose of thoroughness, in the event that the procedural violations were not a denial of FAPE.  Student prevailed on Procedural Issues 1 (a) (b) and 2 (a)[2] (i).

Therefore, Student prevailed.

**B.    Student Has Met His Burden of Proof For Compensatory Education at a NPS or NPA, Including Fusion Learning Center.**

Compensatory education is the remedy for denial of FAPE.  The Decision correctly states that the court has "broad discretion in fashioning a remedy, as long as the relief is appropriate in light of the purpose of special education law." (Decision Conclusion of Law 26).  The Decision goes on to state that, "The District's transition program is not designed to give Student the opportunity to work toward a diploma, and "... it does not appear that another year at Fallbrook High School is the appropriate compensatory remedy."  (Decision Conclusion of Law 30).

Rather than exercising its discretion to assist Student to attain his High School Diploma at an appropriate compensatory program, that isn't the District's transition program, and isn't another year as a "super senior" at Fallbrook High School, the ALJ confuses the entire purpose of the Due Process Hearing by erroneously stating that, "Student did not meet his burden of proving that an NPS placement should be ordered to provide compensatory education to Student."

Student has the burden of proving that District's liability in order to access compensatory education.. Student succeeded in doing this.  If there is no District program appropriate for Student (as indicated in Conclusion of Law 30), then an alternative placement must be ordered. That was the entire purpose of the Due Process Hearing.  If Student's parents had wanted to expose themselves once again to the District's condescending attitude, they could have requested an IEP after June 7, 2007.  Dr. Cynthia Norall testified that Student needs an alternative placement.  This can be a certified non-public school, a non-public agency, or a combination of both, as long as Student can attain his diploma. Despite the District's statement in its closing

---

[2] 2 (a) is the same identical  issue as 1 (b), however, this was omitted from the Decision.

1    brief that "there is no evidence that Fusion employs a full-time School Psychologist or a full-

2    time School Counselor, employs any teacher credentialed to teach Special Education or provides

3    Social Skills training," (District's Closing Brief, p. 28 footnote 24), the evidence of Fusion

4    meeting all of these requirements is clearly shown in Ex. Q, that there is a full-time certified

5    Educational Therapist, employs a family therapist to deal with social-emotional issues, has a

6    requirement of one complete year of life skills before graduation, and meets the requirements for

7    providing a High School Diploma in the State of California, after accelerated 1:1 instruction

8    which can accomplish a full school years work in 6-7 months.  Page 505 of Exhibit Q indicates

9    that school districts have referred students to Fusion Academy.  Of the non-public schools

10   considered by parents and Dr. Norall, Fusion appeared to be the most appropriate, and Student

11   thought he could do well there.

12          If Student had been seeking reimbursement for parent expenditures when Student wasn't

13   provided a FAPE, then Student would have had the burden of proving these expenditures.

14   Student prevailed on the procedural FAPE issue, therefore the appropriate remedy is a non-

15   public placement.  This should be changed in the Order.

16   **C.      Student Should Not Be Forced to Re-File a Due Process Request If Student**

17   **and District Do Not Agree at the IEP.**

18          Student is 18 years old, and has been out of school since May, 2007.  Student and District

19   have exhausted any rapport that ever existed by virtue of how the District comported itself at the

20   Due Process hearing and in the attachment to its Closing Brief.  This wasn't a Mediation it was a

21   Hearing.  Student wants a final remedy as a result of meeting his burden of proof for denial pf

22   FAPE.  Student is also entitled to prevailing party status for purposes of attorney fees.  This

23   cannot be completely accomplished as the Decision now stands.  OAH can either comply with

24   the law and modify the Decision, or Student, the party who prevailed on the primary issues in the

25   case will have to appeal this Decision.  Going to an IEP Meeting without an Order of a

26   placement other than the District's Transition Program or another year at Fallbrook High School,

27   isn't an option.  Moreover, if the crux of the District's failure was specifically that Student did

28   not even have the opportunity to work toward his diploma throughout all of his years in high

school, the Decision should order the provision of compensatory education until he attains his diploma.

### III.

### CONCLUSION

Based on the forgoing, Student prevailed on issues sufficient to preclude ruling on substantive issues, rendering Student the prevailing party on the issue of denial of FAPE, with the ensuing remedy, within the broad discretion of OAH of adequate compensatory education at a non-public placement, which can accelerate Student's attainment of a diploma. Paragraphs 1 and 2 of the Order should be immediately changed to reflect this. Paragraph 3 of the Order should be stricken, because the entire purpose of going to Hearing was to avoid any other Hearing.

Dated: November 20, 2007

Respectfully submitted,

Ellen Dowd, Attorney for
Petitioner, Christopher Struble

**EXHIBIT 3**

Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California 92014
(858) 342-8360

**Attorney for Petitioner, Christopher Struble**

### BEFORE THE STATE OF CALIFORNIA

### OFFICE OF ADMINISTRATIVE HEARINGS

### SPECIAL EDUCATION DIVISION

| | |
|---|---|
| In The Matter Of | ) Case No.: N2007090067 |
| CHRISTOPHER STRUBLE | ) PETITIONER, CHRISTOPHER<br>) STRUBLE'S SUPPLEMENT TO MOTION<br>) FOR MODIFICATION OF DECISION |
| Petitioner, | ) |
| v. | ) |
| | ) Hearing Dates: October 16-19, 2007 |
| FALLBROOK UNION HIGH SCHOOL | ) ALJ: Hon. Susan Ruff |
| DISTRICT, | ) |
| Respondent. | ) |
| | ) |

# I.

## SUPPLEMENTAL ARGUMENT

**A.    Under IDEA an ALJ Cannot Delegate Authority To An IEP Team to Fashion Compensatory Education.**

Student is an 18-year old young man who is determined to attain his high school diploma, which has been unlawfully precluded by the District.  As such, Student does not have years to undertake an appeal, and eventually have the issue of compensatory education remanded to OAH, or whatever administrative body is conducting Due Process Hearings at that time.

Attached is a very recent 6th Circuit case, *Board of Education of Fayette County, Kentucky v. L.M.,* decided March 2, 2007.  It upholds the mandate that "IDEA due process hearings "may not be conducted by an employee of the State educational agency ot the local agency involved in the education or care of the child." (citing, *Reid ex rel.  Reid v. District of Columbia,* 401 F. 3d 516, 526 (D.C. Cir. 2005, citing 20 U.S. C. § 1415(f) (3)).

If an IEP Team, which, by statute, must include a representative of the local educational agency, "the IEP Team would in effect exercise the officer's powers." *Reid*, 401 F. 3d at 526.

Additionally, in this case, Sallie Hunt, the Director of Special Education for the District, who, in the Decision was characterized in the Factual Findings as 'insensitive to the parents" and "belittling of the parents" (Decision, page 27, footnote 13), would be presiding over the IEP gloating that she has another opportunity to disregard the parents and Student.

Here, the ALJ is insensitive to the continuous slights delivered by Ms. Hunt, which are included in the Decision, to wit: that Student had limited intellectual capacity, and could only be a "gofer" in the television field (Decision, Factual Finding 139),  to provide a written communication plan so that Student's parents "don't come running over here every time he sneezes" (Decision, Factual Finding 140), and "asking Student if Student was a bigot when he complained about other students bullying him" (Decision, Factual Finding 140).

In *L.M.* the Due Process Hearing was conducted and decided on January 30, 2004, when *L.M.* was in the 4th grade. The Circuit Court Decision was entered on March 2, 2007, more than three years later, when *L.M.* was in 7th grade.  Then, it was remanded back to "have the

appropriate administrative body craft a remedy that complies with the IDEA." (*L.M.* Decision, attached, at page 8).

Here, Student does not have three years to sit at home pondering why he is not working toward his High School Diploma. "Compensatory education awards should aim to place disabled children in the same position they would have occupied but for the school district's violation of IDEA." *Reid*, 401 F. 3d at 518. The swiftest way for Student to attain his High School Diploma, as evidenced by Exhibit Q is Fusion Academy. That was the requested remedy.

**B.    Under Burlington, an ALJ Cannot Deny An Appropriate Remedy If The District's Offer is Inappropriate.**

Compensatory education is the remedy for denial of FAPE. The Decision correctly states that the court has "broad discretion in fashioning a remedy, as long as the relief is appropriate in light of the purpose of special education law." (Decision Conclusion of Law 26). The Decision goes on to state that, "The District's transition program is not designed to give Student the opportunity to work toward a diploma, and "... it does not appear that another year at Fallbrook High School is the appropriate compensatory remedy." (Decision Conclusion of Law 30).

The District's offer of placement was the District's Transition program, which the Decision correctly states cannot appropriately compensate Student because it will not allow Student to work toward a diploma. The District withdrew its other, inappropriate offer of a second senior year at Fallbrook High School. No other options were presented at Hearing except for Fusion Academy, or social skills training with Dr. Cynthia Norall's group.

The U.S. Supreme Court case, *Burlington School Comm. v. Mass Dept of Ed.*, 471 U.S. 359 (1985) demonstrates the need for swift and appropriate relief , to avoid facing appeal, and that " the review process is ponderous", and that "a final decision on the merits...in most instances come a year or more after the school term covered by the IEP has passed." *Id.* at 370.

The IDEA directs the Court to "grant such relief it determines is appropriate." 20 U.S.C. § 1415(e)(2). The type of relief is not further specified, except that it must be "appropriate." This confers broad discretion on the court. *Id.* at 369.

Parents who have adequate means to unilaterally place their child in a private school that is "appropriate" to meet the child's needs when the District's placement offer was not appropriate, have the right to reimbursement. Here, the evidence and testimony of Student's mother showed that Fusion Academy was appropriate to meet Student's needs. If parents had the means to unilaterally place Student at Fusion Academy, he would have been working toward his diploma, and parents would be entitled to retroactive reimbursement. *Id.* at 370. However, where parents don't have the means, why should the child miss educational opportunities while the ponderous review process takes place? In the meantime, parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of the child if it turns out to be inappropriate, or pay for what they consider to be the appropriate placement." *Id.* at 370.

Simply put, if parents had the means, Student would be attending Fusion Academy in order to earn his diploma. There is no burden of proof regarding compensatory education. It is within the purview of the court to fashion this remedy in order to make Student whole. There was no documentary evidence that a school district cannot refer a student to Fusion Academy. To the contrary, Exhibit Q establishes that school districts do refer students, and, that Fusion is state accredited, well-staffed to meet Student's unique needs, and capable of conferring Student with a High School Diploma, as well as a full year of life skills. The evidence was clear that Student learned best in 1:1 or small groups. This is exactly what Fusion offers. The District, on the other hand, had Student in classes of thirty or more students which was problematic.

We are dealing with a sensitive, 18-year old young man, who desperately wants to be in school. The District failed Student, and parents found a remedy. Justice delayed is justice denied. In light of the fact that no other alternatives were suggested by the District (it adhered to its "take it or leave it" offer of a transition program), and it is the District, and the District alone who is charged with the duty to provide Student with a "free appropriate public education," which it failed to do, the remedy sought by Student is appropriate and should be awarded.

## II.

## CONCLUSION

The Decision is contrary to the letter and spirit of the law, is collusively deferential to the District and completely prejudicial to the Student's rights. The Decision should be modified to comport with the law, and to effectively provide a remedy within the broad discretion of OAH, without retaliation or diminution of compensatory education to Student as a result of this Motion.

Dated: November 21, 2007

Respectfully submitted,

Ellen Dowd, Attorney for
Petitioner, Christopher Struble

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BOARD OF EDUCATION OF FAYETTE COUNTY,
KENTUCKY,

*Plaintiff-Appellee,*

No. 06-5534

    *v.*

L.M., as legal guardian of T.D., a minor; L.M., on
her own behalf; and T.D., by his legal guardian,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 04-00266—Jennifer B. Coffman, District Judge.

Argued: February 2, 2007

Decided and Filed: March 2, 2007

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Marie Allison, ASSISTANT PUBLIC ADVOCATE, Lexington, Kentucky, for
Appellants. Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for
Appellee. **ON BRIEF:** Marie Allison, ASSISTANT PUBLIC ADVOCATE, Lexington, Kentucky,
for Appellants. Robert L. Chenoweth, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for
Appellee.

---

### OPINION

---

    RONALD LEE GILMAN, Circuit Judge. This appeal is brought by a child with a disability
within the meaning of the Individuals with Disabilities Education Act (IDEA). For the reasons set
forth below, we **AFFIRM** the judgment of the district court insofar as it upheld the hearing officer's
determination regarding the extent of the School District's violation of the IDEA, but **REVERSE**
the court's affirmation of the compensatory-education award and **REMAND** the case with
instructions to have the appropriate administrative body craft a remedy that complies with the IDEA.

## I.   BACKGROUND

T.D., a minor child, attended preschool and elementary school through the fourth grade under the jurisdiction of the Board of Education of Fayette County, Kentucky (the School District). He exhibited behavioral and academic problems beginning in kindergarten, but was not identified by the School District as a child with a disability within the meaning of the IDEA until May of 2003, just prior to the conclusion of T.D.'s fourth-grade school year. L.M., the child's legal guardian, requested a due process hearing pursuant to the IDEA, which was held by an impartial hearing officer in January of 2004. The hearing officer found that the child was denied a free appropriate public education (FAPE) for his third- and fourth-grade school years (2001-2002 and 2002-2003) due to the School District's failure to refer T.D. for special education after his second-grade year. To remedy this denial, the hearing officer awarded T.D. a compensatory-education package that included 125 hours of specified one-on-one instruction in reading and language skills.

The Exceptional Children's Appeals Board (Appeals Board) affirmed the hearing officer's finding that the child was denied a FAPE for the two years in question, but reversed the hearing officer's award of 125 hours of compensatory education in favor of a more fluid determination of appropriate compensatory education to be prepared by the child's Admissions and Release Committee (Committee). In Kentucky, this Committee is the equivalent of a student's Individualized Education Program (IEP) team under the IDEA.

T.D. was born in February of 1993 and attended elementary school in Fayette County from 1998 through 2003. He was referred for evaluation as a student with possible disabilities under the IDEA in January of 2003, during his fourth-grade school year. The School District conducted a comprehensive evaluation of T.D. shortly thereafter, and the Committee met on May 5, 2003 to review and act on the results of that evaluation. Among other things, the Committee determined that T.D. had been medically diagnosed with attention deficit hyperactivity disorder (ADHD) and that he also met the IDEA eligibility requirements for a reading disability.

The School District does not dispute T.D.'s eligibility under the IDEA. T.D. and his guardian, however, argued before the hearing officer that the School District should have referred T.D. for a disability evaluation under the IDEA's "child-find procedures" as early as kindergarten. Report cards from the first two grading periods of T.D.'s kindergarten year showed that T.D. struggled with behavioral and social skills, beginning language skills, and math. But by the end of T.D.'s kindergarten year, he was meeting expectations in all academic areas, even though he still exhibited behavioral problems. T.D.'s behavioral problems continued for the next three years, and he began experiencing severe academic problems as well. For example, his standardized test scores at the end of the second grade indicated that T.D. was reading "far below grade level" and was considered "at risk." His second-grade teacher requested assistance from a reading specialist and the school's psychologist, and discussed the possibility of a reading disability with the principal. The teacher did not, however, refer T.D. for a formal evaluation under the IDEA.

After T.D. completed the third grade, he was still reading far below grade level. The third-grade teacher recommended that T.D. repeat that grade. His guardian objected, however, and he was promoted to fourth grade. But T.D. attended summer school between the third and fourth grades under the School District's Extended School Services program.

In September of 2002, T.D.'s guardian notified the school that T.D. had been medically diagnosed with ADHD. The school principal then referred T.D. for an IDEA evaluation in November of that year. In February of 2003, the Committee determined that the referral was appropriate and warranted a full evaluation, which was completed in April of 2003. The Committee reviewed T.D.'s evaluation and met on May 5, 2003 to devise a plan of action. At the meeting, the Committee determined that T.D. met the eligibility requirements for special education due to several

disabilities, including his ADHD. The Committee held several meetings during May of 2003 to develop T.D.'s IEP. T.D.'s guardian, unhappy with the IEP as well as the timing of T.D.'s referral for special education, requested a due process hearing pursuant to the IDEA. The hearing officer conducted hearings throughout the fall of 2003 and rendered a written decision on January 30, 2004.

In her decision, the hearing officer concluded that the School District's failure to refer T.D. for a special-education evaluation in the second grade deprived him of a FAPE in the third and fourth grades: "This failure resulted in a loss of educational opportunity and constituted a denial of a FAPE." The hearing officer further concluded that the School District's failure to provide individualized Extended School Year (ESY) instruction during the summer of 2003 also constituted the denial of a FAPE. To remedy these violations, the hearing officer awarded T.D. 125 hours of compensatory education, consisting of one-on-one instruction in reading and language skills, as well as an "additional number of hours equal to the number of hours that [T.D.] would have been eligible for ESY, had the [Committee] considered and determined the need for ESY services in the Summer of 2003." Moreover, the hearing officer ordered the School District to invite T.D.'s private psychologist to the Committee meeting and to pay for the psychologist's attendance.

The School District appealed to the Appeals Board, which agreed with the hearing officer's factual findings but altered the remedy. Instead of requiring a certain number of hours of compensatory education, the Appeals Board "ordered T.D.'s [Committee] to prepare and carry out a plan for providing T.D. with compensatory education services and to meet as required to review and modify the plan, not less than once every twelve months, until the [Committee] determines that the award is fulfilled."

Unhappy with the Appeals Board's decision, the School District filed an action in federal district court, challenging the following two determinations made by the hearing officer and affirmed by the Appeals Board: (1) that T.D. was entitled to ESY instruction for the summer of 2003, and (2) that the School District pay for T.D.'s private psychologist to attend the Committee meeting. T.D. and his guardian asserted 11 counterclaims, 2 of which are the sole issues now on appeal: (1) that the School District denied a FAPE to T.D. during the 1999-2000 and 2000-2001 school years—T.D.'s first- and second-grade years, respectively—as well as during the summer of 2002, and (2) that the limited nature of the compensatory-education award with respect to the 2001-2002 and 2002-2003 school years and the summer of 2003 denied T.D. meaningful relief. The district court affirmed the Appeals Board's decision in its entirety. T.D. and his guardian timely appealed.

## II.    ANALYSIS

### A.    Standard of review

In a lawsuit brought to challenge an IDEA administrative finding, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

A district court thus reviews IDEA cases under a modified de novo standard, meaning that it may set aside administrative findings in an IDEA case "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."

*Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003) (citation and quotation marks omitted). More weight "is due to an agency's determinations on matters for which educational expertise is relevant." *Deal*, 392 F.3d at 849.

On appeal, we will reverse the district court's findings of fact only if they are clearly erroneous. *Id.* at 850. The district court's conclusions of law, however, are reviewed de novo. *Id.* Finally, "[m]ixed questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed de novo," although the panel should accord "due deference to the state administrative hearing officer's decision." *Id.*

**B.    Timing of referral for IDEA eligibility**

T.D. and his guardian first argue that the district court and the Appeals Board erred by failing to find that T.D. was denied a FAPE during the 1999-2000 and the 2000-2001 school years—his first and second grades. They also assert that T.D. was entitled to ESY instruction during the summer of 2002. The hearing officer found that the School District should have referred T.D. for evaluation in the second grade, and that the failure to do so resulted in the denial of a FAPE for only his third- and fourth-grade years. This finding was affirmed by both the Appeals Board and the district court.

The IDEA imposes a "child-find" requirement on the states: their schools must have policies and procedures in place to identify, locate, and evaluate children with disabilities who need special education and related services. 34 C.F.R. § 300.111(a)(1). Even children who are only suspected of having a disability, although they are progressing from grade to grade, are protected by this requirement. 34 C.F.R. § 300.111(c). T.D. and his guardian argue that the School District's failure to evaluate T.D. as early as kindergarten constituted a procedural violation of the IDEA child-find requirement that resulted in substantive harm to T.D.

A school district may be held liable for procedural violations of the IDEA that cause substantive harm to the student. *Metro. Bd. of Pub. Ed. v. Guest*, 193 F.3d 457, 464 (6th Cir. 1999). What a claimant must show to establish a procedural violation is a matter of first impression in this circuit. We now adopt the standard first articulated in *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997), which provides that the claimant "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." This standard was also adopted by the district court below.

*1.    First- and second-grade FAPE claim*

The district court affirmed the Appeals Board's finding that the appropriate time for a referral was at the end of T.D.'s second-grade school year. It reasoned that "[i]t is difficult to assess whether a very young child is disabled or merely developing at a rate different from his peers, and the educational experts involved all seem to indicate that a hasty referral for special education can be damaging to a child." On appeal, T.D. and his guardian offer an exhaustive review of T.D.'s educational and behavioral problems in support of their contention that the School District ignored "clear signs" of his ADHD and reading disability as early as kindergarten. None of this evidence, however, is new information that the hearing officer did not already consider, nor does any of it show why the hearing officer's factual findings are clearly erroneous. An educational expert testified that T.D.'s performance in kindergarten should not have caused teachers to "jump to conclusions." The hearing officer, and later the Appeals Board, also gave due weight to expert testimony concluding that "the nature of ungraded primary school recognizes the progress of very young students is not uniform."

As the hearing officer noted, virtually all of the witnesses who testified at the due process hearing, including T.D.'s own expert, stated that T.D.'s difficulties would not necessarily indicate a disability or a need for special education, and that it would be inappropriate to rush to identify a child that young as disabled. School personnel similarly testified that T.D.'s behavioral and learning problems were not atypical of immature young boys.

The School District did not ignore T.D.'s early problems. It took appropriate action by implementing specialized reading instruction, Reading Recovery Program participation, and behavior-management strategies. Under the IDEA, the School District was required to provide a basic floor of educational opportunity consisting "of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201. There is no additional requirement, however, "that the services so provided be sufficient to *maximize* each child's potential commensurate with the opportunity provided other children." *Id.* at 198 (citation and quotation marks omitted) (emphasis added). The School District provided additional services designed to aid T.D. in catching up to his peers in kindergarten and first grade, even though at that point he was not identified as being disabled within the meaning of the IDEA.

We agree with the district court that these services provided a basic floor of educational opportunity through T.D.'s second-grade school year. The interventions in kindergarten and first grade were moderately successful, at least during those years. By the end of kindergarten, for example, T.D. was meeting expectations in all academic areas. T.D. did not start to fall significantly below grade level until the middle of his second-grade year. No teacher suggested that he repeat a school year until after the third grade. In short, nothing in the record compels the conclusion that the School District either overlooked clear signs of disability before T.D. entered second grade or had no rational justification for failing to evaluate him prior to that time. *See Clay*, 952 F. Supp. at 823.

### 2.      *ESY instruction during the summer of 2002*

T.D. and his guardian also contend that T.D. was entitled to ESY instruction during the summer of 2002, following his third-grade year. In lieu of ESY, T.D. received summer school instruction through the School District's Extended School Services program. Extended School Services are available to students with or without disabilities. There is no evidence in the record regarding the nature of the instruction provided to T.D. that summer.

Under the IDEA, schools are required to provide Extended School Services as necessary in order to provide a child with a FAPE. 34 C.F.R. § 300.106(a). A school must provide these services, however, only if the child's IEP team determines that such services are necessary "for the provision of FAPE to the child." *Id.* But a claimant seeking an ESY must satisfy an even stricter test, because "providing an ESY is the exception and not the rule under the regulatory scheme." *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990). This court has held that the burden is on the claimant proposing an ESY to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid regression so severe that the child would not be able to catch up during the following school year. *Id.* "If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an ESY." *Id.* (brackets and quotation marks omitted). A claimant must show, in other words, that "an ESY is necessary to permit the child to benefit from his instruction." *See id.* (brackets and quotation marks omitted). Claimants can rely on expert opinion testimony to make this showing and are not required to present empirical proof of actual prior regression. *Id.* at 1471-72.

T.D. and his guardian have offered no evidence that the Extended School Services T.D. received in the summer of 2002 were in any way inappropriate or insufficient to meet his needs. They instead make a conclusory statement that the record "clearly establishes" that T.D. was in need of specialized ESY instruction during that summer. T.D. and his guardian also argue that because the hearing officer found that there was evidence of regression entitling T.D. to ESY instruction for the summer of 2003 (and that evidence of regression was cumulative from kindergarten on), *ipso facto* he was also entitled to ESY instruction during the summer of 2002. We reject this argument as inappropriate bootstrapping.

In any event, as noted by the district court, because T.D. has already received an award of compensatory education, a further award "based on the School District's failure to identify T.D. as a child with a disability after T.D.'s second-grade year would be premature at this point." T.D. and his guardian have failed to demonstrate that T.D. needed ESY instruction (instead of the Extended School Services that he did receive) during the summer of 2002 in order to benefit from the instruction provided to him during the previous school year. The hearing officer found that T.D.'s regression was cumulative from kindergarten on, but did not find that the regression during the summer of 2002 was severe enough to warrant the award of an ESY. T.D. and his guardian have offered no evidence in support of their claim to the contrary. Because T.D. and his guardian have not met their burden of showing why the exceptional remedy of ESY instruction was necessary, we will not disturb the district court's ruling on this ground.

## C.    Procedure for determining a compensatory-education award

In fashioning a remedy for the School District's denial of a FAPE for T.D.'s third- and fourth-grade school years, as well as for the summer following his fourth-grade year, the Appeals Board ordered T.D.'s Committee to prepare a plan for providing compensatory education to the student. The Appeals Board also ordered the Committee to meet periodically, not less than once every 12 months, to review and modify the plan until the Committee determines that the compensatory-education award had been fulfilled.

On appeal, T.D. and his guardian argue that this remedy is "vague, unenforceable," and "allows the school district to determine the remedy for its wrongdoing." They instead seek hour-for-hour compensation for each hour of the school day for the four years that T.D. was allegedly denied a FAPE (1,050 hours per year), plus hour-for-hour compensation for the alleged denial of specialized ESY instruction during the summers of 2002 and 2003 (325 hours per summer). Because we agree with the district court that T.D. was denied a FAPE for two years plus one summer, an hour-for-hour award would equal 2,425 hours (1,050 hours per year for two years plus 325 hours for the summer of 2003).

An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate. 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006) ("The courts have discretion on how to craft the relief and there is no obligation to provide a day-for-day compensation for time missed.") (citation and quotation marks omitted). We review the award granted by the Appeals Board and affirmed by the district court under an abuse-of-discretion standard. *See Park*, 464 F.3d at 1033.

The Appeals Board awarded compensatory-education services that it deemed sufficient to remedy the denial of a FAPE to T.D. for two years—covering his third and fourth grades—plus an additional award of time to cover the ESY instruction that he was entitled to but denied during the summer of 2003. Instead of ordering a specific number of hours as the hearing officer had done, however, the Appeals Board left it to T.D.'s Committee to determine the particular services necessary to remedy the denial of his FAPE. The Appeals Board reasoned that the total number of hours awarded was less important than "the amount of extra services that [T.D.] will receive in a

specific week, or over school breaks and the form of such services." In affirming the award, the district court described the plan as "innovative and likely to be more tailored to T.D.'s needs than an award of a particular number of hours predetermined without benefit of observing T.D.'s progression."

We agree with the district court and the Appeals Board that a flexible approach, rather than a rote hour-by-hour compensation award, is more likely to address T.D.'s educational problems successfully. *See Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005) (rejecting an hour-for-hour compensatory-education award in favor of a more flexible approach because some students may need only "short, intensive compensatory programs" while others may need extended programs that would exceed "hour-for-hour replacement of time spent without FAPE"). An appropriate award of compensatory education is "relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).

T.D. may well need more than the 125 hours of compensatory education initially awarded by the hearing officer, but nothing in the record suggests that he needs hour-for-hour compensation in order to catch up to his peers. No one disputes that T.D. is a child of at least average intelligence. He has been shown to have an IQ score of 105. On the other hand, T.D.'s counsel stated at oral argument that this child reads at only a fifth-grade level despite the fact that he is now in the seventh grade. Although we are dismayed that no one has yet acted to remedy this deficiency during the two and a half years of pending litigation, we find no basis to claim that T.D., a child of average intelligence, needs over 2,400 hours of remedial instruction in order to arrive on an equal footing with his classmates. Such an award, in the absence of strong evidence in the record suggesting that so drastic a remedy is necessary, would border on punishment to the School District rather than an equitable remedy for a child in need. *See Reid*, 401 F.3d at 518 ("[C]ompensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.").

T.D. and his guardian also object to the Appeals Board's resolution on the basis that remanding the details of the compensatory-education award to T.D.'s Committee improperly allows the School District to determine the remedy for its own wrongdoing. This raises the fundamental issue of whether the details of a compensatory-education award can be remanded to the Committee and still comply with the statutory scheme of the IDEA. We review issues of statutory construction de novo. *United States v. Blood*, 435 F.3d 612, 618 (6th Cir. 2006). Although there is no Sixth Circuit precedent on point, a recent case from the District of Columbia Circuit, *Reid, supra*, is instructive.

In *Reid*, the hearing officer awarded the student in question 810 hours of compensatory education to remedy the school district's denial of a FAPE for four and a half years. 401 F.3d at 518. He also vested the student's IEP team with the power to reduce or discontinue compensatory services if and when the IEP team determined that the student either no longer needed or was no longer benefitting from the compensatory education. *Id.* Specifically, "[t]he team's decision that [the student] no longer needs or is not benefitting from this award of compensatory education services will terminate this award." *Id.* at 520. The district court affirmed. *Id.* On appeal, the District of Columbia Circuit reversed the district court's ruling, holding that, under the IDEA, hearing officers may not authorize IEP teams to reduce or discontinue awards of compensatory education. *Id.* at 526.

The *Reid* court began its analysis by noting that "IDEA due process hearings 'may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child.'" *Id.* (citing 20 U.S.C. § 1415(f)(3)). An IEP team, in contrast, is statutorily *required* to include a representative of the local educational agency. 20 U.S.C. § 1414

(d)(1)(B)(iv). Because the IEP team was delegated the power to reduce or terminate the compensatory-education award initially set by the hearing officer, the court held that "the IEP team would in effect exercise the officer's powers." *Reid*, 401 F.3d at 526. "In sum, while the IEP team certainly must monitor [the student's] progress and coordinate compensatory relief with his current IEP, a delegation that permits the team to reduce or terminate his awarded amount of compensatory education exceeds the statute's bounds." *Id.* at 527. The fact that the IEP team was also comprised of nonemployees, including the student's mother, did not change the court's ultimate conclusion. *Id.* at 526. "Under the statute, the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." *Id.*

Certainly one could make the argument that because an IEP is comprised of a number of individuals, only one of which must be a representative from the School District, that the School District does not have control over the actions of the IEP team and therefore is not really performing the hearing officer's functions. But we believe that the *Reid* court takes the better approach, creating a clean and clear separation by barring altogether an IEP team's power to terminate a compensatory-education award. Under the statute, an IEP team consists of the disabled child's parents, at least one of the child's regular education teachers, at least one special education teacher of the child, a representative of the local educational agency (here, the School District), "an individual who can interpret the instructional implications of evaluation results," other individuals who have knowledge or special expertise regarding the child, and finally, "whenever appropriate, the child with a disability." 20 U.S.C. § 1414 (d)(1)(B). When the child is still enrolled in the school district that caused the violation, then, his IEP team may consist of three or more employees of that school district—potentially half of the IEP team. T.D. is not currently enrolled in the School District, so the possibility of the School District exerting an undue influence in his particular case is not great, but we decline to approve a practice that might have such an impermissible effect in the future. We therefore hold that neither a hearing officer nor an Appeals Board may delegate to a child's IEP team the power to reduce or terminate a compensatory-education award.

In the present case, the Appeals Board awarded "[t]wo years of compensatory education for the District's delay in identifying and providing education services to the student," as well as an additional award to compensate for the ESY instruction that T.D. should have received in the summer of 2003. The Appeals Board also authorized T.D.'s Committee to determine when the compensatory education award has been fulfilled. As previously noted, an Admissions and Release Committee in Kentucky is synonymous with an IEP team. *See* 707 Ky. Admin. Regs. 1:320. This case is therefore materially indistinguishable from *Reid*. Because we believe that *Reid* was correctly decided, we reverse the compensatory-education award and remand the case to the district court with instructions to reconsider the remedy awarded in a manner consistent with the foregoing analysis.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court insofar as it upheld the hearing officer's determination regarding the extent of the School District's violation of the IDEA, but **REVERSE** the court's affirmation of the compensatory-education award and **REMAND** the case with instructions to have the appropriate administrative body craft a remedy that complies with the IDEA.

EXHIBIT 4

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

     Petitioner,

v.

FALLBROOK UNION HIGH SCHOOL
DISTRICT,

     Respondent.

OAH CASE NO. N2007090067

ORDER DENYING STUDENT'S
MOTION FOR MODIFICATION OF
DECISION

---

  On November 20, 2007, the Office of Administrative Hearings, Special Education Division (OAH) issued a Decision in the above-entitled case. On November 20, 2007, Student filed a Motion for Modification of Decision. On November 21, 2007, Student filed a Supplement to Motion for Modification of Decision. On November 30, 2007, the District filed an opposition to Student's motion.

  Student objects to the Decision for two reasons. First, Student objects that the Decision made findings as to all of the issues that Student raised in Student's due process complaint, rather than only making findings as to the procedural issues on which Student prevailed. Student also objects to the Decision because it did not, as a compensatory education remedy, order the District to prospectively place Student at the Fusion Academy.

DISCUSSION

  Student provides no statutory or case authority that provides for a "Motion for Modification of Decision." However, based on Student's arguments, it appears that Student's motion is intended to be a Motion for Reconsideration of the Decision. OAH will generally reconsider a ruling upon a showing of new or different facts, circumstances or law justifying reconsideration, when the party seeks reconsideration within a reasonable period of time.

  Student has provided no new or different facts, circumstances or law. Student presents no evidence or authority to show that the Fusion Academy is a certified non-public school within the meaning of Education Code section 56505.2, subdivision (a). At hearing,

Student chose to present the Fusion Academy as Student's only proposal for compensatory education. Student's own moving papers admit that "No other options were presented at Hearing except for Fusion Academy...."[1]  Student provides no legal authority to show that referral to an IEP team (with directions to guide the team) was inappropriate when Student failed to present evidence of an appropriate compensatory remedy.

The case of *Board of Education of Fayette County v. L.M.* (6th Cir. 2007) 478 F.3d 307, cited by Student, does not provide such authority.  In that case, the hearing officer had awarded a certain amount of compensatory education which was later taken away on appeal. That case does not address a situation in which the party with the burden of proof chooses to present evidence of only one possible remedy which is not an appropriate remedy as a matter of law.[2]

Student also cites no new facts, circumstances, or law to support Student's argument that the Decision should not have addressed all of the issues raised in Student's due process complaint.  There is no basis for reconsideration of the Decision.

### ORDER

Student's motion is denied.

Dated: December 6, 2007

SUSAN RUFF
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

---

[1]  Student's moving papers also state that a social skills group was suggested at hearing as an appropriate compensatory remedy.  However, neither Student's initial due process complaint nor Student's written closing argument requested that remedy.  Even if that remedy had been raised at hearing, Student makes no showing of how that remedy would assist Student in working toward a diploma.  It is not appropriate for compensatory education.

[2]  The Decision in the instant case, unlike the one in the *L.M.* case, does not leave unfettered discretion in the hands of the IEP team, but instead directs the IEP team to fashion a program that will provide Student with the opportunity to work toward a high school diploma.  It also provides guidance to the team by finding that placement in the District's transition program or placement at Fallbrook High School for another year would <u>not</u> be appropriate to provide the compensatory education that Student requires.

2

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 145471    — BH**

**December 13, 2007
10:09:24**

**Civ Fil Non-Pris**
USAO #.: 07CV2328 CIVIL FILING
Judge..: LARRY A BURNS
Amount.:                $350.00 CK
Check#.: BC# 207573

**Total—>  $350.00**

FROM: CIVIL FILING
      STRUBLE V. FALLBROOK UNION H.S

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)    PLAINTIFFS**

MARY STRUBLE, As Conservator for CS,

**(b)** County of Residence of First Listed Plaintiff    San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Ellen Dowd, Esq.  SBN 141206  858-342-8360
2658 Del Mar Heights Road#228, Del Mar, CA 92014

**DEFENDANTS** FILED

FALLBROOK UNION HIGH SCHOOL DISTRICT, a Local Educational Agency, 07 DEC 13 AM 10: 09

County of Residence of First Listed Defendant    San Diego
CLERK (IN U.S. PLAINTIFF CASES ONLY)
SOUTHERN DISTRICT OF CALIFORNIA
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)
Sharon Watt BY '07 CV 2328 LAB CAB    DEPUTY

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Appeal of Administrative Due Process Decision under Individuals With Disabilities Education Act

Brief description of cause:
20 U.S.C. 1400, et seq.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

**VIII. RELATED CASE(S) IF ANY**    (See instructions):    JUDGE                    DOCKET NUMBER

DATE    12/13/2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  14547    AMOUNT  $355    12/13/07 BY    APPLYING IFP                    JUDGE                    MAG. JUDGE



ORIGINAL

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.