Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California 92014
(858) 755-6347

Attorney for Plaintiff/Counterdefendant, MARY STRUBLE

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY STRUBLE, As Conservator for CS,<br><br>        Plaintiff,<br><br>v.<br><br>FALLBROOK UNION HIGH SCHOOL DISTRICT, a Local Educational Agency<br>        Defendant.<br><br>FALLBROOK UNION HIGH SCHOOL DISTRICT,<br>        Counterclaimant,<br><br>v.<br><br>MARY STRUBLE, As Conservator for CS,<br><br>        Counter-Defendant, | CASE NO.: 07 CV 2328 LAB (CAB)<br><br>**REQUEST FOR JUDICIAL NOTICE**<br><br>**Date: May 23, 2008**<br>**Time: 9:00 a.m.**<br>**Magistrate Judge: Hon. Cathy Ann Bencivengo**<br>**Judge: Larry Burns** |

Plaintiff brings this request pursuant to Federal Rules of Evidence 201(b), which requires the Court to take judicial notice of adjudicative facts, regulations, advisory opinions, interagency agreements, because their accuracy is not subject to reasonable dispute.

Plaintiff submits the following document for judicial notice:

1.      Letter from Delaine Eastin, California State Superintendent of Public Instruction, dated March 17, 1999 (Ex. 1).

2.     Certified copy of Judgment and Opinion, United States Court of Appeals For the Eleventh Circuit, Case No. o6-00487-CV-MHS-1, entered March 6, 2008 (Ex. 2).

Dated: May 16, 2008

Respectfully submitted,

Ellen Dowd, Attorney for Plaintiff-Cross-Defendant, Mary Struble

07 CV 2328 LAB (CAB)
Request For Judicial Notice

EXHIBIT '1'



California Department of
# EDUCATION

Change Text Size: A A A

Search ▢▢▢▢▢▢ ▮

Advanced | Site Map | A-Z Index

Curriculum & Instruction          Testing & Accountability          Professional Development

Finance & Grants          Data & Statistics          Learning Support          Specialized Programs

Home » Specialized Programs » Special Education » Services & Resources          **Printer-friendly version**



**DELAINE EASTIN**
State Superintendent of Public Instruction



Date:    March 17, 1999

To:    All County and District Superintendents
       All Special Education and SELPA Directors

From:   Michael E. Hersher, General Counsel
        Barry A. Zolotar, Deputy General Counsel
        Legal and Audits Branch

Subject: Legal Advisory - Non-public School/Agency (NPS/A) Waivers and Retroactive Reimbursement to
Parents who have made Unilateral Placements in an NPS/A prior to July 1, 1998 or, on or after July 1, 1998

In this advisory, the California Department of Education (CDE) addresses the situation in which a parent has
unilaterally placed a child in an uncertified private school or contracts with an uncertified related services
provider prior to July 1, 1998, or on or after July 1, 1998, (without the consent of an IEP team), and ultimately
reaches a mediated settlement agreement concerning retroactive reimbursement to the parent without a
certification waiver or contract with the private provider.

The CDE will discuss the relationships among (a) mandated contracting for private school or agency services,
(b) state certification requirements, (c) the rights of parents to have their unilateral placement costs retroactively
reimbursed by a school district in accordance with a mediated settlement agreement, (d) a school district's right
to reimburse parents' costs directly, and (e) state waiver requirements [A reference to a school district includes
county offices of education and special education local plan areas (SELPAs).] .

*Education Code (EC)* Section 56365 authorizes the expenditure of state and federal funds when private
services are necessary to provide a free appropriate public education (FAPE) to a student with exceptional
needs. Situations arise in which parents determine that the only way their child can receive a FAPE is to make a
private placement without the consent of a school district in a private school, or to contract for related services
with a private agency (i.e., psychologist, social worker, physical therapist, assistive device consultant, etc.).
Typically, parents pay for these services themselves. Prior to the 1997 amendments to the Individuals with
Disabilities Education Act (IDEA) (20 U.S.C. § 1400 - 1485), the United States Supreme Court recognized that
parents had the right to make such "unilateral" placements under IDEA, but at their own risk [Burlington School
Committee v. Depart. of Educ., 471 U.S. 359, 368; 105 S.Ct. 1996, 2002 (1985). Carter v. Florence County
School Dist. 4, 950 F.2d 156, 163 (4th Cir. 1991), aff'd., 114 S. Ct. 361, 365 (1993).] .

If the parents request a school district to reimburse them for tuition or related services costs and the school
district refuses, believing that it either had an appropriate placement or the parents' placement was not
"appropriate," parents are likely to petition for a due process hearing. The risk inherent in making a unilateral
placement is that the hearing officer and/or a court might rule against the parents, thereby negating the parents'
entitlement to be reimbursed. This public policy has been codified in IDEA at 20 U.S.C. § 1412 (a) (10) (C)
[Amended by P.L. 105-17, The Individuals with Disabilities Education Act Amendments of 1997, signed June 4,
1997.].

In many cases, the parents and district settle such disputes in mediation. If the school district enters into a
mediated agreement indicating that it is willing to reimburse the parents, several additional issues are raised.

First, for many years, school districts believed they had no legal right to reimburse parents directly: they
believed that a contract was required and the school district could only give the funds to the NPS/A which would
then reimburse the parents directly. At times, however, monetary disputes arose between the NPS/A and the
parents, and parental reimbursement became mired in conflict.

▮**00001**

Second, school districts are required to enter into contracts with NPS/As prior to the commencement of services to the child. (See *EC* § 56365.) Since 1994, school districts must enter into a master contract with an NPS/A which includes an "individual service agreement for each pupil placed by a school district." (See *EC* § 56366 (a) (2).)

Third, school districts are also required to ensure that the NPS/A with whom it contracts has met state certification standards. (See *EC* §§ 56366 (d) and 56366.1.)

Thus, under usual circumstances, school districts are required by law to enter into a contract with an NPS/A that has been certified by the state in terms of credentials, curricula, licenses, staff health issues, criminal history, and overall structural safety of the educational environment.

The primary legal question being addressed in this advisory is whether it is necessary for a school district to seek a State Board of Education (SBE) waiver of state contracting and certification requirements, under *Education Code* Section 56101, once a school district acknowledges in mediation that the parent's unilateral placement provided the child with an appropriate education. In the CDE's opinion, the answer is no. It is not necessary to seek such waivers in situations in which the child has already received either private school and/or private agency related services that the school district subsequently, and in the context of "due process," has concluded were necessary to meet FAPE standards under IDEA. Since the parents will have already paid the private provider for appropriate special education instruction and related services, it is no longer necessary for the parties to enter into a contract or seek a waiver of the contract requirements.

Likewise, since the instruction and related services had been provided and deemed by the school district to have been appropriate, state certification standards are inapplicable, and a waiver of these standards is not required. The United States Supreme Court in Carter v. Florence County School Dist. 4, 950 F.2d 156, 163 (4th Cir. 1991), aff'd., 114 S. Ct. 361, 365 (1993), ruled unanimously that parents who unilaterally place their child in a private school that lacked state certification could obtain reimbursement if the school district's proposed placement was not appropriate and the parents' placement was.

As to direct school district reimbursement to parents, it is universally understood that eligible students are entitled to FAPE at no cost to their parents. Once a monetary due process dispute is resolved by a mediation agreement, the school district must comply with its promises immediately. As to whether a school district can legally reimburse them "directly," we know of no state or federal law that prohibits it. We therefore conclude that it is within a school district's discretion under *Education Code* Section 35160 and consistent with federal law for a school district to make reimbursements directly to parents.

Accordingly, the CDE will authorize retroactive reimbursement in situations in which a school district and parents have successfully mediated a due process dispute concerning "unilateral placement" as set forth either in a final mediation agreement or a settlement agreement bearing a California Special Education Hearing Office SN number. Such retroactive reimbursements will apply as follows:

(a) For private school tuition and costs of private agency related services, only, as documented in a duly executed special education mediation agreement concerning such expenses and costs incurred before July 1, 1998, the CDE will make an apportionment under *Education Code* Section 56740 without the need to obtain a formal waiver of either the NPS/A certification or contracting requirements, if the agreement accompanies a J-50 form;

(b) For private school tuition and costs of private agency related services, only, as documented in a duly executed special education mediation agreement concerning such expenses and costs incurred on or after July 1, 1998, the CDE shall ensure that a school district will not have its funds withheld under a state audit exception in a situation in which the school district resolves a due process matter by mediation, despite the fact that the LEA did not obtain a formal waiver of the NPS/A certification or contracting requirements.

Nothing in this advisory applies to reimbursement of attorney's fees and/or related services fees attributed to tutors who are currently enrolled students of the district; and nothing in this advisory applies to prospective private school tuition and/or prospective private related service costs. This policy is not predicated upon efforts made or not made by a school district to obtain a waiver; nor is it predicated upon the particular fiscal year, prior to July 1, 1998, in which the tuition and/or related services costs were incurred.

For further information regarding this advisory, contact ~~Michael E. Hersher or Barry A. Zolotar~~ (deleted 03/17/06) the Legal Office of the CDE at 916-657-2453.

**The guidance in this Legal Advisory is not binding on local education agencies or other entities. Except for the statutes, regulations, and court decisions that are referenced herein, this Legal Advisory is exemplary, and compliance with it is not mandatory. (See *Education Code* Section 33308.5.)**

**Download Free Readers**

**P00002**

California Department of Education
1430 N Street
Sacramento, CA 95814

Contact Us | FAQ | Web Policy

Last Reviewed: Thursday, February 07, 2008

00003

3/14/2008 8:39 PM

EXHIBIT '2'

# United States Court of Appeals

## For the Eleventh Circuit

FILED IN CLERK'S OFFICE
U.S.D.C  Atlanta

APR – 7 2008

JAMES N. HATTEN, CLERK

No. 07-11777

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Mar 6, 2008

THOMAS K. KAHN
CLERK

District Court Docket No.
06-00487-CV-MHS-1

JARRON DRAPER,

Plainiff-Appellee,

versus

ATLANTA INDEPENDENT SCHOOL SYSTEM,

Defendant-Appellant.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _William Miller_
Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------
Appeal from the United States District Court
for the Northern District of Georgia
--------------------------------------------------------

## J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:     March 6, 2008
For the Court:   Thomas K. Kahn, Clerk
By:    Harper, Toni

ISSUED AS MANDATE
APR 0 4 2008
U.S. COURT OF APPEALS
ATLANTA, GA.

P 00001.

ORIGINAL                                    CORRECTED

DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM    1381

Jarron **DRAPER**, Plaintiff–Appellee,

v.

**ATLANTA INDEPENDENT SCHOOL SYSTEM**, Defendant–Appellant.

No. 07-11777.

United States Court of Appeals,
Eleventh Circuit.

March 6, 2008

**Background:** High school student filed request for due process hearing, in which he alleged that school system had denied him a free appropriate public education (FAPE) under the Individuals with Disabilities Education Act (IDEA). The United States District Court for the Northern District of Georgia, No 06-00487-CV-MHS-1, Marvin H Shoob, Senior District Judge, 2006 WL 1734257, denied school district's motion to stay due process hearing decision. Student moved for relief from administrative order, and school district moved for judgment on administrative record. The District Court, Shoob, Senior District Judge, 480 F.Supp 2d 1331, granted motions in part and denied them in part, and school system appealed.

**Holdings:** The Court of Appeals, Pryor, Circuit Judge, held that:

(1) district court was free to fashion appropriate relief for student and was not barred, based on any implicit finding by administrative law judge (ALJ), from awarding placement in private school,

(2) cooperative process established by the IDEA between parents and schools did not bar district court from providing

parents appropriate relief that included a unilateral choice regarding their child's education;

(3) district court did not clearly err in accepting administrative law judge's (ALJ's) finding that dyslexic student had been misdiagnosed;

(4) district court did not clearly err in finding that parents of dyslexic student should not have known, before they received results of reevaluation of student by school authorities roughly five years after initial evaluation, that student had been misdiagnosed; and

(5) award of compensatory education in form of placement at private school for period of roughly five years or until he obtained his high school diploma, whichever came first, was not abuse of discretion

Affirmed.

1. Schools ⟺155.5(2.1)

Award of compensatory education may be appropriate relief where responsible authorities have failed to provide handicapped student with appropriate education as required by the Individuals with Disabilities Education Act (IDEA); compensatory education provides services prospectively to compensate for a past deficient program. Individuals with Disabilities Education Act, § 601 et seq., 20 U S C A § 1400 et seq

2. Schools ⟺155.5(2.1)

Whether educational program provided handicapped student with adequate education, as required by Individuals with Disabilities Education Act (IDEA), is mixed question of law and fact, the district court's determination on which is subject to *de novo*

Westlaw. Headnotes and Key Number Classification
COPYRIGHT © 2008 Thomson West
The Westlaw Headnotes and Key Number Classification constitute no part of the opinion of the court

**1382    DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM**

review Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A § 1400 et seq.

**3. Federal Courts ⊂⊃850.1**

District court's specific findings of fact are reviewed for clear error

**4. Federal Courts ⊂⊃776**

To extent that issue involves interpretation of federal statute, district court's conclusions thereon are reviewed *de novo.*

**5. Schools ⊂⊃155.5(2.1)**

Court of Appeals reviews for abuse of discretion a district court's awards under section of the Individuals with Disabilities Education Act (IDEA) authorizing court to award, for school district's violations of the IDEA, "such relief as the court determines is appropriate." Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii), 20 U.S.C.A. § 1415(i)(2)(C)(iii)

**6. Schools ⊂⊃155.5(5)**

Individuals with Disabilities Education Act (IDEA) grants broad discretion to district court with respect to what relief is appropriate where responsible authorities have failed to provide handicapped student with adequate education as required by the Individuals with Disabilities Education Act (IDEA) Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii), 20 U.S.C.A. § 1415(i)(2)(C)(iii)

**7. Schools ⊂⊃155.5(5)**

Even assuming that when, as remedy for the inappropriate education that learning disabled student for years had received in public school system, administrative law judge (ALJ) had granted him a choice between compensatory education in public school system or having public school system pay for

his education at private school, the ALJ had implicitly found that public school system could prospectively provide appropriate educational program for student, district court, on petition for review, was free to fashion appropriate relief for student and was not barred, based upon any such implicit finding, from awarding placement in private school. Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii), 20 U.S.C.A § 1415(i)(2)(C)(iii)

**8. Schools ⊂⊃155.5(5)**

"Appropriate relief" that district court is statutorily authorized to provide for violations of Individuals with Disabilities Education Act (IDEA) is such relief as is appropriate in light of the purpose of the IDEA. Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii), 20 U.S.C.A § 1415(i)(2)(C)(iii)

See publication Words and Phrases for other judicial constructions and definitions

**9. Schools ⊂⊃155.5(5)**

Equitable considerations are relevant when fashioning "appropriate relief" for violations of the Individuals with Disabilities Education Act (IDEA), and district court enjoys broad discretion in evaluating such considerations. Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii), 20 U.S.C.A § 1415(i)(2)(C)(iii).

**10. Schools ⊂⊃154(4)**

While the Individuals with Disabilities Education Act (IDEA) reflects a structural preference in favor of providing special education in public schools, placement in private school may be appropriate, where public school has failed to provide adequate education in timely manner. Individuals with

**00003**

Disabilities Education Act. § 601 et seq., 20 U.S.C.A § 1400 et seq.

**11. Schools ⇐154(4)**

Under the Individuals with Disabilities Education Act (IDEA), prospective injunction that requires placement in private school is appropriate beyond cavil, where educational program calling for placement in public school is inappropriate  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A § 1400 et seq

**12. Schools ⇐154(4)**

Disabled student who seeks placement in private school at public school system's expense is not required to demonstrate that he cannot be educated in public setting; under the Individuals with Disabilities Education Act (IDEA), relevant question is not whether student could in theory receive appropriate education in the public setting, but whether he will receive such an education  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A § 1400 et seq

**13. Schools ⇐154(4)**

Award of reimbursement for expenses of private school is allowed under the Individuals with Disabilities Education Act (IDEA) where private placement is appropriate for student and educational program at public school has been inadequate  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A § 1400 et seq

**14. Schools ⇐154(4)**

Individuals with Disabilities Education Act (IDEA) does not relegate families who lack the resources to place their children unilaterally in private schools to shouldering the burden of proving that public school cannot adequately educate their child before those parents can obtain placement in private

school  Individuals with Disabilities Education Act. § 601 et seq , 20 U.S.C.A. § 1400 et seq.

**15. Schools ⇐155.5(5)**

Even assuming that district court, on petition for review of decision of administrative law judge (ALJ). had left intact the alternate remedy granted by ALJ for school authorities' violations of the Individuals with Disabilities Education Act (IDEA), pursuant to which learning disabled student and his parents could choose either to receive compensatory education in public school system or to have public school system pay for student's education at private school, cooperative process established by the IDEA between parents and schools did not bar district court from providing parents appropriate relief that included a unilateral choice regarding their child's education  Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii), 20 U.S.C.A § 1415(i)(2)(C)(iii)

**16. Schools ⇐148(2.1)**

Parents have right under the Individuals with Disabilities Education Act (IDEA) to make some unilateral decisions concerning their child's education after school system has violated the IDEA.  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq.

**17. Schools ⇐155.5(4)**

In cause of action under the Individuals with Disabilities Education Act (IDEA), district court did not clearly err in accepting administrative law judge's (ALJ's) finding that dyslexic student had been misdiagnosed as suffering from mild intellectual disability, where finding was supported by evidence that child had been observed writing words, letters, and numbers backwards, and that

00004

**1384    DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM**

child performed much better on verbal than on written tasks, as well as by limited nature of testing performed by school authorities as basis for this diagnosis, which testing did not measure child's phonological processing levels and included no review of child's receptive and expressive levels. Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq.

**18. Schools ⇐155.5(2.1)**

In cause of action under the Individuals with Disabilities Education Act (IDEA), district court did not clearly err in finding that parents of dyslexic student should not have known, before they received results of re-evaluation of student by school authorities roughly five years after initial evaluation, that student had been misdiagnosed initially, and thus had been inappropriately placed in class for students with mild intellectual disability; accordingly, court did not clearly err in finding that IDEA action brought by parents less than two years after being informed of results of this reevaluation was timely Individuals with Disabilities Education Act, § 615(f)(3)(C), 20 U.S.C.A. § 1415(f)(3)(C).

**19. Schools ⇐148(2.1)**

Under the Individuals with Disabilities Education Act (IDEA), educational program must be reasonably calculated to enable child to receive educational benefits Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq.

**20. Schools ⇐148(2.1)**

In measuring whether handicapped child has received adequate educational benefits, of kind guaranteed by the Individuals with Disabilities Education Act (IDEA), courts must determine only whether the child has received basic floor of opportunity. Individu-

als with Disabilities Education Act, § 601 et seq., as amended, 20 U.S.C.A. § 1400 et seq

**21. Schools ⇐155.5(5)**

Under the Individuals with Disabilities Education Act (IDEA), while ordinary educational programs need provide only some benefit, compensatory awards for violations of the IDEA must do more, they must compensate by placing children in position that they would have been in but for the IDEA violation  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq

**22. Schools ⇐148(3)**

In cause of action under the Individuals with Disabilities Education Act (IDEA), district court did not clearly err in finding that public school system had failed to provide dyslexic student with adequate education over the school year in which his IDEA was first identified, given evidence that, in school year in question, school authorities had failed to timely modify his existing placement to reflect the new diagnosis, and had then placed him in classes in which he could not succeed and failed, for half of school year, to address his reading deficiency  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq

**23. Schools ⇐148(3)**

In cause of action under the Individuals with Disabilities Education Act (IDEA), district court did not clearly err in finding that public school system had failed to provide dyslexic student with adequate education over school year immediately following that in which his dyslexia was first diagnosed, given evidence that, despite student's continued academic stagnation and expert's recommendation of intensive multi-sensory training, school system had continued with

**P00005**

## DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM    1385

existing program over objection of student's parents  Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C A § 1400 et seq.

**24. Schools ⊜154(4)**

In cause of action under the Individuals with Disabilities Education Act (IDEA), district court's award of compensatory education in form of placement at private school for period of roughly five years or until he obtained his high school diploma, whichever came first, was not abuse of discretion, and was not in nature of punitive award, for dyslexic student who, as result of misdiagnosis of his condition and misplacement in class for those with mild intellectual disabilities, and as result of school officials' failure to provide appropriate education even after his dyslexia was identified, was still reading at third-grade level in high school  Individuals with Disabilities Education Act, § 615(i)(2)(C)(iii),    20    U.S.C A § 1415(i)(2)(C)(iii)

_____

Appeal from the United States District Court for the Northern District of Georgia.

Before HULL and PRYOR, Circuit Judges, and MOORE*, District Judge

PRYOR, Circuit Judge:

The issue in this appeal is whether the district court abused its discretion when it awarded a student who is disabled placement in a private school as compensation for violations of the Individuals with Disabilities Education Act. 20 U S C §§ 1400–1482. Jarron Draper entered the Atlanta Independent

School System as a student in the second grade.  After years of conflict with the School System, Draper's family requested and received an administrative hearing about his education  By then, Draper was 18 years old and in the eleventh grade, but he could read at only a third-grade level.  The administrative law judge entered extensive findings and awarded Draper relief, and the district court, after both parties sought review, adopted the findings and increased the award.  Draper is now 21 years old.  The School System concedes that it violated some of Draper's rights and, in one year, provided him a deficient educational program, but the School System argues that other violations are either barred by the statute of limitations or not supported by the record. The School System also contends that Draper must be educated in a public school and that Draper's award is disproportionate to the violations of his rights.  This appeal reminds us of words written by the late Judge John Minor Wisdom about a denial of educational opportunity in a different era.  "A man should be able to find an education by taking the broad highway  He should not have to take byroads through the woods and follow winding trails through sharp thickets, in constant tension because of the pitfalls and traps, and, after years of effort, perhaps attain the threshold of his goal when he is past caring about it." *Meredith v Fair*, 298 F.2d 696, 703 (5th Cir 1962).  Because the district court did not abuse its broad discretion to fashion appropriate relief under the Act, we affirm.

## I.  BACKGROUND

Before we address the merits of the arguments of the School System, we review three

_____

* Honorable K  Michael Moore, United States District Judge for the Southern District of Florida,    sitting by designation

00006

matters First, we provide a brief overview of the Act to place the factual record in context. Next, we review the factual record about the education of Draper by the School System. Finally, we review the decisions of both the district court and the administrative law judge.

### A  The Individuals with Disabilities Education Act

The Act provides federal assistance to states that provide a free and appropriate education to children with disabilities 20 U.S.C. § 1412(a)(1)(A) States are required to identify children in need of special education services Id § 1412(a)(3)(A). After a child is identified as disabled, the state must develop, review, and revise an "individualized education program" that meets the requirements of the Act Id § 1412(a)(4) A team that includes, at a minimum, the parents of the child, one regular-education teacher of the child, one special-education teacher of the child, and a representative of the local educational agency develops the educational program. Id § 1414(d)(1)(B), (d)(3)(A) The program must comply with the procedures of the Act and be "reasonably calculated to enable the child to receive educational benefits" JSK ex rel JK v Hendry County Sch Bd, 941 F.2d 1563, 1571 (11th Cir 1991) (citing Bd of Educ of Hendrick Hudson Cent Sch Dist, Westchester County v Rowley, 458 U.S. 176, 206–07, 102 S.Ct 3034, 3051, 73 L Ed 2d 690 (1982))

If the parents either disagree with the educational program or believe that the child has been denied rights under the Act, they are entitled to a hearing "conducted by the State educational agency or by the local educational agency" as determined by state law 20 U.S.C. § 1415(f)(1)(A) Georgia law provides that the hearings are to be conducted by the Office of State Administrative Hearings. Ga Code Ann § 50-13-41(a)(1) If ei-

ther party is aggrieved by the decision of the state educational agency, the party can file a civil action "in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A).

[1] The Act directes the district court to base its decision on a preponderance of the evidence and to "grant such relief as the court determines is appropriate." ~~20 U.S.C.~~ § 1415(i)(2)(C)(iii). "This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by [the Act]" Todd D ex rel Robert D v Andrews, 933 F.2d 1576, 1584 (11th Cir.1991) (citing Jefferson County Bd of Educ v Breen, 853 F 2d 853, 857 (11th Cir 1988)). Compensatory education provides services "prospectively to compensate for a past deficient program" G ex rel RG v. Fort Bragg Dependent Sch, 343 F 3d 295, 308 (4th Cir 2003)

### B  Factual Background

Draper entered the School System as a seven-year-old child in the second grade in 1994. He could not read, was writing at a kindergarten level, and did not know the sounds of the alphabet Draper's teachers recommended that Draper be tested to determine the cause of his academic struggles in February 1995, November 1996, February 1997, and October 1997

The School System performed an evaluation of Draper on June 1, 1998, and concluded that he had an intelligence quotient of 63. This evaluation was flawed because it failed to assess Draper for a specific learning disability even though he displayed signs of dyslexia, such as writing letters, numbers, and words backwards Draper was 11 years old.

P00007

**DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM**    1387

On January 25, 1999, Draper was placed in the most restrictive educational environment available, a self-contained classroom for children with mild intellectual disabilities. The restrictive classroom provided Draper with a functional curriculum that would not lead to a regular high school diploma. Draper's team met on April 19, 2000, and determined that he was reading at a third-grade level and spelling at a first-grade level. Draper was 13 years old. Draper remained in the restrictive classroom through the school year of 2002–03. His placement in the restrictive classroom between 1999 and 2003 was based on the 1998 evaluation.

Draper was not reevaluated until April 2003, when he was in the ninth grade and 16 years old. Under the Act, Draper should have been reevaluated by June 2001. 20 U.S.C. § 1414(a)(2)(B)(ii). After completing the evaluation, the school psychologist recommended further testing because discrepancies in subtest scores suggested that the evaluation did not accurately reflect Draper's intellectual potential.

The School System reevaluated Draper in July 2003. This evaluation revealed that Draper did not have mild intellectual disabilities but had a specific learning disability. The evaluation established that a full-scale intelligence quotient of 82, which is in the low-average range of intelligence, more accurately reflected Draper's intelligence. The evaluation also established that Draper was still reading at a third-grade level, performing at a third-grade level in arithmetic, and performing at a second-grade level in spelling. His reading level had not improved since April 2000.

Draper's team met several times throughout the summer and fall to modify his educational program. Draper's family made it clear to the School System that Draper want-

ed to receive a regular high school diploma so that he could go to college. On August 3, 2003, Draper's family requested private schooling and one-on-one tutoring to help Draper close the achievement gap in his studies. No action was taken on these requests

On September 9, 2003, the School System modified Draper's diagnosis from mild intellectual disabilities to specific learning disability. Draper's team recommended only 1.5 hours of speech tutoring a week. On October 7, 2003, Draper's team amended the educational program to provide Draper with 19.5 hours of general education and 10.5 hours of special education a week. The School System placed Draper in regular-education classes for the first time since third grade even though a witness for the School System testified that a fifth-grade or sixth-grade reading level is required to survive academically in high school

Draper's educational program provided that he would use the Lexia program, an instructional computer program, to improve his ability to read, but Draper was not provided the Lexia program. On November 17, 2003, the School System agreed, after mediation, to provide Draper with the Lexia program by no later than November 21, 2003. Despite the agreement, the School System did not implement the Lexia program until December 9, 2003, and, by January 12, 2004, Draper had received only 2.5 hours of instruction with the Lexia program.

On May 24, 2004, Draper was privately evaluated by the Lindamood–Bell reading program. The Lindamood–Bell Center recommended that Draper receive intensive sensory-cognitive training at a rate of 6 hours daily for a total of 360 hours. On May 26, 2004, although the School System was aware that Draper was still reading at a third-grade

*add dash*

**1388**     **DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM**

level, Draper's team decided that he would use the Lexia program for the summer. Draper's family requested private reading services but were informed that they would have to file a formal complaint to pursue the matter

During the summer of 2004, the School System referred Draper to Dr Judy Wolman for an independent psychological evaluation The evaluation established that Draper's skills in several areas were severely discrepant from his potential. Dr. Wolman concluded that Draper suffered from a specific learning disability consistent with dyslexia and recommended "intensive multi-sensory training" to remedy his academic deficits Despite Draper's family's objections that the Lexia program was inadequate to address Draper's needs, Draper's team decided on November 18, 2004, to continue the use of the Lexia program When Draper's team met again on May 12, 2005, Draper had failed his language-arts class and was failing the second semester of algebra

On September 10, 2004, the Georgia Department of Education acknowledged that Draper's grades had not improved The Department informed Draper's family that they could request a hearing if they were not satisfied with Draper's educational program The hearing was conducted by the administrative law judge in November 2005. By then, Draper was 18 years old and in the eleventh grade

### C   *Procedural History*

The administrative law judge held a hearing for three days regarding Draper's education. The School System retained an expert, Dr. Barry Bogan, who had never met or spoken with Draper Cross-examination established that Bogan's assumptions regarding Draper's diagnosis, age, and educational level were incorrect. Bogan was unaware

that Draper had been diagnosed as having a specific learning disability Bogan testified that Draper was 16 or 17 years old when in fact Draper was almost 19 years old. Bogan was of the opinion, based on his review of a single test, that Draper was reading at a sixth-grade or eighth-grade level instead of a third-grade level Bogan opined that the School System had provided Draper an adequate education.

Draper called several experts to testify on his behalf Both Dr Wolman and Camilla Fletcher had spent extensive time with Draper Wolman testified that Draper did not have the necessary skills to benefit from the Lexia program, and Fletcher testified that the use of the Lexia program for 30 minutes a day was insufficient to remedy Draper's achievement gap After Dr Edward Dragan spoke with Draper and reviewed his educational file, Dragan testified that the School System should have discovered that it had misdiagnosed Draper as mildly intellectually disabled much earlier than 2003. Dragan expressed serious doubt that the School System could or would provide Draper the appropriate services to remedy his educational deficits. Wolman and Fletcher both expressed concern about the ability of an expert to evaluate a student's education if the expert had never spoken with the student and was unfamiliar with the student's diagnosis.

Draper testified that the School System did not provide him with Lexia instruction 30 minutes a day for five days a week as the School System had alleged Draper stated that his tutor, a football coach, spent much of the sessions surfing websites about football on the internet Draper testified that his science class consisted of coloring and his math class of crossword puzzles. The administrative law judge concluded that Draper

00009

was "very articulate" and a "very impressive witness."

The administrative law judge found that the School System failed to provide Draper an adequate education for the school years of 2002–03, 2003–04, and 2004–05. The administrative law judge found that, after the School System misdiagnosed Draper in 1998, the School System failed to reevaluate him, in violation of the Act. The administrative law judge concluded that the use of an educational program that did not increase Draper's reading ability after three years failed to satisfy the Act.

The administrative law judge awarded Draper a choice of two remedial options. The first option provided Draper with substantial additional support services in the School System. The School System would have been required to provide Draper with intensive multi-sensory reading services for 60 minutes a day, five days a week; train all of Draper's teachers in dyslexia instructional strategies; provide Draper with a one-on-one, certified, special-education teacher to support him in all his classes; provide one hour a day of tutorial services; provide services during the summer; and, during the first year, evaluate Draper's progress monthly. The second option allowed Draper to be placed in a private school and required the School System to pay his tuition, not to exceed $15,000 a year. These services were available until June 2009 or when Draper received a high school diploma, whichever came first.

Both parties sought review by the district court. 20 U.S.C. § 1415(i)(2)(A). Draper contended that the administrative law judge provided inadequate compensatory services to remedy the violations of the Act by the School System, and the School System argued that it had not violated the Act. The School System argued that the administrative law judge had disregarded the statute of limitations, made erroneous findings of fact, failed to use the proper standard under the Act, and created a remedy "unauthorized by the law or the evidence."

While the dispute was pending in the district court, Draper selected the second option, the placement in a private school, and requested placement at the Cottage School, but Draper reserved his right to argue that the second option was inadequate. The School System moved to stay the enforcement of the order of the administrative law judge so that the School System would not have to pay for Draper's placement in a private school while the district court reviewed the dispute. The district court denied the motion to stay the enforcement of the award and ruled that Draper's selection of the second option was enforceable while the dispute was pending in the district court.

In its final order, the district court ruled for Draper in part and for the School System in part. The district court concluded that the statute of limitations permitted an award for Draper's placement in the restrictive classroom in 1999 but limited compensation for the failure by the School System to reevaluate Draper for the period between November 2002 and April 2003. The district court agreed with the administrative law judge that the School System failed to provide Draper an adequate education for the school years of 2002–03, 2003–04, and 2004–05. As Draper requested, the district court modified the second option in the award by the administrative law judge. The district court awarded Draper full services at the Cottage School without the $15,000 cap and extended the time frame of the remedy to 2011 or when Draper receives a high school diploma, whichever comes first. The district court found that "there is ample evidence in

▸00010

the record of the types of services [Draper] will require to appropriately educate him within the meaning of the [Act]." The district court concluded that the Cottage School could address Draper's educational needs and was the "appropriate" placement

## II. STANDARDS OF REVIEW

[2–6] A few standards govern our review of this appeal. Whether an educational program provided an adequate education under the Act "is a mixed question of law and fact subject to *de novo* review." *CP v Leon County Sch Bd. Fla.*, 483 F.3d 1151, 1155 (11th Cir 2007) (citing *Sch. Bd. v. K.C.*, 285 F 3d 977, 982–83 (11th Cir.2002)) "Specific findings of fact are reviewed for clear error." *Id* (citing *K C*, 285 F.3d at 983). "To the extent that this issue involves the interpretation of a federal statute, it is a question of law which we review *de novo*" *Id* (citing *Walker County Sch. Dist v Bennett ex rel. Bennett*, 203 F.3d 1293, 1295 (11th Cir 2000)) We review awards under section 1415(i)(2)(B)(iii) of the Act for abuse of discretion. *See Bd. of Educ v L M.*, 478 F.3d 307, 316 (6th Cir.2007). If the district court finds a violation of the Act, it "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Act grants "broad discretion" to the district court. *Sch. Comm. of Burlington v. Dep't of Educ*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985).

## III. DISCUSSION

We evaluate the argument of the School System in two parts First, we consider whether the district court abused its discretion in the light of the decision of the administrative law judge. Second, we consider whether Draper's award is disproportionate

to the violations of the Act by the School System

### A  The District Court Did Not Abuse Its Discretion in the Light of the Decision of the Administrative Law Judge

The School System argues that, even if Draper was entitled to an award, the district court abused its discretion in two ways. First, the School System argues that, because the award by the administrative law judge provided Draper a placement in a public school as one option for compensation, the district court could not award Draper a placement in a private school Second, the School System contends that Draper's award is contrary to the Act because the administrative law judge granted Draper a unilateral choice regarding his education. These arguments fail.

1  The Provision of a Public School Option by an Administrative Law Judge Does Not Preclude an Award of Placement in a Private School by a District Court.

The School System argues that Draper's award violates the Act as a matter of law because it allows a placement in a private school when the administrative law judge provided the option of a placement in a public school. The School System reads the provision of a public school option by the administrative law judge as a finding that the School System is able to educate Draper adequately Although we doubt that the decision of the administrative law judge evinced any confidence in the ability of the School System to compensate for its failed attempt to educate Draper, we will assume, for the purpose of this discussion, that the administrative law judge found that the School System could prospectively provide an appropriate educational program for Draper. Even with that assumption, the argument of the School System fails

## DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM    1391

[7–9] The district court was free to fashion appropriate relief for Draper regardless of the options offered in the discussion of the administrative law judge. The Act requires "appropriate" relief, and "the only possible interpretation is that the relief is to be 'appropriate' in light of the purpose of the Act." *Burlington*, 471 U.S. at 369, 105 S.Ct. at 2002. " '[E]quitable considerations are relevant in fashioning relief,' *Burlington*, 471 U.S., at 374, 105 S.Ct., at 2005, and the court enjoys 'broad discretion' in so doing, *id.*, at 369, 105 S.Ct., at 2002." *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 16, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993) "This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by [the Act]" *Andrews*, 933 F.2d at 1584 (citing *Breen*, 853 F.2d at 857)

The district court did not find that the School System could afford Draper appropriate relief. The district court, unlike the administrative law judge, did not award Draper a placement in a private school as one option for compensation  The district court awarded Draper placement in a private school.

[10] The School System argues that a purpose of the Act, which is to make public schools the preferred setting, precludes Draper's award of placement in a private school, but we disagree  The Supreme Court has explained that the Act contemplates that such education will be provided where possible in regular public schools   , but the Act also provides for placement in private schools at public expense where this is not possible." *Burlington*, 471 U.S. at 369, 105 S.Ct. at 2002–03. We have recognized that the Act "reflects a structural preference in favor of providing special education in public schools,"

but we have explained that when a public school fails to provide an adequate education in a timely manner a placement in a private school may be appropriate. *Loren F ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1312 (11th Cir 2003).

[11, 12] A prospective injunction that requires a placement in a private school is appropriate "beyond cavil" when an educational program "calling for placement in a public school [is] inappropriate." *Burlington*, 471 U.S. at 370, 105 S.Ct. at 2002. "[A] disabled student is not required to demonstrate that he cannot be educated in a public setting. Under [the Act], the relevant question is not whether a student could in theory receive an appropriate education in a public setting but whether he will receive such an education." *Ridgewood Bd. of Educ. v N.E. ex rel. M.E.*, 172 F.3d 238, 248–49 (3d Cir 1999).

[13] It is well settled that an award of reimbursement for the expenses of a private school is allowed under the Act when the private placement is appropriate for the student and an educational program at a public school has been inadequate. *Burlington*, 471 U.S. at 370, 105 S.Ct. at 2002–03. In *Burlington*, the student's father unilaterally removed the student from the public school and placed the student in a private school because the father believed that the educational program offered by the public school was inadequate. *Id* at 362, 105 S.Ct at 1999. The Supreme Court held that a prospective injunction providing placement in a private school would be appropriate, as would reimbursement for those expenses  *Id* at 370, 105 S.Ct. at 2003. The Court reasoned that, because of the inevitable elapse of time during the litigation, a determination that a public school system violated the Act would be

⊯00012

an "empty victory" if reimbursement for the expenses of a private education were unavailable. *Id.* Similarly, in *Florence County,* after the local and state agencies rejected the parents' complaints about an educational program, the parents unilaterally placed the student in a private school. 510 U.S. at 10, 114 S.Ct. at 363–64. The Supreme Court affirmed the award of reimbursement because the educational program offered by the public school was inadequate and the placement in a private school was appropriate. *Id* at 12–15, 114 S.Ct. at 364–66.

The School System argues that Draper's award is different from an award of reimbursement, but reading "appropriate" as requiring prospective placement in a public school, as the School System argues, would create an anomaly in the law. If Draper's family had unilaterally placed him in the Cottage School, then an award of reimbursement would be appropriate under the Act. *See Burlington,* 471 U.S. at 370, 105 S.Ct. at 2003. The district court found that the School System had failed to provide Draper an adequate educational program, and the district court concluded that the Cottage School offered an appropriate placement. If the district court could not prospectively award Draper a placement in a private school, Draper would be worse off with an award of prospective education than he would be with a retroactive award of reimbursement for the same violations of the Act. The Supreme Court has recognized that "conscientious parents who have adequate means" will place their child in private school if they are "reasonably confident of their assessment" that an educational program at a public school is inadequate. *Id* at 370, 105 S.Ct. at 2003. The argument of the School System would provide those wealthier parents greater benefits under the Act than poorer parents.

[14] We do not read the Act as requiring compensatory awards of prospective education to be inferior to awards of reimbursement. The Act does not relegate families who lack the resources to place their children unilaterally in private schools to shouldering the burden of proving that the public school cannot adequately educate their child before those parents can obtain a placement in a private school. The Act instead empowers the district court to use broad discretion to fashion appropriate equitable relief.

The argument of the School System is wrong. Although it ordinarily has a structural preference for special education in public schools, the Act does not foreclose a compensatory award of placement in a private school. The district court was free to award Draper a placement in a private school without regard to the remedy fashioned by the administrative law judge, and Draper was not required to prove that the School System was incapable of providing him an appropriate education.

**2. The Provision of Two Options for Draper by the Administrative Law Judge Does Not Affect the Validity of the Award by the District Court.**

[15] The School System also contends that Draper's award violates the Act because the administrative law judge provided Draper a unilateral choice between two options. The School System argues that Draper's award is inconsistent with "the cooperative process that [the Act] establishes between parents and schools." *Schaffer ex rel Schaffer v Weast,* 546 U.S. 49, 53, 126 S.Ct. 528, 532, 163 L.Ed.2d 387 (2005). We disagree.

The argument of the School System is based on the erroneous premise that the district court, like the administrative law judge, awarded Draper two options for com-

pensation when, in fact, the district court awarded Draper placement in only a private school. Whatever two options the administrative law judge awarded Draper is beside the point. We review the decision of the district court, and that decision awarded Draper his preferred form of compensation.

The School System contends that the district court left the provision of two options in Draper's award intact, but we read the record differently. Before the district court modified and supplemented Draper's award, Draper selected the second option in that award, which was placement in a private school. The School System moved to stay the enforcement of the award so that it would not have to pay for Draper's placement in a private school, but the district court denied that motion. The district court ruled that Draper's selection of the second option was enforceable. When the district court, in its final order, granted Draper's request to increase his award, the first option was no longer viable. Draper had already rejected that option.

In its final order, the district court awarded relief to supplement the option that Draper had already selected. The district court unequivocally found that the second option, with the supplements sought by Draper, would provide the appropriate relief under the Act. "In exercising its discretion to grant such relief as the Court deems appropriate, the Court finds that [Draper] is entitled to the full services at The Cottage School including the supplemental services as outlined by Dr. Digieso in her affidavit. [The School System] shall pay for these services in full at a total cost of $34,150.00 a year." The district court did not leave the first option intact as the School System contends.

[16] Even if we assume that the district court left the first option intact, the argu-

ment of the School System still fails. Parents have a right, under the Act, to make some unilateral decisions concerning their child's education after a school system has violated the Act. In *Florence County*, the Supreme Court, for example, reaffirmed the parental "right of unilateral withdrawal recognized in *Burlington*." *Florence County*, 510 U S at 13, 114 S.Ct. at 365. The cooperative process established by the Act between parents and schools does not bar district courts from providing parents appropriate relief that includes a unilateral choice regarding their child's education.

### B. The District Court Did Not Abuse Its Discretion and Enter a Disproportionate Remedy.

The School System argues that the district court abused its discretion in three ways: (1) the district court erroneously based its decision on Draper's misdiagnosis and placement in the restrictive classroom in 1998; (2) the award was a disproportionate remedy for the violations of the Act by the School System; and (3) the award constituted impermissible punitive damages. The first two arguments implicate findings of fact by the district court, which we review for clear error. We reject the arguments of the School System.

1. The District Court Did Not Abuse Its Discretion When It Considered Draper's Misdiagnosis in 1998 and His Placement in the Restrictive Classroom Between 1999 and 2003.

The School System presents two arguments about Draper's misdiagnosis. The School System contends that Draper was not misdiagnosed in 1998 but that, if he was misdiagnosed, Draper's complaint about his placement in the restrictive classroom between 1999 and 2003 is barred by the statute of limitations. We disagree on both points

2002

[17] The School System contends that "there is no undisputed record evidence" of Draper's misdiagnosis, but that is not the issue  What matters is that there is substantial evidence to support the finding of the administrative law judge that Draper was misdiagnosed in 1998, and the acceptance of this factual finding by the district court was not clearly erroneous

The administrative law judge relied on substantial evidence that the evaluation of Draper in 1998 was far from the comprehensive evaluation that was supposed to be administered.  The administrative law judge found as follows that the limited evaluation failed to measure key aspects of Draper's abilities:

Given that [Draper] had been observed writing words, letters, and numbers backwards, a classic symptom of dyslexia, and that he performed much better on verbal tasks, the evaluation performed in June 1998 was spectacularly deficient.  The evaluation did not measure [Draper's] phonological processing levels (which are essential to reading) nor did the evaluator review [Draper's] receptive and expressive levels.  Based on the limited evaluation performed, which essentially included an I.Q. test, the school psychologist concluded that [Draper] had a full scale I Q of 63

The persistent refusal of the School System to acknowledge the substantial evidence of its misdiagnosis borders on incredible

[18] The district court also did not err in finding that the misplacement of Draper in the restrictive classroom between 1999 and 2002 is not barred by the statute of limitations.  The Act requires parents to request a due process hearing "within 2 years of the date the parent    knew or should have known about the alleged action that forms the basis of the complaint "  20 U.S.C.

§ 1415(f)(3)(C).  Draper filed his complaint in November 2004.  The district court found that Draper's family did not have the facts necessary to know that Draper had been injured by his misdiagnosis and misplacement until they received the results of his evaluation in 2003.

The argument of the School System rests on the dubious proposition that Draper's family should have known that Draper had been misdiagnosed and misplaced even before the School System informed Draper's family that it had reached that conclusion.  The School System argues, for example, that because the administrative law judge found it "incredulous" that anyone would consider Draper mentally retarded in 2003, Draper's family should have been "intimately aware of the particular nature—if not the precise medical classification—of his disability."  The School System contends that the district court clearly erred because Draper's family should have known something that the trained professionals of the School System did not admit they knew.

This argument fails  Substantial evidence supports the finding that, until 2003, Draper's family did not know enough to realize that Draper had been injured by his misdiagnosis and misplacement by the School System  We decline the invitation of the School System to conclude, as a matter of law, that Draper's family should be blamed for not being experts about learning disabilities.  The observation by the administrative law judge was a statement about an obvious failure by the School System, not a statement about a misdiagnosis by Draper's family  The district court did not clearly err by adopting the finding that Draper's family did not have reason to know of Draper's injury until 2003

**00015**

**DRAPER v. ATLANTA INDEPENDENT SCHOOL SYSTEM**    **1395**

2   Draper's Award Is Not Dispro-
portionate to the Violation by
the School System

The School System contends that Draper's
award is disproportionate to the violations by
the School System. The School System does
not contest that it failed to provide Draper
an adequate education for the school year of
2002–03, but instead challenges the findings
of the administrative law judge and the dis-
trict court that the School System failed to
provide Draper an adequate education in the
school years of 2003–04 and 2004–05. The
School System contends that it provided
Draper with an adequate program in reading
in those years.

[19–21] In our review of Draper's award,
we are mindful that an award of compensa-
tion for a violation of the Act is different
from the educational program ordinarily re-
quired by the Act. An educational program
must be "reasonably calculated to enable the
child to receive educational benefits." *JSK*,
941 F.2d at 1571 (quoting *Rowley*, 458 U.S.
at 206–07, 102 S.Ct. at 3051). "[W]hen meas-
uring whether a handicapped child has re-
ceived [adequate] educational benefits ...
courts must only determine whether the child
has received the basic floor of opportunity."
*Id.* at 1572–73 (citing *Andrews*, 933 F.2d at
1580). If there has been a violation, the
district court may award "appropriate" com-
pensatory relief. 20 U.S.C.
§ 1415(i)(2)(C)(iii), *Andrews*, 933 F.2d at
1584. Although "ordinary [educational pro-
grams] need only provide 'some benefit,'
compensatory awards must do more—they
must compensate." *Reid ex rel Reid v. ~~Dist~~
of Columbia*, 401 F.3d 516, 525 (D.C. Cir.
2005). Compensatory awards should place
children in the position they would have been
in but for the violation of the Act. *Id.* at 518.

   District

*a.*   *2003–04*

[22] The School System contends that
the district court erred when it found a viola-
tion for the school year of 2003–04 based on a
disagreement with the use of the Lexia pro-
gram, but this argument misunderstands the
findings of the district court. The use of the
Lexia program was one of many deficiencies
in Draper's educational program during the
school year of 2003–04. In September Drap-
er's program maintained his placement in the
restrictive classroom even though the evalua-
tion in July 2003 found that Draper did not
have mild intellectual disabilities. After the
School System changed Draper's diagnosis,
the School System provided Draper with only
1.5 hours of speech tutoring a week. On
October 7, 2003, the School System was
aware that Draper could read at only a third-
grade level and that a fifth-grade or sixth-
grade reading level was required to access
the curriculum in high school, but the School
System placed Draper in regular-education
classes. Draper's program stated that the
Lexia program would be provided to address
his reading deficit, but Draper's family had
to file a formal complaint before the School
System actually provided the Lexia program.
Even after the formal complaint, the School
System did not provide Draper with the Lex-
ia program until December 2003, and by
January 2004 Draper had received only 2.5
hours of services using the Lexia program.
Draper was still reading at a third-grade
level at the end of the school year of 2003–04.

Substantial evidence supports the findings
of the district court. The School System
failed to modify Draper's educational pro-
gram for several months after testing estab-
lished that his placement was not appropri-
ate, knowingly placed Draper in classes in
which he could not succeed, and failed to
address Draper's reading deficiency for half

of the school year. The finding that the School System failed to provide Draper an adequate education for the school year of 2003–04 is not clearly erroneous

  *b   2004–05*

[23] The School System argues that the district court, in its finding about the school year of 2004–05, failed to recognize the difficulty of modifying an educational program to address a complex situation. This Court has recognized that, when a program is revised, "perfection is not required." *Loren F.*, 349 F.3d at 1312 (citing *K.C.*, 285 F.3d at 982). The record reflects that the district court understood this admonition.

The district court did not fault the School System because it failed to be perfect. The district court found that the School System failed to provide Draper with "the basic floor of opportunity." *JSK*, 941 F 2d at 1573 (citing *Andrews*, 933 F 2d at 1580). The School System was aware in the summer of 2004 that Draper was still reading at a third-grade level, and the School System was informed that Dr. Wolman recommended "intensive multi-sensory training to bring the deficient skills closer to his potential so that he can ultimately perform independently as an adult." Despite Draper's continued academic stagnation and the recommendation of Dr Wolman, the School System continued to use the Lexia program over the objection of Draper's family. The district court did not clearly err when it found that the educational program provided by the School System failed to provide Draper with an adequate education for the school year of 2004–05.

  3.   Draper's Award Is Compensatory, Not Punitive.

[24] The School System argues that both the decision of the district court and the earlier findings of the administrative law judge smack of retaliation. The School System complains of "disdainful references" to its witnesses and officials by the administrative law judge, and the School System describes as "caustic" the conclusion of the administrative law judge that the School System had "forfeited its right to continue to 'educate' [Draper]." The School System complains that the district court repeated these allegedly improper comments.

We are not in any position to disturb these findings. Unlike the administrative law judge, we have not observed the parties and witnesses who appeared and testified at Draper's hearings There is ample evidence to support the administrative law judge's description of Draper's educational experience as a "tragic tale," and there is nothing in this record that suggests to us that the findings adopted by the district court are anything but supported in fact Although strongly worded, the decisions of both the district court and the administrative law judge are professional and temperate

In the light of this record, we cannot say that Draper's award was an abuse of discretion. The record supports the conclusion of the district court that Draper's award is "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid*, 401 F 3d at 524. We categorically reject the assertion of the School System that Draper's award "looks suspiciously like" an award of punitive damages

**IV.   CONCLUSION**

We AFFIRM the judgment in favor of Draper

AFFIRMED.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By _Willson T. Nork_
Deputy Clerk
Atlanta, Georgia

100017