Ellen Dowd, Esq.
State Bar Number 141206
2658 Del Mar Heights Road #228
Del Mar, California 92014
(858) 342-8360
Fax: 858-755-6348
ellendowd@sbcglobal.net

**Attorney for Plaintiff/Counter-Defendant, MARY STRUBLE, As Conservator for CS**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY STRUBLE, As Conservator for CS, | CASE NO.: 07 CV 2328 LAB (CAB) |
| Plaintiff, | PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE |
| v. | Date: August 1, 2008 |
| FALLBROOK UNION HIGH SCHOOL DISTRICT, a Local Educational Agency | Time: 2:00 p.m. |
| Defendant. | Magistrate Judge: Hon. Cathy Ann Bencivengo |
| FALLBROOK UNION HIGH SCHOOL DISTRICT, | |
| Counterclaimant, | |
| v. | |
| MARY STRUBLE, As Conservator for CS, | |
| Counter-Defendant, | |

TO ALLPARTIES AND THEIR ATTORNEYS OF RECORD:

Plaintiff respectfully requests that this Court take judicial notice of the following document pursuant Rule 201 of the Federal Rules of Evidence:

1.    Decision in OAH Case No. N 2007080202, attached hereto as Exhibit "A."

Dated: July 11, 2008

Respectfully submitted,

Ellen Dowd, Attorney for Plaintiff/
Counter-Defendant, Mary Struble

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

                   Petitioner,

v.

MODESTO CITY SCHOOLS,

                  Respondent.

OAH CASE NO. N 2007080202


## DECISION

Charles Marson, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division (OAH), State of California, heard this matter on January 22-25 and January 28-29, 2008, in Modesto, California.

Student's Mother represented Student. Mark Herbst, Supervisor of Special Education, Grades 7 through 12, represented Modesto City Schools (District). Accompanying Mr. Herbst was Aaron Anderson, a paralegal with the law firm of Kronick, Moscovitz, Tiedemann & Girard.

Mother, by permission of the ALJ, appeared by telephone. Mr. Herbst and Mr. Anderson were present throughout the hearing. Student did not appear.

The second amended request for due process hearing was filed on September 20, 2007. On November 16, 2007, the matter was continued. At the hearing, oral and documentary evidence were received. At the close of the hearing, at the parties' request, the matter was continued and the record held open until February 19, 2008, when the parties filed closing briefs and the matter was submitted.

1

*Ex "A"*

ISSUES

1)    Did the District fail to provide Student a free appropriate public education (FAPE) for the school year (SY) 2005-2006, his tenth grade year, by failing to provide appropriate accommodations and modifications, a program to meet his unique needs, or a transition plan?

2)    Did the District fail to provide Student a FAPE for SY 2006-2007, his eleventh grade year, by failing to provide appropriate accommodations and modifications, a program to meet his unique needs, or a transition plan?

3)    Did the District fail to provide Student a FAPE for SY 2007-2008 school year, his twelfth grade year by failing to provide appropriate accommodations and modifications, a program to meet his unique needs, or a transition plan, or by removing him from the football team?

4)    Did the District deny Mother the opportunity to participate in the individualized education program (IEP) process?

5)    Has the District provided Mother all requested educational files concerning Student?


REQUESTED REMEDIES

Student requests a ruling that the District denied him a FAPE for the SYs 2005-2006, 2006-2007, and 2007-2008. He requests that he be given more accommodations and modifications than the District has thus far provided, such as additional time for tests and assignments, lessons in smaller portions, and a different one-to-one aide. Student also requests that additional relief be ordered depending on proof at the hearing.


CONTENTIONS OF THE PARTIES

Student contends that the programs the District has provided him have not met his unique needs because the District has not provided him sufficient accommodations and modifications (A/M) to make progress in his program, as evidenced by his grades. He alleges that in order to receive a FAPE he must have additional time for tests and assignments, lessons in smaller portions, and a different one-to-one aide. The District contends that it has met all of Student's unique needs insofar as it can without Mother's approval of a current IEP. It asserts that he has been granted numerous A/M throughout the years at issue, including, where necessary, additional time on tests and assignments and lessons in smaller portions. It argues that Student's one-to-one aide has at all times performed properly, and that it is Student who has refused to take full advantage of his aide.

2

Student also contends that the District is no longer implementing his last agreed-upon IEP but is instead implementing one or more IEPs that Mother has refused to sign, without having sought or obtained the authority of an ALJ to do so. Student asserts that, as a result, the District is not providing special education and services that are in conformity with his outstanding IEP, and has precluded Mother from full participation in the IEP process. The District contends Student's special education and services have conformed to his last agreed-upon IEP, and denies that it is implementing any IEP that Mother has not approved.

Finally, Student contends that the District has refused to disclose to Mother all the records in his IEP and cumulative files, while the District asserts that it has disclosed all those records.

## FACTUAL FINDINGS

*Background*

1.    Student, an 18-year-old male, resides with Mother within the District, and is eligible for special education because of a specific learning disorder (SLD). He is in the 12th grade at the District's Thomas Downey High School (Downey), and is scheduled to graduate with a diploma in June if he passes all the courses he is currently taking.

2.    Student's learning is hampered by processing delays in auditory and visual memory as well as in visual motor integration.

3.    At least since the year 2000, Mother and the District have disagreed so extensively about Student's educational needs that his last agreed-upon placement must be pieced together from documents signed over a period of years. Student's last full, signed IEP is dated January 20, 2000, when he was in the fourth grade. That IEP was not introduced in evidence, but is described in *Student v. Modesto City Elementary School Dist.*, SEHO Case No. SN02-02770 (April 2, 2003)(SEHO decision),[1] a previous dispute between the parties. It placed Student in regular education with 120 minutes of Resource Specialist Program (RSP) support four times a week and speech therapy twice weekly. By the time Student entered the fourth grade, he had met, or nearly met, all of his reading and written language goals from the January 2000 IEP, and his only remaining unmet goal was in math. He had "no current annual goals and objectives in two of his three major areas of educational deficit, reading and written language."

4.    On December 18, 2000, Mother signed a form entitled "K-8 Differential Standards, Program Modifications" that set forth the A/M Student was to receive. Neither party introduced that form in evidence. The only evidence of the contents of the document is a passage in the SEHO decision stating that the form allowed Student to use a separate, quiet room to take tests; have all tests read to him except those testing reading skills; take tests either orally or by dictating written answers to an adult; be given more time on tests than

---

[1] Official notice is taken of the SEHO decision and its contents.

3

normally allotted; use a calculator in tests of problem solving; be given extended deadlines on assignments; and be permitted to use adapted technology for assignments such as spell check, a tape recorder, and a computer. In addition, Student was to have his assignments modified in scope and length, and was permitted to use alternative texts in class, if necessary.

5.    On August 26, 2003, the parties held an IEP meeting in response to the SEHO decision, which had ordered certain relief. The meeting was an addendum to the 2000 IEP meeting and did not produce a complete IEP. The District proposed new goals but Mother did not accept them. The parties acknowledged at the meeting that Student's last goals were from 2000 and had largely been met, but agreed to use them until a pending psychoeducational assessment was completed. The notes of the August 2003 meeting state that A/M were discussed and that Mother wanted alternative texts to be used. Mother did not sign the addendum.

6.    In his seventh grade year (SY 2002-2003) and for the first part of his eighth grade year (SY 2003-2004), Student was instructed at home. On September 26, 2003, the parties entered into an addendum agreement providing that Student's home instruction would be phased out, and that he would receive RSP support for one period a day, speech and language therapy once a week for 20 minutes, occupational therapy once a week for 30 minutes, and transportation to and from school. Mother consented to those proposals. The District wanted to place Student in a special day class but Mother did not agree. The District then placed Student in regular education, which the evidence shows was what Mother desired and which was consistent with the January 2000 IEP. Taken together, the January 2000 IEP, the "K-8 Differential Standards, Program Modifications" Mother signed on December 18, 2000, and the IEP documents signed by Mother on or about September 26, 2003, yield this basic placement: Student was placed in regular education classes, given one period a day of RSP support, and the A/M agreed to in 2000. This constitutes Student's last agreed-upon placement (the 2003 IEP).

7.    The parties held several IEP meetings in 2004 and early 2005 but failed to reach agreement on a new program for Student, who attended the District's La Loma Junior High School for his ninth grade year (SY 2004-2005) under the terms of the 2003 IEP. By that time he had met all the goals in his 2003 IEP.

*FAPE in Student's Sophomore Year (SY 2005-2006)*

8.    At the beginning of every school year, a school district must have in place an IEP for a special education student that addresses all his unique needs and is reasonably calculated to enable him to derive educational benefit.

9.    In order to provide a FAPE to a special education student, a school district must provide special education and services "in conformity with" an IEP that has been formulated in compliance with the requirements of the Individuals with Disabilities in Education Act (IDEA), including the requirement that the IEP be consented to in writing by the Student's parent. The most recent IEP to which Mother had consented was the 2003 IEP.

4

*The May 6, 2005 IEP Meeting*

10.     The District convened an annual IEP meeting on May 6, 2005, to determine Student's program for his tenth grade year at Downey (SY 2005-2006), the first school year at issue here. The District's IEP team members proposed to leave Student in regular education with one period a day in the resource room, and to give him a one-to-one paraprofessional aide. No speech and language or occupational therapy was offered, but the parties agreed that they were no longer necessary.[2] The parties agreed that Student had met his previous goals, so the District proposed new ones. The notes of the meeting state that Mother accepted the proposed math goal but not the others. Mother signed nothing to indicate agreement with any goal, so it lacked the required written consent. The District proposed a new list of A/M. Some additions were made at Mother's request, but the District would not agree to allow Student to answer only odd or even-numbered questions on tests. Mother did not consent to the IEP.

11.     After the May 2005 IEP meeting the District was aware that it had reached an impasse with Mother that it could not resolve on its own. The District knew that Student's last agreed-upon IEP was shortly to become two years old and it contained elements, such as goals, that dated back to an IEP in January 2000 and were obsolete. The District knew that adherence to the 2003 IEP would not provide Student a FAPE in SY 2005-2006. The evidence showed that the District then chose to implement the May 2005 IEP, even though Mother had not consented to it, without filing a request for due process hearing to obtain an order from an ALJ allowing it to do so.

12.     When a student with an IEP was placed primarily in regular education classes at Downey, it was the duty of his resource teacher to coordinate the student's special education program with each of his regular education teachers and to work with the student individually in the resource room. Steven Roseman was Student's resource teacher in his sophomore year. Mr. Roseman testified that the District implemented Student's May 2005 IEP during that year even though it was not signed. He was told to do so by "the administrator at Downey" and by Mr. Herbst, the Supervisor of Special Education for grades 7 through 12, who at the time was Student's program specialist. When asked why he implemented an unsigned IEP, Mr. Roseman responded that he could not in good conscience let a student stay in class and not get service, and that the regular education teachers needed to know what to do with a student.

*Placement in regular education*

13.     The District placed Student in regular education classes with an hour in the resource room by implementing the unsigned May 2005 IEP. However, the result was the

_____

[2] The District represents that Mother, in a letter dated May 13, 2004, asked it to remove occupational therapy and speech and language services from Student's program. Although that letter is not in the record, Student has not raised the absence of those services as an issue, so it will be assumed that the parties agreed those services should cease.

5

same as it would have been under Student's last agreed-upon IEP. It was in conformity with Student's last agreed-upon IEP and therefore did not deny Student a FAPE. The evidence did not show that this part of Student's placement failed to address any of his unique needs.

*Accommodations and Modifications (A/M)*

14.    An IEP must contain a statement of the program modifications that will be provided for a student so that he can advance toward attaining his annual goals and be involved and make progress in the regular education curriculum. It must also contain a statement of the accommodations that are necessary to measure his academic achievement and functional performance. At hearing, Student's sole argument in support of his allegation that his program did not meet his unique needs was that the District had failed to give him the A/M he required to advance toward his goals and make progress in his curriculum.

15.    At the beginning of the school year, Mr. Roseman distributed to all of Student's regular education teachers the new list of A/M that was part of the May 2005 IEP, and asked them to implement it. The new list mostly contained the same A/M that were in the 2003 IEP. It added several new A/M,[3] and eliminated only one: over Mother's objection, the list eliminated the use of alternative texts if they were necessary. Mr. Roseman testified that alternative texts were made available to Student in the resource room, that in his opinion they were unnecessary for Student, and that Student did not use them. In an IEP meeting on February 8, 2006, the District added the requirement that alternative texts be available to Student. Since the alternative texts were actually made available throughout Student's tenth grade year, the District did not fail to conform to the 2003 IEP in this respect.

16.    Mr. Roseman and Student's tenth grade teachers all understood that the A/M to be provided to Student were only to be provided as necessary, while Student argues that they were to be provided routinely and without exception. The only evidence in the record supports the District's interpretation. The form entitled "K-8 Differential Standards, Program Modifications" that Mother signed on December 18, 2000, and that became part of the 2003 IEP, was described in the SEHO decision as allowing Student the following accommodations and modifications:

> [Student] was allowed to use a separate, quiet room to take tests, to have all tests read to him except those testing reading skills, to take tests either orally or by dictating written answers to an adult, to be given more time than normally allotted, to be given extended deadlines on assignments, and to be permitted to use adapted technology for assignments (spell check, tape recorder, computer, etc.) as well as a calculator in tests of problem

---

[3] The additions were that Student could have the format of a test modified; have test directions reread, clarified, or simplified; use a calculator; have a note-taker; and have preferential seating. Whether the District adequately provided these new A/M is not decided here. Since the IEP was unsigned, the District was under no obligation to implement these new and unauthorized A/M.

6

> solving…. In addition, [Student] was to have his assignments
> modified in scope and length, and was permitted to 'use
> alternative text(s) in class, if necessary.'

(SEHO decision, p. 4.) All of the District's lists of A/M that were introduced in evidence consistently used words such as "allowed" or "permitted," and Student's teachers uniformly understood them to mean that the A/M should be granted as necessary, not automatically. That reading was reasonable and not out of conformity with Student's 2003 IEP.

17.    Student's tenth grade teachers consistently testified that he was given nearly all of the A/M to which he was entitled under the May 2005 IEP. The only exceptions were when Student refused to take advantage of an accommodation or modification, or when a teacher thought it was unnecessary. His teachers would have given him any A/M to which he was entitled if he had requested it.

18.    Mother contends that District staff should not have relied on Student to determine whether and when he needed particular A/M. Student is a quiet, shy, well-behaved young man who is liked by his peers and teachers. In March 2004, when Student was in the eighth grade, Barry Olson, an independent psychologist, stated in an educational evaluation of Student that his "primary difficulty seems to be a problem with underassertive behavior," that he "has difficulty expressing his needs," and that he "should be coached to be more expressive of his needs openly on a one-to-one basis." His high school teachers recognized that fact but did not believe his lack of assertiveness prevented him, by the time he was in the tenth grade, from asking for what he wanted. Student could easily express his needs through his resource room teacher and his one-to-one aide as well as directly. The evidence did not show that, from the tenth grade onward, Student had any serious difficulty in communicating his needs to his tenth grade teachers, either directly or through his resource room teacher or his aide. It was therefore reasonable for his regular education teachers to depend on him, his aide, or his resource teacher to tell them whether any particular A/M was necessary, and there was no evidence that such reliance deprived Student of any A/M that he needed or to which he was entitled.

19.    Student was reluctant to take advantage of many of the A/M to which he was entitled. He frequently declined to take his tests in a quiet room, or to have his assignments modified. He rarely used his calculator, though he was encouraged to do so. He attempted to complete full assignments instead of shortened assignments. In one class he obtained preferential seating in front; in another he sat in the back by choice. The experience of Todd Lial, Student's tenth and eleventh grade English teacher, was typical. Mr. Lial invited Student to take his tests in the resource room, offered him extended time for testing, the use of books on compact discs (CDs), and the use of notes on tests, but Student declined. His teachers generally allowed him to make those decisions for himself. The evidence showed that Student wanted to be thought of as like his peers and not as a special education student, and that he took many steps to minimize the appearance that his treatment was out of the ordinary.

7

20.    In many instances Student's teachers did not believe certain A/M were necessary. For example, Jim McGrath, Student's algebra teacher, testified that Student did not need alternative texts in his class because he did not use a text much, and because he had numerous other aids available that worked as well as alternative texts, such as worksheets and test generators. In other instances Student's assignments were not modified in scope and length because they were already quite short, or because Student had extensive additional time to complete them. It was common practice for Student's tenth grade teachers to allow him until the end of a grading period (usually a quarter) to turn in assignments.

21.    The evidence did not show that Student was deprived of any accommodation or modification in his tenth grade year that were necessary for him to advance toward attaining his annual goals or be involved in or make progress in his curriculum.[4] Since alternative texts were available to him, the elimination of that accommodation from the May 2005 IEP was without material consequence. While the District did not implement the 2003 IEP in Student's tenth grade year as it should have, the A/M it provided were not materially out of conformity with that IEP.

*Procedural rights*

22.    When a parent refuses to consent to the receipt of special education and services, after having consented in the past, California law requires that the school district seek resolution of the impasse by filing a request for a due process hearing. If the district believes that implementation of all or part of an IEP to which the parent will not consent is necessary to provide the student a FAPE, it must seek an order from an ALJ allowing it to use that IEP.

23.    A procedural violation of IDEA results in a denial of FAPE if it impedes the Student's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, or causes a deprivation of educational benefits.

24.    The District's decision not to file a request for due process hearing to seek authority from an ALJ to implement the May 2005 IEP violated the procedural provisions of California law because it left Student without an authorized IEP for his tenth grade year that provided a FAPE. By that violation the District impeded Student's right to a FAPE and deprived him of educational benefit because it denied him the benefit of current, measurable, appropriate goals and accurate present levels of performance. It also significantly impeded Mother's right to participate in the decision-making process regarding the provision of a FAPE to her child, and for those reasons denied Student a FAPE.

---

[4] Student was called as a witness by the District but did not testify. Although Student is 18 years old, he has granted his educational rights to Mother, who is also his guardian ad litem. In those roles Mother instructed him not to testify. She was warned that adverse inferences might be drawn from his failure to testify, but adhered to her decision. Mother also refused to testify, though given the same warning. As a result, the only witnesses who testified were those employed by the District.

8

*Effect of avoidance of due process on Goals, Objectives, and Present Levels of Performance*

25.     An annual IEP must contain a statement of measurable annual goals designed to meet the student's needs that result from his disability to enable him to be involved in and make progress in the general curriculum, and meet each of his other educational needs that result from his disability. It must also contain a statement of the student's present levels of academic achievement and functional performance. The present levels of performance (PLOPs) establish a baseline for measuring the child's progress throughout the year. Knowledge of a student's progress from his PLOPs in one year toward his annual goals is essential for drafting appropriate goals for the next year. Unless a student's progress toward meaningful annual goals is accurately measured, new PLOPs cannot accurately be derived and new goals cannot adequately be written.

26.     At the IEP team meeting on May 6, 2005, it was agreed that Student's old goals, those left over from his 2003 IEP, had long since been met. The District members of the team proposed new goals and objectives[5] in the areas of math, reading, written language, spelling, and self-advocacy. Mother did not consent in writing to any of the proposed goals.

27.     Student's tenth grade resource teacher Steve Roseman distributed the entire May 2005 IEP to Student's regular education teachers. Algebra teacher Jim McGrath confirmed that he received the entire document. This suggests that Student's teachers implemented the new goals. However, there was no evidence that anyone actually monitored Student's progress toward the May 2005 goals and objectives. The pages in the IEP setting forth goals contain spaces for entering progress reports, and it was District practice to report progress toward goals in those spaces. However, on Student's May 2005 IEP goal pages, those spaces are blank. The next annual IEP, on October 27, 2006, at which Student's progress toward his tenth grade goals should have been reviewed, makes no mention of those goals or progress toward them. The notes of that meeting state instead that Student "is still operating off dated goals due to many years of unsigned IEPs" and that "all goals from his eighth grade remain in effect." Supervisor Herbst testified that, to the best of his knowledge, Student spent his tenth grade year with no goals other than the January 2000 goals he had long since met. The preponderance of evidence supports that conclusion.

28.     The District could have given Student meaningful annual goals by obtaining an order from an ALJ allowing it to use the May 2005 IEP, but it chose not to. Since Student had met the goals in his January 2000 IEP long before his tenth grade year, and the District did not implement new goals for him, Student had no meaningful goals in his tenth grade year. By failing to obtain legal authority to provide Student meaningful, measurable annual

---

[5]   Since the 2004 amendments to the IDEA, the requirement to develop short-term objectives or benchmarks only concerns children with disabilities who are assessed using alternate assessments aligned to alternate achievement standards. (See, 20 USC § 1414 (d)(1)(A)(i)(I)(cc).) However, states have the option to continue to use objectives, and the District did so in all of Student's IEPs.

9

goals, and failing to provide such goals, the District impeded Student's right to a FAPE, deprived him of educational benefits, and therefore denied him a FAPE in SY 2005-2006.

### Effect on Mother's hearing rights

29.    By avoiding the resolution of their disputes in due process, the District also significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child.  It denied her a forum in which her dispute with the District could be promptly resolved, and in which the District bore the burden of initiating the hearing, and the burdens of going forward and of proof.  Instead it imposed on her the burden of discovering its unauthorized use of the May 2005 IEP, and the burdens of initiating the hearing, going forward, and proving her case if she wished to overturn the District's decision to implement an IEP to which she did not consent.

### Prior written notice

30.    The IDEA requires a school district to provide written notice to parents before it initiates or refuses a change in a student's identification, evaluation, or educational placement. The written notice must describe the action proposed or refused, explain why the district proposes or refuses to take the action, describe the documents underlying the decision, describe the factors relevant to the decision, explain why other options were rejected, and inform parents of their procedural rights with respect to the decision.

31.    The District did not give Mother written notice of its decision to implement the May 2005 IEP, either before or after that decision was made.  That decision initiated a change in Student's educational placement.  By not notifying Mother of that decision, the District significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, because it deprived her of the knowledge that the District was unlawfully imposing an unsigned IEP on Student and therefore deprived her of the opportunity to seek legal redress.

32.    By significantly impeding Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, the District denied Student a FAPE in the SY 2005-2006.

### FAPE in Student's Junior Year (SY 2006-2007)

33.    From the beginning of his junior year at the end of August 2006, to October 27, 2006, Student's special education program was the same as it had been in his sophomore year.

### The October 27, 2006 IEP Meeting

34.    On October 27, 2006, the District convened Student's triennial IEP meeting. Mother declined to participate, for reasons discussed below.  The District team members

10

proceeded with the meeting and created a new IEP for Student that again placed him in regular education with an hour in the resource room. It retained the requirement of a one-to-one aide, produced a new list of A/M to which Student would be entitled, and created new goals in the areas of math, reading, and written language. The District sent the new IEP to Mother for her signature, but she did not consent to it.

35.    Kreg Moore was Student's eleventh grade resource teacher. He testified that the District members of the IEP team decided to implement the new, unsigned October 2006 IEP. At the beginning of the school year, he gave Student's regular education teachers both the 2003 and May 2005 IEPs. When the October 2006 IEP was produced, he asked them to work from it, as well as the 2003 IEP.

### Placement in regular education

36.    The placement of Student in regular education classes with an hour in the resource room was accomplished by implementation of the unsigned May 2005 and October 2006 IEPs. However, it was in conformity with Student's last agreed-upon IEP and therefore did not deny Student a FAPE.

### Accommodations and modifications (A/M)

37.    As before, Student's sole argument in support of his allegation that his program did not meet his unique needs during his junior year was that the District had failed to give him the A/M he required to advance toward his goals and make progress in his curriculum.

38.    The new list of A/M in the October 2006 IEP was substantially different from the list in the last agreed-upon IEP. It no longer provided that Student could take tests in a quiet room, have tests read to him, give answers orally, use assistive technology or alternative texts, or have assignments modified in scope and length. It added the accommodations that he could use open books and notebooks for tests and assignments, and books on CDs. It retained two of the last agreed-upon A/M: he could take more time on tests and assignments, and have help from a note taker. To the extent that the new October 2006 IEP's list of A/M removed A/M allowed by the 2003 list, its implementation was out of conformity with Student's last agreed-upon IEP.

39.    In practice, the new list of A/M did not make a material difference in the A/M actually accorded Student in the eleventh grade. Mr. Moore testified that he gave Student's teachers both the 2003 and 2006 lists with the instruction to allow any A/M identified on either list.[6]  The testimony of Student's eleventh grade teachers closely paralleled the

---

[6] The uneven, varying implementation of Student's unsigned IEPs was a product of the confusion brought about by the absence of a current, signed IEP during the years at issue. As Supervisor Herbst admitted, the absence of a signed IEP during those years was "very, very confusing" to the special education faculty.

11

testimony of his tenth grade teachers. Student was given nearly all of the A/M to which he was entitled under either the 2003 or the October 2006 IEP. The only exceptions were when Student refused to take advantage of an accommodation or modification, or when a teacher thought it was unnecessary.

40.    Student's Spanish teacher, John Lamont, testified that it was unnecessary to modify Student's assignments in scope and length because they were already very short and designed for the 13 and 14-year-old students who typically took his beginning Spanish class. (Student was the oldest student in his class.) Mr. Lamont was unaware that any alternative text for the class existed, but would have looked for one if asked. Student's U.S. History teacher, Jason Taylor, testified that he was unaware of any available alternative texts, and never shortened assignments in scope and length because it was unnecessary; Student was able to complete the regular assignments. Student's teachers routinely gave him extra time on tests and assignments. His teachers would have given him any A/M to which he was entitled if he had requested it. As before, Student was reluctant to take advantage of the A/M to which he was entitled. He would have been permitted, for example, to take tests in the resource room, and was encouraged to do so, but rarely did.

41.    Because Student did not testify, there was almost no evidence that contradicted the testimony of his teachers. School psychologist Robert Stack testified that Student would have benefited from having test instructions clarified or simplified; however, there was no evidence that the failure to do so had any impact on Student's test performance or academic progress. The evidence did not show that Student was deprived of any accommodation or modification in his eleventh grade year that was necessary for him to advance toward attaining his annual goals or be involved in or make progress in his curriculum. Since Student's teachers accorded him the A/M from his 2003 IEP as well as the unsigned October 2006 IEP, the elimination of some A/M from the October 2006 list was without material consequence. In Student's 11th grade year the District did not implement only the 2003 IEP as it should have, but the A/M it provided were not materially out of conformity with that IEP.[7]

*Procedural rights*

42.    The District's decision not to file a request for due process hearing to seek authority from an ALJ to implement the May 2005 IEP and then the October 27, 2006 IEP during Student's junior year violated the procedural provisions of California law because it left Student without an authorized IEP that provided a FAPE. By that violation the District impeded Student's right to a FAPE and deprived him of educational benefit because it denied him the benefit of current, measurable, appropriate goals and accurate present levels of performance. It also significantly impeded Mother's right to participate in the decision-making process regarding the provision of a FAPE to her child, and for that reason also

---

[7] Whether the District adequately provided A/M that the 2003 IEP did not contain is not decided here. Since the October 2006 IEP was unsigned, the District was under no obligation to implement the new and unauthorized A/M it contained.

12

denied Student a FAPE. The District did not, however, prevent her participation in the annual IEP meeting.

*Mother's lack of participation in the October 27, 2006 IEP Meeting*

43.     Mother had in previous years actively participated in Student's IEP meetings and educational programming, sometimes with the assistance of an attorney. Student contends that Mother was wrongly excluded from the October 27, 2007 IEP meeting because she got inadequate notice and had received a psychoeducational assessment only about a week before the scheduled meeting.

44.     The evidence showed that Mother had a longstanding practice of making it very difficult for the District to schedule IEP meetings by refusing to respond to the District's proposals to hold IEP meetings, and refusing to propose dates on which she was available even by telephone.[8] The District made extensive efforts to schedule the annual IEP meeting for the SY 2006-2007. Starting in September 2006, Mr. Herbst repeatedly wrote and telephoned Mother proposing various possible dates for the meeting, and inviting proposals from her. Mother failed to respond to his letters or voicemail messages. The District appropriately recorded its many written and oral attempts to arrange the meeting.

45.     An assessment plan had been signed by Mother on June 20, 2006, and the District was required to hold an IEP meeting within 60 days of receipt of the signed assessment plan (less vacation days). That meant that the District had to hold the meeting before the end of October. On October 18, 2006 the District mailed a notice to Mother that the meeting would occur on October 27, 2006.

46.     At the beginning of the IEP meeting on October 27, 2006, Mr. Herbst telephoned Mother to ask her to participate in the meeting. Mother declined, on the grounds that she had only received a psychoeducational assessment a week before, and had not had adequate notice of the meeting. There was no evidence supporting Mother's claim that the notice was inadequate.

47.     Mother's conduct in refusing to cooperate with the calendaring of the October 2006 IEP meeting was unreasonable. She allowed the entire District IEP team to assemble before she informed them that she thought the notice of meeting was inadequate. She still made no attempt to discuss alternative dates.

48.     In light of Mother's history with the District in calendaring IEP meetings, the District's need to hold a meeting within 60 days of the assessment plan, and the District's many efforts to calendar the meeting, the District was reasonable in assuming that Mother could not be persuaded to participate in the annual IEP meeting and in proceeding with the meeting on October 27, 2006. In so doing the District did not significantly interfere with

---

[8] Mother always attended IEP meetings by telephone.

Mother's right to participate in the decision-making process with respect to the provision of a FAPE to Student.

49.      The District's decision not to file a request for due process hearing to seek authority from an ALJ to implement the May 2005 IEP and then the October 27, 2006 IEP during Student's junior year violated the procedural provisions of California law because it left Student without an authorized IEP that provided a FAPE. By that violation the District impeded Student's right to a FAPE and deprived him of educational benefit because it denied him the benefit of current, measurable, appropriate goals and accurate present levels of performance. It also significantly impeded Mother's right to participate in the decision-making process regarding the provision of a FAPE to her child, and for that reason also denied Student a FAPE.

*Effect of avoidance of due process on Goals, Objectives and Present Levels of Performance (PLOPs)*

50.      At its October 27, 2006 IEP meeting, the District members of the team considered recent triennial evaluations of Student, and derived his PLOPs by combining those evaluations with his grades. Except for assessment data measuring Student's grade level skills, the PLOPs contain nothing that could not have been assembled about any regular education student. They lack any of the detailed measurements that would have been produced by tracking Student's progress toward meaningful goals during his tenth grade year, and were for that reason inadequate for the creation of new goals.

51.      The team nonetheless drafted new goals for Student in the areas of math, reading, and written language. The new goals bear no apparent relationship to the PLOPs. For example, the only mention in the PLOPs of Student's writing ability was that he scored at the 5.7 grade level on broad written language during his psychoeducational assessment. His new written language goal was to write an expository essay containing an introduction, body and conclusion in clearly defined topic sentences and supporting details with 75 percent accuracy in four of five trials. This lack of relationship between Student's vague PLOPs and his new goals was a product of the District's failure to provide meaningful goals to Student in the previous year, and to measure and report his progress toward them.

52.      From the beginning of Student's junior year to October 27, 2006, Student had only his 2000 goals, which had long since been met, and therefore had no meaningful goals. The new goals in the unsigned October 2006 IEP were implemented for the rest of Student's junior year. Each goal contained benchmarks requiring the reporting of progress by February 2007, June 2007, and October 2007. Mr. Moore filled out the first two progress reports for each goal, stating that by February and June 2007 Student's progress toward each goal was sufficient to meet the annual goal. However, the District stopped measuring his progress toward these goals in June 2007. Because of this, there was inadequate information to determine accurate PLOPs or new goals at Student's next annual IEP meeting.

14

53.    The District could have given Student meaningful annual goals by obtaining an order from an ALJ allowing it to use the May 2005 and October 2006 IEPs in his junior year, and then by keeping track of Student's progress toward those goals for a full year, but it chose not to. By failing to obtain legal authority to provide Student meaningful, measurable annual goals, and thus failing to implement such goals for a full year, the District impeded Student's right to a FAPE, deprived him of educational benefits, and, therefore, denied him a FAPE in SY 2006-2007.

### Effect on Mother's hearing rights

54.    The District's decision not to file a request for due process hearing to seek authority from an ALJ to implement the October 2006 IEP significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child. It denied her a forum in which her dispute with the District could be promptly resolved, and in which the District bore the burden of initiating the hearing, and the burdens of going forward and of proof. Instead it imposed on her the burden of discovering its unauthorized use of the October 2006 IEP, and the burdens of initiating the hearing, going forward, and proving her case if she wished to overturn the District's decision to implement an IEP to which she did not consent.

55.    The District did not give Mother written notice of its decision to implement the October 2006 IEP, either before or after that decision was made. That decision initiated a change in Student's educational placement. By not notifying Mother of that decision, the District significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, because it deprived her of the knowledge that the District was unlawfully imposing an unsigned IEP on Student and therefore of the opportunity to seek legal redress.

56.    By significantly impeding Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, the District denied Student a FAPE in the SY 2006-2007.

### Prior written notice

57.    The District did not give Mother written notice of its decision to implement the October 2006 IEP, either before or after that decision was made. That decision initiated a change in Student's educational placement. By not notifying Mother of that decision, the District significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, because it deprived her of the knowledge that the District was unlawfully imposing an unsigned IEP on Student and therefore deprived her of the opportunity to seek legal redress.

58.    By significantly impeding Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, the District denied Student a FAPE in the SY 2006-2007.

15

*FAPE in Student's Senior Year (SY 2007-2008)*

59.    From the beginning of Student's senior year at the end of August 2007, to December 17, 2007, Student's special education program was the same as it had been in his junior year with one significant exception: the District ceased implementing the unauthorized goals from the October 2006 IEP and did not replace them. Russ Garcia was Student's resource teacher in his senior year. Mr. Garcia decided to stop tracking Student's progress toward the October 2006 goals because Mother had not consented to them. He left blank the spaces on the goals for the October 2007 and annual progress reports, and Student's next annual IEP shows that no part of his progress toward them was measured or considered. Student was without meaningful goals from the end of August 2007 to December 17, 2007, and the progress he had made in his junior year toward the October 2006 goals was disregarded.

*The December 17, 2007 IEP Meeting*

60.    The District members of the IEP team convened for Student's annual review on December 17, 2007. Mother declined to participate because she incorrectly believed it was unlawful for the District to proceed with an IEP meeting while a due process proceeding was pending. The District IEP team members created a new IEP for Student, again placing him in regular education with an hour in the resource room. It retained the requirement of a one-to-one aide, produced another new list of A/M to which Student would be entitled, and created new goals in the areas of math, reading, and written language. The District sent the new IEP to Mother for her signature, but she did not consent to it.

61.    Supervisor Herbst testified without contradiction that the District has implemented the unsigned December 17, 2007 IEP, including its A/M and goals.[9]

*Placement in regular education*

62.    The District placed Student in regular education classes with an hour in the resource room by implementing the unsigned October 2006 IEP, but that was in conformity with Student's last agreed-upon IEP and therefore did not deny Student a FAPE.

*Accommodations and Modifications (A/M)*

63.    As before, Student's sole argument in support of his allegation that his program did not meet his unique needs during his senior year was that the District had failed

---

[9] In light of this testimony, Mr. Moore's documented implementation of the October 2006 goals, Mr. Moore's testimony that the October 2006 IEP team decided as a group to implement its new IEP, and Mr. Roseman's testimony that he was authorized by his superiors to implement the May 6, 2005 IEP and did so, the District's assertions in its closing brief that it "did not implement any unsigned IEP" and that "all portions of Student's program and accommodations are provided with express consent or agreement" are inexplicable.

16

to give him the A/M he required to advance toward his goals and make progress in his curriculum.

64.    The list of A/M in the December 17, 2007 IEP was slightly different from the list generated in October 2006. It restored access to assistive technology by allowing Student to use a computer on campus. It continued to allow him to use a calculator, have more time on tests and assignments, use open books for tests and assignments, have note-taking help, and use books on CD. It was out of conformity with the 2003 IEP because it did not allow for use of a quiet room for tests, for the reading of tests to Student, for oral answers to test questions, for modifying assignments in scope and length, or for the use of alternative texts.[10]

65.    As in previous years, the new list of A/M in the December 17, 2007 IEP did not make a material difference in the A/M actually accorded Student in the twelfth grade. Royal Addis was Student's teacher in Government in the fall of his senior year, and is now his teacher in Economics. During both semesters he allowed Student the use of a quiet room for tests, extra time on tests and assignments, the use of a note-taker, and the reading of tests to him. Robert Watts was Student's teacher in Introduction to Fire Protection in the fall. He testified that he allowed Student to take tests in a quiet room and gave him extra time on tests and assignments. He offered to read tests orally to Student, but Student did not accept this assistance. He never modified tests for Student, but offered to explain them if they were not clear.

66.    Because Student did not testify, there was no evidence about A/M in his senior year that contradicted the testimony of his teachers. Student was given nearly all of the A/M to which he was entitled under the 2003 IEP. The only exceptions were when Student refused to take advantage of an accommodation or modification, or when a teacher thought it was unnecessary. Student did not show by a preponderance of evidence that he was deprived of any A/M in his twelfth grade year that that was necessary for him to advance toward attaining his annual goals or be involved in or make progress in his curriculum. In Student's twelfth grade year the District did not implement the 2003 IEP as it should have, but the A/M it provided were not materially out of conformity with that IEP.[11]

*Procedural rights*

67.    The District's decision not to file a request for due process hearing to seek authority from an ALJ to implement the October 27, 2006 IEP and then the December 17,

---

[10]  In a letter to Mother dated November 13, 2007, Mr. Herbst represented that the District would promptly provide alternative texts for Student in the resource room. The record does not reveal whether this promise survived the December 17, 2007 IEP meeting.

[11]  Whether the District adequately provided A/M that the 2003 IEP did not contain is not decided here. Since the December 2007 IEP was unsigned, the District was under no obligation to implement any new and unauthorized A/M it contained.

2007 IEP during Student's senior year violated the procedural provisions of California law because it left Student without an authorized IEP that provided a FAPE. By that violation the District impeded Student's right to a FAPE and deprived him of educational benefit because it denied him the benefit of current, measurable, appropriate goals and accurate present levels of performance. It also significantly impeded Mother's right to participate in the decision-making process regarding the provision of a FAPE to her child, and for that reason also denied Student a FAPE. The District did not, however, prevent her participation in the annual IEP meeting.

*Mother's lack of participation in the December 19, 2007 IEP meeting*

68.      Student contends that Mother was wrongly excluded from the October 27, 2007 IEP meeting.

69.      Mr. Herbst began his written and oral efforts to persuade Mother to attend an annual IEP meeting for Student's senior year by writing to her on August 30, 2007, proposing various dates. Mother did not respond. Mr. Herbst wrote again on September 19, 2007, proposing more dates. He also called and left voicemail messages. Again Mother did not respond. The District sent her an official notice of meeting on December 4, 2007, setting forth three dates, the last of which was December 19, 2007. Again Mother did not respond. The District appropriately recorded its many written and oral attempts to arrange the meeting.

70.      On December 10, 2007, Mother filed with OAH a request for an expedited order prohibiting the holding of the IEP meeting on any of the dates announced, on the ground that the stay-put provision of IDEA prohibited the holding of an IEP meeting while this proceeding was pending. On December 18, 2007, OAH denied the request on the ground that it had no authority to issue such an order.

71.      On December 19, 2007, the last of the dates announced in the December 4, 2007 notice, the District convened Student's annual IEP meeting and telephoned Mother, who asked that the meeting not proceed while she called OAH to protest the meeting. After having unsuccessfully done so, she called Mr. Herbst at the meeting and told him she would not participate and would complain to the California Department of Education instead.

72.      Mother's conduct in refusing to cooperate with the calendaring of the December 2007 IEP meeting was unreasonable. In light of her history of resisting the calendaring of IEP meetings, her insistence that the meeting was unlawful, based on a legal theory that had no merit and had been rejected by OAH, and the District's many unsuccessful efforts to schedule the meeting, the District was reasonable in assuming that Mother could not be persuaded to participate in the annual IEP meeting and in proceeding with the meeting on December 19, 2007. In so doing the District did not significantly interfere with Mother's right to participate in the decision-making process with respect to the provision of a FAPE to Student.

18

*Avoidance of due process*

> *Effect of avoidance of due process on goals, objectives and present levels of performance (PLOPs)*

73.     At its December 17, 2007 IEP meeting, the District members of the team derived Student's PLOPs solely from his grades and completion of assignments. The PLOPs contain no information that could not have been assembled about any regular education student. They make no mention of the progress he made in his junior year toward the unauthorized goals in his October 27, 2006 IEP. Instead, the notes of the meeting state that Student's last goals to which Mother consented were more than four years old and had been previously met.

74.     The PLOPs reported at the December 17, 2007 IEP meeting were too vague to be useful in writing new goals. For example, on a page entitled "Present Levels of Academic Achievement and Functional Performance," the IEP team wrote that Student's areas of strength are reading and writing, math is an area of weakness, and all of those areas are still below grade level. The only attempt to describe Student's functional performance is the statement that "[Student] has visual motor difficulties." The PLOPs lacked any of the detailed measurements that would have been produced by tracking Student's progress toward meaningful goals during his eleventh grade year, were too vague and incomplete to serve their purposes, and, therefore, were inadequate for the creation of new goals.

75.     The team nonetheless drafted new goals for Student in the areas of math, reading, and written language. The new goals bear no apparent relationship to the PLOPs. For example, the only mentions in the PLOPs of Student's ability in math are that it is an area of weakness and that he failed the math portion of the California High School Exit Examination (CAHSEE). His new math goal requires that by his next annual review, Student will be able to solve multi-step problems, including word problems, involving linear equations and inequalities with one variable, and provide justification for each step with 80 percent accuracy in two out of three trials. The absence of any relationship between Student's vague PLOPs and his new goals was a product of the failure of the District to provide meaningful goals to Student in the previous year and to measure his progress toward them for a full year.

76.     The District could have given Student meaningful annual goals by obtaining an order from an ALJ allowing it to use the October 2006 and December 2007 IEPs in his senior year, and then by keeping track of Student's progress toward those goals for a full year, but it chose not to. By failing to obtain legal authority to provide Student meaningful, measurable annual goals, and thus failing to implement such goals for a full year, the District impeded Student's right to a FAPE, deprived him of educational benefits, and therefore denied him a FAPE in SY 2007-2008.

19

*Effect on Mother's hearing rights*

77.    The District's decision not to file a request for due process hearing to seek authority from an ALJ to implement the October 2006 and December 17, 2007 IEPs in Student's senior year significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child. It denied her a forum in which her dispute with the District could be promptly resolved, and in which the District bore the burden of initiating the hearing, and the burdens of going forward and of proof. Instead it imposed on her the burden of discovering its unauthorized use of the October 2006 and December 2007 IEPs, and the burdens of initiating the hearing, going forward, and proving her case if she wished to overturn the District's decision to implement IEPs to which she did not consent.

*Prior written notice*

78.    The District did not give Mother written notice of its decision to implement the October 2006 and December 2007 IEP in Student's senior year, either before or after those decisions were made. Those decisions initiated a change in Student's educational placement. By not notifying Mother of them, the District significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child. Until she found out by other means, the District's failure to notify her deprived her of the knowledge that the District was unlawfully implementing unsigned IEPs and therefore of the opportunity to seek legal redress.[12]

79.    By significantly impeding Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child, the District denied Student a FAPE in the SY 2007-2008.

*Disclosure of Records*

80.    Within five days of receiving a request, a school district must provide to a parent all of her child's student records. Mother made such a request well before the hearing. Student alleges in his complaint that the District has failed to disclose to Mother all of his records in his IEP and cumulative files. Since Mother refused to testify, no evidence supported this contention. Supervisor Herbst testified that the District sent her all the records in those files, and produced a cover letter supporting that claim. The evidence did not show that the District failed to produce the requested records.

---

[12] The first indication in the record that Mother had learned of the District's implementation of unsigned IEPs is in the original complaint she filed in this matter on August 8, 2007.

*One-to-one aide*

81.    Throughout the years at issue, Student had the assistance of a paraprofessional, or one-to-one aide, in all his classes, on campus outside of classes, and in the resource room. Student contends that these aides were untrained, unqualified, and too frequently replaced.

82.    Student's only complaint about his aides at hearing was that he did not receive the assistance of his aide during his regular education classes because she sat far away from him. The evidence showed that his aide never sat next to him except in the resource room or elsewhere outside of the regular education classroom. In some classes the aide would sit just a few desks away; in some she would sit across the room. The seating arrangements always required that Student leave his desk and walk over to the aide if he wished to speak to her. Student never had any contact with his aide during these classes.

83.    All of Student's teachers who were asked about the aide testified that Student himself was responsible for the seating arrangements and the lack of contact with his aide. He was embarrassed to have an aide follow him into class. He did not want to seem unlike the other students and therefore, by choice, never consulted the aide during class, no matter where she sat. John Lamont, Student's eleventh grade Spanish teacher, testified that in his class Student sat in a front corner desk and his aide sat about fifty feet away, in the back, diagonally across the classroom and as far away as seating permitted. When he inquired into this arrangement, both Student and the aide told him that was the way they wanted it. The aide said that if Student needed her help, they would work together after class. Mr. Lamont testified that they had an arrangement they would not speak during the class.

84.    The undisputed testimony showed that both of Student's aides during the years in question, Lisa and Nicole, performed their duties appropriately. They sat next to him in the resource room, worked with him on tests and assignments, organized his notebooks, reminded him to take materials to class, took notes for him in class, and otherwise assisted him. Since neither Student nor Mother would testify, there was no evidence to the contrary. There was no evidence that the aides were improperly trained or instructed. The only evidence about the proper seating arrangement for aides was Mr. Herbst's testimony that the arrangements varied from student to student. The evidence did not show that there was any shortcoming in the training, performance, or instruction of his aides.

85.    The evidence showed that Student had only two one-to-one aides in the classroom during the three years in question. He had several instructors at home, where he was receiving compensatory education as part of the order of the SEHO hearing officer in 2003. However, there was no evidence that the number was too high, or the turnover too frequent, to have any adverse impact on his education.

*Removal from the Football Team*

21

86.     Student played on the school's football team in his eleventh grade year. At the end of that year, he was removed from the team pursuant to a District policy prohibiting a student whose grades were below a certain standard from playing. Participation in football was not part of Student's last agreed-upon IEP or his placement. On this record, his removal from the team appears to have been part of the even-handed application of District's policy to regular and special education students alike. There was no evidence that the District discriminated against him as a special education student in applying the rule, and no evidence that he was denied an equal opportunity to engage in this extracurricular activity.

## CONCLUSIONS OF LAW

*Burden of Proof*

1.     Student, as the petitioner, has the burden of proving the essential elements of his claim. (*Schaffer v. Weast* (2005) 546 U.S. 49 [163 L.Ed.2d 387].)

*Elements of a FAPE*

2.     Under the IDEA and state law, children with disabilities have the right to a free appropriate public education (FAPE). (20 U.S.C. § 1400(d); Ed. Code, § 56000.) FAPE means special education and related services that are available to the child at no charge to the parent or guardian, meet state educational standards, and conform to the child's IEP. (20 U.S.C. § 1401(a)(9).) "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(a)(29).) "Related services" are transportation and other developmental, corrective and supportive services as may be required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26).) In California, related services are called designated instruction and services (DIS), which must be provided if they may be required to assist the child in benefiting from special education. (Ed. Code, § 56363(a).)

3.     There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the tribunal must determine whether the district has complied with the procedures set forth in the IDEA. (*Board of Educ. v. Rowley* (1982) 458 U.S. 176, 206-07 [73 L.Ed.2d 690].) Second, the tribunal must decide whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

4.     In *Rowley*, the Supreme Court held that the IDEA does not require school districts to provide special education students the best education available, or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* at p. 198.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefit to the student. (*Id.* at p. 201.)

22

5.    In *Rowley, supra,* the Court found that some educational benefit had been conferred on the student since she achieved passing marks and advanced from grade to grade. (458 U.S. at pp. 202-03.) However, the Court cautioned that it was not establishing any one test for measuring the adequacy of educational benefits conferred under an IEP. (*Rowley, supra,* 458 U.S. at pp. 202, 203 n.25.)

*Required contents of an IEP*

6.    Federal and state law specify in detail what an IEP must contain. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.320; Ed. Code, § 56345.) An annual IEP must contain, *inter alia,* a statement of the individual's present levels of academic achievement and functional performance, including the manner in which the disability of the individual affects his or her involvement and progress in the regular education curriculum. (Ed. Code, § 56345, subd. (a)(1); 20 U.S.C. § 1414(d)(1)(A)(i)(I); 34 CFR § 300.320 (a)(1).) The statement of present levels essentially creates a baseline for designing educational programming and measuring future progress. The IEP "shall show a direct relationship between the present levels of performance, the goals and objectives, and the specific educational services to be provided." (Cal. Code Regs., tit. 5, § 3040, subd. (c).)

7.    An annual IEP must also contain a statement of measurable annual goals designed to: (1) meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general curriculum; and (2) meet each of the pupil's other educational needs that result from the individual's disability. (Ed. Code, § 56345, subd. (a)(2); 20 U.S.C. § 1414(d)(1)(A)(i)(II).) Annual goals are statements that describe what a child with a disability can reasonably be expected to accomplish within a 12-month period in the child's special education program. (Letter to Butler, 213 IDELR 118 (OSERS 1988); Notice of Interpretation, Appendix A to 34 CFR part 300, Question 4 (1999 regulations).) Those goals are then broken down into short-term objectives, if objectives are used. Short-term instructional objectives are measurable, intermediate steps between the present levels of educational performance and the annual goals that are established for the child. The objectives are developed based on a logical breakdown of the major components of the annual goals, and they can serve as milestones for measuring progress toward meeting the goals. (Notice of Interpretation, Appendix A to 34 CFR part 300 (1999 regulations).)

8.    In addition, the IEP must include "appropriate objective criteria, evaluation procedures, and schedules for determining, on at least an annual basis, whether the annual goals are being achieved," and a statement of how the student's progress toward the goals will be measured. (Ed. Code, § 56345, subd. (7), (9); 20 U.S.C. § 1414(d)(1)(A)(i)(III).) An examination of an IEP's goals is central to the determination whether a student has received a FAPE. In *Adams, etc. v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, the court stated: "[W]e look to the [IEP] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer ... a meaningful benefit."

23

9.    An IEP must also contain a statement of the program modifications or supports that will be provided for the student to advance appropriately toward attaining his annual goals and to be involved in and make progress in the regular education curriculum, and a statement of any individual accommodations that are necessary to measure the student's academic achievement and functional performance. (20 U.S.C. § 1414(d)(1)(A)(i)(IV), (VI)(aa); Ed. Code, § 56345, subds. (a)(4), (6)(A).)

*Requirement that substantive violation be material*

10.    The IDEA defines a FAPE in part as "special education and related services that . . . are provided in conformity with the [child's] individualized education program." (20 U.S.C. § 1401(9).)

11.    A school district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP. A material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP. (*Van Duyn v. Baker School Dist.* (9th Cir. 2007) 502 F.3d 811, 815.) However, the materiality test is not a requirement that prejudice be shown: " [T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail." (*Van Duyn v. Baker School Dist., supra,* 502 F.3d at p. 822.)[13]

12.    The District's argument that it should be relieved of liability because Student made progress in school is also unavailing. The fact that a student advances from grade to grade is sometimes relevant to the claim that an IEP was reasonably calculated to allow a student to benefit from his education. A student's progress is no defense against charges that a district failed to resolve its dispute with a parent in due process, failed to provide special education and services in conformity with an outstanding IEP, significantly impeded a parent's right to participate in the decision-making process regarding the provision of a FAPE to her child, or implemented IEPs that were unsigned without prior authorization from an ALJ or court.

13.    Based on Factual Findings 1-2, 4, 10, 12, 14-21, 37-41, 60-61, 63-66, and 81-85, and Legal Conclusions 9-12, the District did not deny Student a FAPE in any of the three school years at issue by failing to afford him the accommodations and modifications to which he was entitled under his last agreed-upon IEP. The District correctly provided those A/M as necessary, rather than routinely. Every accommodation and modification on the governing list is qualified by the words "allowed" or "permitted," except for the modification of assignments in scope and length. That wording implies that District staff had some discretion to determine when and which A/M would be used. The uncontested evidence showed that Student's teachers so understood it. In context, that single exception was more likely to be an accident of wording than a deliberate distinction. Student's one-to-one aides

---

[13] The parties dispute the causes of Student's low and failing grades, but that dispute is not resolved here because its resolution would not alter the result under the substantive or procedural tests for a denial of FAPE.

24

performed properly; he was unwilling to be seen talking to them in his general education classes. Any A/M to which Student was entitled that were not provided were unnecessary for him to be involved in and make progress in the general curriculum.

*Procedural Requirements*

*Role of Procedural Protections*

14.    In *Rowley*, the Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. (*Rowley, supra*, at pp. 205-06.) However, a procedural error does not automatically require a finding that a FAPE was denied. Since July 1, 2005, the IDEA has codified the pre-existing rule that a procedural violation results in a denial of FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the parents' child, or causes a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E)(ii); see, *W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

*Parental Participation in IEP Process*

15.    A parent is a required member of the IEP team. (20 U.S.C. § 1414(d)(1)(B)(i); 34 C.F.R. § 300.501(c); Ed. Code, § 56341, subd. (b)(1).) The parent must be a member of "any group that makes decisions on the educational placement of their child." (20 U.S.C. § 1414(d)(1)(B)(i), (f).) The team must consider the concerns of the parents throughout the IEP process. (20 U.S.C. § 1414(c) (1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.324(a)(ii); Ed. Code, § 56341.1, subd. (a)(1), (d)(3), (e).) While the IEP team should work toward reaching a consensus, the school district has the ultimate responsibility to determine that the IEP offers a FAPE. (App. A to 34 C.F.R. part 300, Notice of Interpretation, 64 Fed.Reg. 12473 (Mar. 12, 1999).)

16.    A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693.) A parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way. (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1036.)

17.    A school district must provide the parent with adequate advance notice to ensure that at least one parent is present at the IEP meeting or has been afforded an opportunity to participate, and must be sent out early enough to ensure attendance. (Ed. Code, § 56341.5, subds. (a), (b).) The meeting notice must include information about the purpose of the meeting, and the parent's right to bring other people to the meeting who have knowledge or special expertise regarding the child. (Ed. Code, § 56341.5, subd. (c).) The IEP meeting should be scheduled at a mutually-agreed upon time and place. (Ed. Code, §

25

56341.5(c).) An IEP meeting may be conducted without a parent in attendance if the LEA is unable to convince the parent to attend. In that event the LEA is required to maintain a record of attempts to arrange a mutually agreed-upon time and place, including detailed records of telephone calls, copies of correspondence, and records of visits to the parent's home or place of employment. Telephonic conferencing is authorized as an alternative method of holding an IEP meeting. (Ed. Code, § 56341.5, subd. (h); 34 C.F.R. §§ 300.322(d).)

18.    A school district must hold an IEP meeting and develop an IEP within 60 days from the date of receipt of a parent's written consent for assessment, not counting days between the pupil's regular school sessions, terms, or days of school vacation in excess of five schooldays, unless the parent agrees in writing to an extension. (Ed. Code, § 56344, subd. (a).)

19.    A copy of an assessment report must be given to a parent. (Ed. Code, § 56329, subd. (a)(3).) There is no requirement that it be provided before the IEP meeting at which it is discussed.

20.    Based on Factual Findings 43-49 and 68-72, and Legal Conclusions 15-19, the District did not significantly impede Mother's right to participate in the decision-making process with respect to the provision of a FAPE to her child by excluding her from, or proceeding with, the IEP meetings of October 27, 2006, or December 17, 2006.

*Procedures for resolving impasse*

21.    When a parent refuses to consent to the receipt of special education and services, after having consented in the past, California law requires that the school district seek resolution of the impasse by filing a request for a due process hearing:

> (d) If the parent or guardian of a child who is an individual with exceptional needs refuses all services in the individualized education program after having consented to those services in the past, the local educational agency *shall file a request for due process* pursuant to Chapter 5 (commencing with Section 56500).

(Ed. Code, § 56346, subd. (d)(emphasis supplied.) If a parent consents to some but not all of a proposed program, the district must implement only those portions to which the parent has agreed:

> (e) If the parent of the child consents in writing to the receipt of special education and related services for the child but does not consent to all of the components of the individualized education program, those components of the program to which the parent has consented shall be implemented so as not to delay providing instruction and services to the child.

26

(Ed. Code, § 56346, subd. (e).)  The clear implication of subdivision (e) is that the district may not implement the portions of the IEP to which the parent has not consented.  Finally, if the district believes that the components of the IEP to which the parent will not consent are necessary to provide the student a FAPE, it must seek an order from an ALJ to that effect:

> f) ... if the local educational agency determines that the proposed special education program component to which the parent does not consent is necessary to provide a free appropriate public education to the child, *a due process hearing shall be initiated* in accordance with Section 1415(f) of Title 20 of the United States Code.

(Ed. Code, § 56346, subd. (f)(emphasis supplied).  And the statute makes it clear that, while the district seeks resolution of the impasse in due process, it may not implement the disputed IEP.  Instead:

> While a resolution session, mediation conference, or due process hearing is pending, the child shall remain in his or her current placement, unless the parent and the local educational agency agree otherwise.

(Ed. Code, § 56346, subd. (f).)

22.    The plain meaning of the term "shall" in Education Code section 56346, subdivisions (d) and (f), is that the requirement is mandatory: the school district must file a request for due process hearing to resolve its impasse with a parent if it cannot provide a student a FAPE under the outstanding IEP.  OAH decisions have uniformly supported this interpretation.  (See, e.g., *San Diego Unified School Dist. v. Student*, OAH Case No. N2007060523 (Sept. 4, 2007); *Ocean View School Dist., et al., v. Student*, OAH Case No. N2007050694 (Aug. 22, 2007); *Manhattan Beach Unified School Dist. v. Student*, OAH Case No. N2007030412 (July 31, 2007); *Chula Vista Elementary School Dist. v. Student*, OAH Case No. N2007040557 (July 26, 2007); *Student v. Los Angeles Unified School Dist.*, OAH Case No. N2006020813 (July 11, 2007); see also, *Murphy v. Timberlane Regional School Dist.* (1st Cir. 1994) 22 F.3d 1186, 1195-1196.)  The apparent legislative purposes were to provide a mechanism for the prompt resolution of the conflict, so that the student's educational programming was not left uncertain; and to place the grave decision to impose an unwanted IEP on an unwilling parent only in the hands of an ALJ or a court, not in the hands of the school district that was a party to the disagreement.

23.    The mandatory duty of a district to seek a due process hearing was confirmed by *Porter v. Manhattan Beach Unified School Dist.* (C.D.Cal., Dec. 21 2004 (Case No. CV 00-8402 GAF)) 105 LRP 40577.  In *Porter* a school district's impasse with a parent prevented it from providing a FAPE to a student for seven years.  The district blamed the

27

parents, but the District Court held that the fault lay with the school district because it did not seek resolution in due process:

> Under California law, if the parent does not agree to the IEP, the school district is required to take affirmative steps to ensure that the child receives a FAPE. Cal. Educ. Code § 56346(b)-(c); *Doe v. Maher*, 793 F.2d 1470, 1490 (9th Cir. 1986) (holding that if there is no agreement on the terms, "the agency has a duty to formulate the plan to the best of its ability in accordance with information developed at the prior IEP meeting, but must afford the parents a due process hearing in regard to that plan").
> ....
> If the local educational agency determines that the portions of the program to which the parent did not consent, or all of the program if the parent did not consent to any part of the IEP, is necessary to provide the child with a FAPE, it is required to initiate due process hearing procedures to override the parent's refusal of consent. *Id.*; see also *Doe [v. Maher]*, 793 F.2d at 1490.

The District Court emphasized that the parents, however intransigent, were not to blame for the consequences of their impasse with the school district:

> Regardless of the conduct of the parents of a disabled child, when a child goes without special education services for years on end, there can be no one to blame but the entity in control of providing the services -- the school district. If the District did not get the consent it needed, it clearly had both a right and an obligation, as a matter of law, to get approval for the IEPs from the state agency to implement them ... Cal. Educ. Code § 56346(b)-7(c).

24.    The District argues in its closing brief that it had no mandatory duty under Education Code section 56346, subdivision (d), because "Parent did not provide written consent to the actual IEPs but did not refuse the program and services being offered." The proposed distinction is unsupported by authority or reasoning and is meaningless: the statute's reference to a refusal of services means the refusal to consent to services. The provision is in a statute entitled "Parental Consent." Here Mother did refuse "the program and services being offered" because she refused to consent to the offered IEPs. The District's interpretation would mean that before its mandatory duty to seek resolution in due process arose, a parent would have to withdraw her child from special education entirely. The statute cannot be read that way without undermining its purposes. In *Porter v. Manhattan Beach Unified School Dist., supra,* as here, the student continued to receive some services from the district while his parents declined to consent to various IEPs and the dispute between the

28

parties was pending. The *Porter* court nonetheless held that the district had failed in its mandatory duty to seek due process.

25.    The District also argues in its closing brief that it had no mandatory duty under Education Code section 56346, subdivision (f), because Mother "did not refuse necessary services." However, it is plain that she did refuse portions of the offered IEPs (most obviously the new goals offered) that were necessary if Student were to receive a FAPE. To say otherwise would be to argue that the 2003 IEP, cobbled together from documents dating back to 2000, still provided Student a FAPE in SYs 2005-2006, 2006-2007, and 2007-2008. The District's argument stops short of that claim.

26.    Based on Factual Findings 11-12, 22-29, 35, 49-56, 59, 61, 67, and 73-77, and Legal Conclusions 21-25, the District committed procedural violations in all the school years at issue by implementing unsigned IEPs without having first obtained authority to do so from an ALJ or court under Education Code section 56346, subdivisions (d) and (f).

   *Prior Written Notice*

27.    A school district must provide written notice to the parents of a pupil whenever the district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the pupil, or the provision of a FAPE to the pupil. (20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a); Ed. Code, § 56500.4.) The notice must contain:  (1) a description of the action refused by the agency, (2) an explanation for the refusal, along with a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the refusal, (3) a statement that the parents of a disabled child are entitled to procedural safeguards, with the means by which the parents can obtain a copy of those procedural safeguards, (4) sources of assistance for parents to contact, (5) a description of other options that the IEP team considered, with the reasons those options were rejected, and (6) a description of the factors relevant to the agency's refusal. (20 U.S.C. § 1415(c)(1); 34 C.F.R. § 300.503(b).)

28.    Based on Factual Findings 30-32, 57-58, and 78-79, and Legal Conclusion 27, the District committed procedural violations in all the school years at issue by failing to provide written notice to Mother of its decision to implement IEPs that she had not signed.

   *Impact of violations*

29.    Based on Factual Findings 24-28 and 50-53, and Legal Conclusions 6-8, 11-12, 14, and 21-27, the District's failure to resolve its impasse with Mother in due process, in all the school years at issue, impeded Student's right to a FAPE and deprived him of educational benefits because it deprived him of current, meaningful, measurable goals and accurate, useful present levels of performance.

30.    Based on Factual Findings 29-32, 54-58, 67, and 73-77, and Legal Conclusions 15-19, 21-25, and 27-28, in all the school years at issue, the District's failure to

29

resolve its impasse with Mother in due process, and its failure to give her written prior notice of its implementation of IEPs to which she had not consented, significantly impeded Mother's opportunity to participate in the decision-making process regarding the provision of a FAPE to her child. They deprived her of the procedural protections she would have enjoyed in a hearing sought by the District, and deprived her of the knowledge that the District was unlawfully implementing unsigned IEPs and therefore of opportunities to seek legal redress.

*Records*

31.    A parent has the right to examine all school records of her child and to receive copies within five calendar days after a request is made. (Ed. Code, §§ 56043, subd. (n), 56504.)

32.    Based on Factual Finding 80, and Legal Conclusion 31, the District provided to Mother all of the school records of her child to which she was entitled.

*Extracurricular activities*

33.    A school district must ensure that it provides to a special education student all supplementary aids and services determined appropriate and necessary by the student's IEP team, including extracurricular activities, in the manner necessary to afford the student "an equal opportunity for participation" in those activities. (34 C.F.R. § 300.107(a).)

34.    Based on Factual Finding 86, and Legal Conclusion 33, the District did not deny Student an equal opportunity for participation in the football team in his senior year. His removal from the team resulted from the even-handed application of a District policy to regular education and special education students alike.

*Limitation of issues*

35.    A party who requests a due process hearing may not raise issues at the hearing that were not raised in the request, unless the opposing party agrees otherwise. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *County of San Diego v. California Special Education Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1465.) This decision does not address whether the goals or transition plans offered in the unsigned IEPs were appropriate, or whether those IEPs constituted offers of FAPE because Student's complaint does not address those issues. The decision analyzes the goals only to illustrate the adverse affect of the District's imposition of unsigned IEPs without authority from an ALJ or court on Student's education and his right to a FAPE.

*Relief*

36.    ALJs have broad latitude to fashion equitable remedies appropriate for the denial of a FAPE. (*School Comm. of Burlington v. Department of Educ.* (1985) 471 U.S.

30

359, 370 [85 L.Ed.2d 385]; *Parents of Student W. v. Puyallup School Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496.)

37.    It is apparent from the totality of circumstances, and from the expressed wishes of Student and Mother, that the most important remedy that can be afforded Student is relief that enables him to graduate with a diploma. Student's grades in academic classes during high school have been uneven and generally poor. His cumulative grade point average was 2.273 at the end of the tenth grade, and 1.333 at the end of the eleventh grade. He flunked Biology in the tenth grade and English in the eleventh grade, and still needs to pass those classes in order to graduate. He will graduate in June if he passes all the classes he is taking this school year. He has passed the language arts portion of the CAHSEE but failed the math portion by a few points. He is now enrolled in a remedial CAHSEE course for math.

38.    The order for relief therefore provides for individual tutoring in the subjects in which Student is most at risk of failing. Since he has already failed Biology and English, and failed the math portion of the CAHSEE, tutoring by a credential teacher[14] in these areas is required up to a maximum of 90 minutes every school day. The mix of subjects within those 90 minutes is left to Student to decide.

39.    The order also anticipates that Student may have academic difficulty in other subjects he is taking this semester. Since he has to pass all his classes to graduate, the order also provides for tutoring by a qualified tutor[15] up to a maximum of 60 minutes a day in any subject in which his cumulative grade during the semester falls below a C. This tutoring is intended to be part of, not in addition to, the maximum of 90 minutes a school day of tutoring.

40.    All tutoring should take place after normal school hours so that it does not interfere with Student's class schedule. The use of the tutoring that is ordered is optional. It is up to Student to decide every week the subjects in which he most needs tutoring, and to notify the District of the number of hours of tutoring he wants in each of those subjects. It is then left to the District to organize the schedule of that tutoring by coordinating the schedules of available tutors. Thus, for example, it is up to Student to decide that he wants 30 minutes a day of tutoring in math the following week, but it is up to the District to determine when, in the following week, that math tutoring will occur. The tutoring schedule is so structured in order to minimize disputes between the parties.

41.    It is the practice at Downey to allow a student to make up failed classes during Extended Summer School, which occurs not in summer but during the regular semester. If Student does not graduate in June, he may be required to make up one or more classes in

---

[14] Supervisor Herbst testified persuasively that while a resource teacher is capable of this sort of remedial teaching, it is more effective if done by a teacher credentialed in the subject area.

[15] The order is not intended to preclude use of personnel from a certified nonpublic agency.

Extended Summer School during the SY 2008-2009. The compensatory tutoring ordered is therefore to be made available until the end of the next school year, in case Student does not graduate in June. Any tutoring after the end of the regular SY 2007-2008 shall be only in the subjects of the classes Student needs to make up. The District's obligations under this order cease when Student graduates with a diploma.


## ORDER

1.    The District shall promptly cease implementing the December 17, 2007 IEP or any other IEP to which Mother has not consented, and shall promptly resume the implementation of the last agreed-upon IEP (the 2003 IEP).

2.    Effective as of the date of this Order, as compensatory education, the District shall promptly make available to Student individual tutoring after regular school hours as follows:

        a.    The District shall make tutoring by credentialed teachers available to Student in the subjects of biology, English, and math up to a maximum of 90 minutes every school day.

        b.    In any subject in which Student's cumulative scores on tests and assignments falls below a C during the remainder of the spring semester, the District shall make tutoring by qualified tutors available to him up to a maximum of 60 minutes every school day for all subjects.

        c.    The total tutoring made available under this Order shall not exceed 90 minutes on any school day.

        d.    The District shall create weekly grade checks for all Student's courses and send them to Mother at the end of each school week.

        e.    By Thursday noon of each school week, Student shall notify the District in writing of the subjects in which he desires to be tutored during the following school week, the approximate amount of time that he desires that tutoring to take, and whether Student desires that tutoring to take place on campus or at his home.

        f.    By Friday noon of each school week, the District shall notify Student in writing of the details of his schedule for tutoring in the following school week. The District shall decide the days and hours in which the subjects are taught in order to be consistent with the schedules of Students' tutors, and shall make the tutoring available on campus or at Student's home, at Student's option.

3.    The terms of this order may be altered only by written agreement of the parties.

32

4.    This order shall be effective until the end of SY 2008-2009 or until Student graduates with a diploma, whichever occurs first.

## PREVAILING PARTY

Education Code section 56507, subdivision (d) requires this decision to indicate the extent to which each party prevailed on each issue heard and decided. Student prevailed on issues 1, 2, 3, and 4. The District prevailed on issue 5.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this decision to a court of competent jurisdiction. If an appeal is made, it must be made within 90 days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated: February 27, 2008

CHARLES MARSON
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

33